**LEVI & KORSINSKY, LLP**
Adam M. Apton (316506)
Adam C. McCall (302130)
388 Market Street, Suite 1300
San Francisco, CA 94111
Tel.: (415) 373-1671
Fax: (415) 484-1294
Email: aapton@zlk.com
        amccall@zlk.com

*Attorneys for Lead Plaintiff and*
*Lead Counsel for the Class*

[Additional counsel on signature block]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE eHEALTH INC. SECURITIES LITIGATION | Master File No. 4:20-cv-02395-JST<br><br>CLASS ACTION<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

Lead Plaintiff Billy White ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, alleges the following upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by eHealth, Inc. ("eHealth") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of eHealth's public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning eHealth; (d) information readily obtainable on the Internet; and (e) interviews with former eHealth employees.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

## SUMMARY OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities who purchased or otherwise acquired shares of eHealth common stock on the public market between March 19, 2018 and July 23, 2020, inclusive (the "Class Period"), seeking to recover damages for violations of the federal securities laws under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder, against eHealth and certain of its top officials.

2. eHealth is a health insurance broker that focuses on selling Medicare-related policies on behalf of private insurers. Its main source of revenue is commissions from selling Medicare Advantage, Medicare Supplement, and Medicare Part D prescription drug policies. On January 1, 2018, eHealth adopted and implemented a new accounting standard for recognizing revenue. This standard, referred to herein as Accounting Standard Codification 606 or ASC 606, allowed eHealth to recognize immediately the entirety of the commissions it expected to receive over the expected life of the policies. Although eHealth sold annual policies that could be cancelled at any time by the consumer, it assumed that its policies would be renewed for several years. Consequently, for many of eHealth's Medicare-related policies, it recognized between three and five years of commissions immediately upon the sale of the policy.

3. The assumption that eHealth's customers would renew its policies was, however, unrealistic and contrary to eHealth's recent experience of both cancellations and renewals. Beginning in 2017, eHealth started soliciting Medicare customers with television advertising. Late-night commercials boasting $0 monthly plan premiums effectively generated a surge in customers in a short period of time. Between 2017 and 2018, the number of Medicare-related insurance applications submitted to eHealth by applicants grew by 39%. These customers, however, were notorious for cancelling their policies in short periods of time, causing eHealth to experience sky-rocketing "member churn" ratios, *i.e.*, the percentage of customers who cancel their policies within the first year. Notwithstanding, eHealth was able to provide analysts and investors with record-setting earnings due to the fact that it was able to recognize three- to five-years of commission revenue for these policies upfront and immediately.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

4.     eHealth and its senior officers successfully concealed material information about the worsening "member churn" from investors while at the same time reporting exceptionally strong earnings results. For example, in its annual report on Form 10-K for fiscal 2019, eHealth reported revenue and operating profit of $506,201,000 and $81,409,000, respectively. These earnings results represented net income growth of more than 250% compared to 2017. These statements were false and/or materially misleading, however, due to the fact that eHealth was overstating its commission revenue. eHealth premised its revenue recognition on, among other things, the assumption that its customers would renew their policies for durations of between three- and five-years. Substantial portions of their enrollees were cancelling the policies within the first year. When accounting for these cancellations, eHealth's revenue and operating profit for fiscal 2019 was $378,201,000 and negative $181,591,000.

5.     eHealth's false and materially misleading financial earnings results prompted a meteoric rise in the price of eHealth's stock during the Class Period, jumping from $16.49 per share at the start of fiscal 2018 to an intra-Class Period high of $146.09 per share on March 4, 2020. Defendants capitalized on the artificially inflated stock price, selling over $40 million of stock while in possession of material adverse information and receiving more than $15 million in equity compensation.

6.     Class members were materially harmed from eHealth's false and misleading statements. As a direct result of Defendants' materially false and misleading statements, eHealth's stock price artificially increased from a relative steady price of around $15.32 per share of common stock on March 19, 2018 to $136.32 prior to April 8, 2020. It was on that day that Muddy Waters Capital, a well-known and highly respected research firm, published a report revealing eHealth's accounting misconduct. The report disclosed, among other things, that eHealth's "highly aggressive accounting masks [] a significantly unprofitable business," "that the key driver of growth since 2018 has been EHTH's reliance on Direct Response television advertising, which attracts an unprofitable, high churn enrollee," "that EHTH's persistence assumptions in its LTV model [under ASC 606] seem highly aggressive when compared to reality." Muddy Waters report also disclosed that eHealth's financial statements for 2019: (a) overstated revenue by $128 million; (b) overstated operating profit by $263 million; and (c) understated an operating loss of -$181 million. The Muddy Waters report resulted in

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

a sharp decline in the price of eHealth's stock, plummeting to $103.20 per share.

7.     Subsequently, on July 23, 2020, when eHealth announced its earnings results for the second quarter of fiscal 2020, its stock price fell again as the information contained in its announcement confirmed substantive aspects of the "member churn" allegations previously asserted in the Muddy Waters report. In response, eHealth's stock price declined from a closing price of $114 per share on July 23, 2020 to $79.17 per share on July 24, 2020.

8.     Plaintiff brings this action to recover these losses for the class members.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and § 27 of the Exchange Act (15 U.S.C. § 78aa).

10.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as eHealth has its principal executive offices located in this District and a significant portion of its business, actions, and the subsequent damages, took place within this District.

11.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchanges.

## THE PARTIES

12.    Plaintiff purchased eHealth common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of Defendants' misrepresentations.

13.    Defendant eHealth is a Delaware corporation with principal executive offices located at 2625 Augustine Drive, Second Floor, Santa Clara, California 95054.  eHealth is traded on the New York Stock Exchange under the ticker symbol "EHTH".

14.    Defendant Scott N. Flanders ("Flanders") is the Chief Executive Officer of eHealth and has served in that capacity since May 2016. Flanders has also been a director of eHealth since February 2008. Flanders reviewed and certified eHealth's financial statements during the Class Period and made statements in press releases and earnings conference calls identified below.

15.    Defendant Derek N. Yung ("Yung") is the Chief Financial Officer of eHealth, and has

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

served in that capacity since June 2018. Yung reviewed and certified eHealth's financial statements issued during the Class Period and made statements in press releases and earnings conference calls identified below.

16.    Defendant David K. Francis ("Francis") is the current Chief Operating Officer and former Chief Financial Officer of eHealth. Francis reviewed and certified eHealth's financial statements issued during the Class Period and made statements in press releases and earnings conference calls identified below.

17.    Defendants Flanders, Yung, and Francis are named as Defendants for violations of all counts asserted herein, and are referred to as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers, and the investing public, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material, non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading. The Individual Defendants are therefore liable for the misstatements and omissions plead herein.

18.    "Section 10(b) Defendants" refers to Defendants eHealth, Flanders, Yung, and Francis.

19.    "Section 20(a) Defendants" refers to Defendants Flanders, Yung, and Francis.

## BACKGROUND ALLEGATIONS

### A.    eHealth Is an Insurance Broker for Medicare-Related Insurance Policies.

20.    eHealth operates as an insurance broker for large insurance companies. The majority of its revenue comes from commissions received in exchange for Medicare insurance plans, primarily Medicare Advantage, Medicare Supplement, and Medicare Part D policies. This segment of eHealth's business—referred to as the Medicare segment—generated approximately 70% of its revenue in 2017, 75% in 2018, and 80% in 2019. During these years, approximately 55% of eHealth's commission

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

revenue came from just three companies: Humana; Aetna; and UnitedHealthcare.

21.     Immediately before the Class Period, eHealth concluded a significant change in management. Between May 2016 and January 2018, eHealth replaced its Chief Executive Officer, Chief Financial Officer, Chief Operations Officer, Chief Marketing Officer, and Chief Data Officer in addition to hiring a number of other senior executives for roles in sales, operations, and business development. In its annual report on Form 10-K for fiscal 2017, eHealth described these "change[s] in leadership" as "significant" and "occur[ing] over a short period of time."

22.     In 2018, under its new leadership, eHealth shifted its focus and resources to the Medicare segment and generating commission revenues. eHealth attributed this shift to flagging revenue from individual and family health insurance plans. Whereas individual and family health insurance plans comprised 66% of eHealth's revenue in fiscal 2015, the same segment accounted for only 24% of revenue in 2017.

23.     Consequently, to effect this shift in focus and resources, on January 22, 2018 eHealth acquired GoMedigap, a platform that provides Medicare Supplement enrollment services to individual customers.

24.     eHealth used cash and stock to purchase GoMedigap. Pursuant to the purchase agreement, eHealth paid $15 million in cash upfront along with 294,637 shares of common stock (valued at $5.59 million). Significantly, the purchase agreement also required eHealth to pay "earnout payments" consisting of up to $20 million in cash and 589,275 shares of common stock (subject to meeting certain milestones in 2018 and 2019). In February 2019 and January 2020, eHealth issued 294,608 shares of common stock (589,216 shares in total valued at $45.8 million) along with cash payments of $9.5 million and $8.8 million ($18.3 million in total), respectively, to fund and pay the "earnout payments." In total, eHealth paid $85 million for GoMedigap, 60% of which was paid in stock.

25.     eHealth also reconfigured its marketing strategy in 2018 to rely heavily on "direct-to-consumer" television advertising. Between 2017 and 2018, eHealth's marketing and advertising expenses increased by more than $17 million, or 26%. The increase was primarily due to eHealth's investment in Medicare-related marketing initiatives, including television.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

26.    eHealth's new marketing initiatives generated an immediate result. Between 2017 and 2018, the number of Medicare-related insurance applications submitted to eHealth by applicants grew by 39% from 190,195 to 264,903. Year over year, out of all of eHealth's Medicare-related applications, the percentage generated from direct channels, namely direct-response television, increased from 32% to 71% in the fourth quarter. In total, of the 264,903 applications submitted, 239,688 were approved.

**B.    eHealth Recognizes Commission Revenue from Insurance Carriers.**

27.    eHealth generates revenue from commissions paid by health insurance carriers whenever it assists in the sale of a Medicare-related insurance plan.

28.    Historically, eHealth recognized commission revenue on an annual basis once the annual or first monthly commission amount for the plan year was reported to eHealth by the carrier (net of an estimate for future forfeiture amounts due to plan cancellations). For commissions paid on a monthly basis, eHealth recorded a receivable for the commission amounts to be received over the remainder of the year (net of an estimate for future forfeitures).

29.    This changed in 2018 with eHealth's adoption of ASU 2014-09, *Revenue from Contracts with Customers (Topic 606)* ("ASC 606"). Initially issued in May 2014, ASC 606 directs entities to recognize revenue that it reasonably expects to receive during the life of the contract. Consequently, whereas eHealth previously recognized revenue equal to only the commission received (or to be received) for the year in which the applicant was approved, when eHealth adopted ASC 606 in 2018 it began recognizing multiple years of commission revenue upfront and immediately upon applicant approval based upon its internal estimates for the life of the policy (*i.e.*, the number of years for which the policy would be renewed and thus commission would be owed).

**C.    eHealth Uses ASC 606 to Record Massive Revenue and Earnings Gains.**

30.    When eHealth implemented ASC 606, it used the accounting standard to record a massive increase in historical earnings by adjusting past years of revenue and income. For example, for fiscal 2016, eHealth used ASC 606 to successfully eliminate its net loss for the year of $4.88 million and changed it to a gain of $304 thousand. Earnings per share also changed from an initial loss of $0.27 per share to a gain of $0.02 per share.

31.    The following table provides the adjustments eHealth made to its income statement for

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

the year ended December 31, 2016:

| 2016 Income Statement Impact | | | | | | |
|---|---|---|---|---|---|---|
| | **Year Ended December 31, 2016 ASC 606 Adoption** | | | | | |
| **Statement of Operations** | | **As Reported** | | **Adjustment** | | **As Adjusted** |
| Revenue: | | | | | | |
| Commission | $ | 170,850 | $ | 6,384 | $ | 177,234 |
| Other | | 16,110 | | (20) | | 16,090 |
| Total revenue | | 186,960 | | 6,364 | | 193,324 |
| Operating costs and expenses: | | | | | | |
| Cost of revenue | | 3,176 | | (2,314) | | 862 |
| Marketing and advertising | | 72,213 | | - | | 72,213 |
| Customer care and enrollment | | 48,718 | | - | | 48,718 |
| Technology and content | | 32,749 | | - | | 32,749 |
| General and administrative | | 35,216 | | - | | 35,216 |
| Restructuring charges (benefit) | | (297) | | - | | (297) |
| Amortization of intangible assets | | 1,040 | | - | | 1,040 |
| Total operating costs and expenses | | 192,815 | | (2,314) | | 190,501 |
| Income (loss) from operations | | (5,855) | | 8,678 | | 2,823 |
| Other income, net | | 102 | | 1,047 | | 1,149 |
| Income (loss) before income taxes | | (5,753) | | 9,725 | | 3,972 |
| Provision (benefit) for income taxes | | (871) | | 4,539 | | 3,668 |
| Net income (loss) | $ | (4,882) | $ | 5,186 | $ | 304 |
| Net income (loss) per basic share | $ | (0.27) | $ | 0.29 | $ | 0.02 |
| Net income (loss) per diluted share | $ | (0.27) | $ | 0.29 | $ | 0.02 |

32.     eHealth's adjustments for fiscal 2017 were more significant. In pertinent part, eHealth increased its commission revenue by $18.4 million, or 11.6%. It also decreased its cost of revenue by $1.69 million, which amounted to 74% of the revenue costs for the year. These changes resulted in a complete reversal of eHealth's $25.4 million net loss for the year to a $25.4 million gain. The following tables provides the adjustments eHealth made to its income statement for the year ended December 31, 2017:

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

| 2017 Income Statement Impact | | | | | | |
|---|---|---|---|---|---|---|
| | **Year Ended December 31, 2017** | | | | | |
| **Statement of Operations** | **As Reported** | | **ASC 606 Adoption Adjustment** | | **As Adjusted** | |
| Revenue: | | | | | | |
| Commission | $ | 158,424 | $ | 18,459 | $ | 176,883 |
| Other | | 13,931 | | (108) | | 13,823 |
| Total revenue | | 172,355 | | 18,351 | | 190,706 |
| Operating costs and expenses: | | | | | | |
| Cost of revenue | | 2,273 | | (1,691) | | 582 |
| Marketing and advertising | | 65,874 | | - | | 65,874 |
| Customer care and enrollment | | 59,183 | | - | | 59,183 |
| Technology and content | | 32,889 | | - | | 32,889 |
| General and administrative | | 39,969 | | - | | 39,969 |
| Acquisition costs | | 621 | | - | | 621 |
| Amortization of intangible assets | | 1,040 | | - | | 1,040 |
| Total operating costs and expenses | | 201,849 | | (1,691) | | 200,158 |
| Income (loss) from operations | | (29,494) | | 20,042 | | (9,452) |
| Other income, net | | 327 | | 855 | | 1,182 |
| Income (loss) before income taxes | | (29,167) | | 20,897 | | (8,270) |
| Benefit from income taxes | | (3,755) | | (29,941) | | (33,696) |
| Net income (loss) | $ | (25,412) | $ | 50,838 | $ | 25,426 |
| | | | | | | |
| Net income (loss) per basic share | $ | (1.37) | $ | 2.74 | $ | 1.37 |
| Net income (loss) per diluted share | $ | (1.37) | $ | 2.70 | $ | 1.33 |

33. ASC 606 also impacted eHealth's earnings for fiscal 2018 and 2019. Using ASC 606, eHealth was able to report commission revenue gains of 28% and 100% from 2017 to 2018 and 2018 to 2019, respectively. In the span of just these two years, eHealth grew its net income by more than 250%. The following table reflects eHealth's earnings for 2018 and 2019 compared to 2017:

| | **Year Ended December 31,** | | | | | |
|---|---|---|---|---|---|---|
| | **2019** | | **2018** | | **2017** | |
| Revenue | | | | | | |
| Commission | $ | 466,676 | $ | 227,211 | $ | 176,883 |
| Other | | 39,525 | | 24,184 | | 13,823 |
| **Total revenue** | | 506,201 | | 251,395 | | 190,706 |

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

| Operating costs and expenses | | | | | | |
|---|---|---|---|---|---|---|
| Cost of revenue | | 2,738 | | 1,228 | | 582 |
| Marketing and advertising | | 150,249 | | 82,939 | | 65,874 |
| Customer care and enrollment | | 134,304 | | 70,547 | | 59,183 |
| Technology and content | | 47,085 | | 31,970 | | 32,889 |
| General and administrative | | 64,150 | | 45,828 | | 39,969 |
| Change in fair value of earnout liability | | 24,079 | | 12,300 | | - |
| Amortization of intangible assets | | 2,187 | | 2,091 | | 1,040 |
| Restructuring charges | | - | | 1,865 | | - |
| Acquisition costs | | - | | 76 | | 621 |
| Total operating costs and expenses | | 424,792 | | 248,844 | | 200,158 |
| Income (loss) from operations | | 81,409 | | 2,551 | | (9,452) |
| Other income, net | | 2,090 | | 755 | | 1,182 |
| **Income (loss) before provision (benefit) for income taxes** | | 83,499 | | 3,306 | | (8,270) |
| Provision (benefit) for income taxes | | 16,612 | | 3,065 | | (33,696) |
| **Net income** | $ | 66,887 | $ | 241 | $ | 25,426 |
| **Net income per share:** | | | | | | |
| Basic | $ | 2.90 | $ | 0.01 | $ | 1.37 |
| Diluted | $ | 2.73 | $ | 0.01 | $ | 1.33 |
| **Weighted-average number of shares used in per share amounts:** | | | | | | |
| Basic | | 23,075 | | 19,294 | | 18,512 |
| Diluted | | 24,539 | | 20,409 | | 19,047 |
| **Comprehensive income:** | | | | | | |
| Net income | $ | 66,887 | $ | 241 | $ | 25,426 |
| Foreign currency translation adjustment, net of taxes | | (11) | | (75) | | 29 |
| **Comprehensive income** | $ | 66,876 | $ | 166 | $ | 25,455 |

34.   The adoption of ASC 606 at eHealth was widely regarded internally as a positive development because it allowed the company to report significantly better earnings results. CW1, a former employee of eHealth who worked at the company from February 2018 through June 2019 as Vice President & General Manager, Value-Based Provider, recalled meeting with Francis at eHealth's Santa Clara headquarters in February 2018. Francis and other top executives were "happy" about the new standard and how it would increase eHealth's revenue from the previous, same book of business.

35.   Other former employees, including CW2 who reported directly to Francis (discussed below), also recalled that senior management was "excited" for ASC 606's implementation. CW2 overheard senior managers frequently discuss the change. "It was, rather than just counting revenue

coming in that quarter, they'd be able to count revenue based on the life of the business. There was talk for months prior" to the new rule "that it's coming. Everyone was all excited." CW2 overheard these conversations about the accounting rule while attending regular meetings with Francis, Flanders, and Yung.

36.     Another former employee, CW3, who worked as a business systems analyst, recalled Flanders discussing the new accounting standard during quarterly "town hall" meetings in 2017 and 2018 and explaining the valuable role that the new revenue recognition standard would play in eHealth's overall financial health. According to CW3, the new standard was greeted enthusiastically by senior management, because it allowed them to book revenue for commissions far into the future that it did not in fact receive due to customer churn. CW3 recalled Flanders saying during the town halls that the new rule would be "good for business."

### D.     eHealth Used Inflated LTVs to Overstate Its Revenue.

37.     As stated previously, ASC 606 directed entities to recognize revenue that it reasonably expected to receive during the life of a contract. eHealth implemented this new rule by recognizing commission revenue when the insurance carrier approved the policy. The amount of revenue recognized was equal to the commissions it expected to receive across the entire life of the policy. Thus, for all policies it sold, eHealth recognized an upfront, outsized amount of revenue equal to the current commission rates multiplied by the number of years the policy would exist or, as eHealth referred to it, the "average plan duration." This, in turn, resulted in the policy's "constrained lifetime value" or "LTV."

38.     The LTV for a policy is based on several factors, including the conversion rates of approved members into paying members, forecasted member churn (*i.e.*, the rate at which customers cancel new policies or fail to renew them), and forecasted commission amounts per approved member. eHealth purportedly used its historical sales information to calculate LTVs and updated its calculations on a quarterly basis. Accordingly, if negative changes occurred across these factors, such as increased member churn for example, eHealth would be required to decrease its revenue going forward. The inputs to LTV are "not particularly judgmental" because they are based on historical data, as eHealth has previously stated to the SEC in correspondence dated September 23, 2019.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

39.   eHealth used inflated LTVs when recognizing commission revenue under ASC 606. In particular, eHealth falsified and inflated the plan durations for its various policies by disregarding evidence of increased member churn. This member churn was the result of eHealth's direct response television advertising campaign, which attracted low-quality customers in terms of member retention. Consequently, while eHealth incorporated plan durations of approximately 3 years for Medicare Advantage plans and approximately 5 years for Medicare Part D prescription drug plans and Medicare Supplement plans, the plan durations for these policies were materially lower due to the fact that upwards of 45% of the customers were likely to cancel their policies within the first year.

40.   CW2, a former eHealth employee whose tenure at eHealth Technical Management department spanned over 18 years from 2000 until March 2018, corroborated that eHealth was aware of customer churn and its deleterious impact on lifetime revenues. CW2's title was Vice President, Program and Technical Management, which required him to manage three teams: in program management (focused on IT infrastructure, back-office operations, front-office operations, finance, security and compliance), in content management (most team members were based in China) and in technical account management (focused on eHealth's integration with health insurance carriers). CW2 worked out of Mountain View, California, and reported to Francis. According to CW2, Francis and other senior executives had discussions about how they were losing money on the Medicare business due to member churn, which was causing new enrolled customers to quickly drop their plans. CW2 confirmed that member churn was "primary in all the discussions" and that they frequently discussed "strategies to retain the business." In response to the issue, eHealth formed a team "focused on developing strategies to retain" customers located at the Gold River, California, call center. According to CW2, Francis and other senior executives "would meet on a daily basis" to discuss "how many people came on board – signed up for Medicare Advantage plans."

41.   CW2 further recalled that in his discussions about churn with Francis, Francis focused on the fact that eHealth "needed to retain membership for 'x' number of years—about two years—in order to turn a profit on enrolled customers." CW2 had frequent, in-person discussions with Francis about churn during his employment. According to CW2 , the Medicare business was eHealth's "bread and butter." New Medicare members had to stay on the books a certain amount of time to be profitable.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

However, according to CW2, given eHealth's churn rates, there was no business rationale for booking larger revenues for contracts that were likely to last only a short time.

42.     Similarly, a former Medicare Sales Representative, who worked at eHealth from July 2018 to April 2019 ("CW4"), confirmed that by late 2018 eHealth senior executives became worried about customer churn, a metric that enabled eHealth to inflate revenue booked under the new ASC 606 standard. CW4 reported to Morgan Bradshaw, Sales Manager, at eHealth's Salt Lake City, Utah, call center who, in turn, reported to Mark Taub, Senior Director of Medicare Sales & Operations, and Michael Wilson, Director of Medicare Sales. CW4 primarily answered in-bound telephone calls to eHealth from potential Medicare-related customers solicited through television commercials, including those featuring Joe Namath and other famous individuals. CW4 used a script to enroll Medicare customers and had an enrollment rate of between 30% and 40%.

43.     CW4 explained that in December 2018 his supervisors grew concerned about "increased turnover." CW4 observed other sales representatives who had churn rates as high as 35% to 40%. CW4 discussed the problem with Taub, Wilson, and senior executives in California. According to CW4, to address the churn issue, eHealth introduced a bonus structure for all Medicare Advantage sales representatives whose customers stayed enrolled for 90 days. Prior to the change, eHealth awarded its sales representatives commissions tiered to how many customers they signed up. For customers who bought a Medicare Advantage plan, but dropped off "half way in the other month, you would still get credit," meaning the full commission. With the change, "they talked about increasing the comp plan to include retention (of the customer). They started incentivizing people to get them (customers) to stay on." Under the new plan, a sales representative could receive, in addition to his commission, a bonus of $10-$20 per contract if a customer stayed enrolled 90 days in an eHealth-sold plan.

44.     A former eHealth Business Development Director ("CW5") also corroborated that senior management was aware of "quite a bit" of churn in 2018. According to CW5, eHealth had problems retaining customers who enrolled through its marketplace. CW5 knew member churn was an issue; new members would drop during the initial portion from enrollment to first premium. CW5 explained that "quite a bit of people" signed up but "never made their first premium payment."

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

45.   Additionally, a former Stock Plan Administrator at eHealth ("CW6") mentioned that sometime in 2019 a salesperson confided to him "oh, yeah, we're looking good now, but the problem is retention." According to CW6, this salesperson also mentioned to him sometime in early 2019 that "we're getting a lot of new clients, new customers… the problem is we can't retain them." CW6 further recalled cubicle and water cooler chats among colleagues, who said that "the company is doing great on selling, but the issue they were working on is retention. We gotta figure out something to do about retention."

46.   eHealth concealed the increased member churn from investors and, in turn, was able to calculate inflated LTVs and overstate its revenue and earnings. This false impression of eHealth's operational and financial strength prompted a meteoric rise in the price of its stock, as investors were led to believe that eHealth had stronger earnings potential than it truly did. From $16.49 per share at the start of fiscal 2018, eHealth's stock price rose to an intra-Class Period high of $146.09 per share on March 4, 2020.

47.   While eHealth's stock price was inflated at record-breaking levels, Flanders, Yung, Francis and other eHealth insiders reaped millions of dollars in stock sale profits. These insiders also secured lucrative incentive payments and bonuses in the form of equity grants, simply because eHealth's stock price had reached various prespecified price targets. *See* Additional Scienter Allegations, Sections B & C, *infra*.

### E.   Muddy Waters Exposes Elevated Member Churn and Predicts Decline in LTVs.

48.   On April 7, 2020, Muddy Waters published its report asserting that eHealth, upon the adoption of ASC 606, was "booking multiple years of revenue at one time" consistent with a "highly aggressive accounting" that is "mask[ing] a significantly unprofitable business"; that "[i]n addition to using aggressive modeling assumptions, [eHealth was] misleadingly downplay[ing] the need for ongoing service and retention" of existing customers; that eHealth's was "manipulat[ing] its presentation of churn to be misleadingly low"; that eHealth "[was] pursuing low quality, lossmaking growth while its LTVs are based on lower churn, pre-growth cohorts"; that to "generate [the] unprofitable growth [of its Medicare Advantage segment], [eHealth] has been incinerating cash"; and that, based on estimations of variable and fixed costs, eHealth will lose approximately -$402 from

each Medicare Advantage member it enrolled in 2019, "yielding an operating loss of -$181 million."

49.   According to the Muddy Waters report, eHealth's management was "running a massive stock promotion" by capitalizing the adoption of the new revenue recognition standard ASC 606.  The report asserted that eHealth's senior executives "knew of the impending standard" and that it "would have a perverse impact on how [eHealth] reports and operates." The stock "promotion took off in 2018, [] when … the company began pursuing higher churn and unprofitable enrollees in order to exploit ASC 606."

50.   The report explained that eHealth "underwent a selling explosion" that raised "2017's miniscule growth in [Medicare Advantage] Accepted Applications of only 1.2%" to "growth rates of 25.8% and 88.3%" in 2018 and 2019, respectively. According to the report, the exponential growth was due in large part to television advertising, which "helped lower the acquisition cost per enrollee" but at the same time "draws in less sticky members, who [were] on the whole quite unprofitable."

51.   This, in turn, led to an increase in "churn rate … from 36.9% in 2017 to 45.6% 2018 and then 47.0% in 2019." Regarding member churn, the report noted that eHealth had recently changed its LTV model to "heavily weight[] the prior three years in determining the life assumption, ensuring that 2017 remains relevant for another year." Consequently, eHealth's estimations incorporated "an overly optimistic [Medicare Advantage] member persistence assumption, which has a material impact on profitability (or lack thereof) of an enrollee." While eHealth was booking three years of future sales, "it should expect to lose 47% of its members over the first year post-sale." The following chart provides eHealth's churn ratios for 2017, 2018, and 2019:

| eHealth Medicare Advantage Churn | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FY16 | 1Q17 | 2Q17 | 3Q17 | 4Q17 | FY17 | 1Q18 | 2Q18 | 3Q18 | 4Q18 | FY18 | 1Q19 | 2Q19 | 3Q19 | 4Q19 | FY19 |
| Beginning | 144,207 | 191,904 | 174,561 | 185,819 | 195,970 | 191,904 | 236,857 | 218,685 | 226,048 | 235,269 | 236,857 | 276,357 | 280,763 | 291,171 | 309,180 | 276,357 |
| Approved Applications | 116,681 | 21,465 | 21,893 | 19,572 | 55,125 | 118,055 | 24,620 | 20,818 | 19,664 | 83,376 | 148,478 | 40,741 | 36,576 | 35,171 | 167,073 | 279,561 |
| Implied Churn | (68,984) | (38,808) | (10,635) | (9,421) | (14,238) | (73,102) | (42,792) | (13,455) | (10,443) | (42,288) | (108,978) | (36,335) | (26,168) | (17,162) | (71,559) | (151,224) |
| Ending | 191,904 | 174,561 | 185,819 | 195,970 | 236,857 | 236,857 | 218,685 | 226,048 | 235,269 | 276,357 | 276,357 | 280,763 | 291,171 | 309,180 | 404,694 | 404,694 |
| Churn % (TTM) | 44.1% | 43.1% | 43.5% | 36.4% | 36.9% | 36.9% | 36.8% | 36.4% | 35.3% | 45.6% | 45.6% | 40.3% | 42.5% | 42.1% | 47.0% | 47.0% |

52.   Muddy Waters explained that "the backbone of [eHealth's] growth in [Medicare Advantage] Accepted Applications in 2018 and 2019 was a high-churn demographic that responds to DR advertising. Our research made clear that two demographics have particularly high churn in the

Case 4:20-cv-02395-JST

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

MA space: Low income enrollees and younger than 65 members who qualify for Medicare because of disability. Low income enrollees tend to churn because once they use the $0 premium plans, they find them lacking, and are quick to respond to someone else's ad during the next Annual Enrollment Period ("AEP"). The under-65 members generally are able to switch plans every 90 days, rather than only during the AEP. As a result, they are high churn, particularly because carriers are generally not trying hard to retain them because their high utilization of healthcare often makes them unprofitable."

53.    Muddy Waters supported its research by conducting interviews with former eHealth executives. One executive explained why television advertising attracted particularly undesirable customers in terms of retention. In pertinent part, the executive said:

> It's sort of the dredges of advertising. [eHealth] buy very cheap inventory on cable TV… that tend to just attract an older demographic and demographic that tends to be watching like 10 hours of TV a day, makes less than $25,000 a year. That's where they get their enormous [sic], through that channel. That is the most effective scale of channel for all of Medicare Advantage because all these people are poor and to get a zero-dollar premium plan that covers everything is a really good deal and they should be on it. And, so that's where they fish, so when you do that, they way that they do, every year around annual enrollment time, there are same people wanting those TV commercials again and eHealth really has no brand loyalty. People don't remember, know they are eHealth customers, they end up becoming [another] customer. eHealth is just some commercial on TV that they see a phone number and it says, "Hey, call in for your free dental and vision." So, they call. So, those people tend to be switchers, right? Next year they are going to see the same commercial and they're going to dial again and they're going to start off the thing, "Where is my fee dental?" The way they did this year. They don't have loyalty…
>
> …Yeah, I would say the way to answer that question [about whether customer lives are trending down], you are what you eat and that meaning whatever their marketing channels are there will give you an indication of the LTV. If 60, 70% of customers are still coming through DR TV than, yeah, you can look at that three years. That's probably accurate. That's what it was a few years ago… I think if anything, it might be getting worse when I left there was four, five hundred agents. I think two years later they had like fifteen and sixteen hundred agents and they have to feed a lot more people. And, the only way to feed them is through more TV. So, if anything I'd say maybe they're certainly not improving [the persistence] in my book. They might be hurting it even more because of the need to keep those call center agents busy."

54.    Another executive also confirmed that television advertising attracted less desirable customers. In pertinent part, the executive explained that: "And then whenever you had DR TV and things like that you could drive that mix up like fifty percent of under sixty-five which is not good,

desirable mix that the carriers wanted. They usually wanted something under thirty percent or something like that… We started TV probably the last couple of years I was there."

55. According to the report, eHealth is "significantly overstat[ing] the remaining customer life on its books in order to arrive at its $589 million commissions receivable balance." The report's authors believe that eHealth is "taking advantage of its reliance on two statistical models, one for new members and one for aged members." The report estimates that "[b]ased on the 47% implied churn in 2019 MA members, the implied [remaining] life is 2.1 years," however, eHealth's LTV calculations are assuming that MA "customers' total lives are well above 3.35 years." But using a conservative "2.34-year remaining life, [an] average of the 2017 through 2019 MA cohorts' [remaining] lives," the report has found that eHealth's 2019 MA LTV is actually 28.1% or $285 less from the $728 calculated by eHealth.

56. The Muddy Waters report stressed that "2018 and 2019 MA enrollee profiles [cohorts] [were] not comparable to that of 2017." According to the report, eHealth's "growth in MA Accepted Applications in 2018 and 2019 was a high-churn demographic" that responded to TV advertising which was mainly composed of "[l]ow income enrollees and younger than 65 members who qualify for Medicare because of disability." Given this demographic's "high utilization of healthcare," the report's authors believe that carriers are not trying hard to retain them as they are unprofitable.

57. Additionally, according to the report, eHealth "pretends that ongoing service needs, which carry real costs, do not exist." In application of ASC 606, eHealth is "book[ing] multiple years of commission revenue by claiming that no further performance on its part is necessary in order to collect these commissions." By doing so, eHealth "ignores the reality that EHTH needs to provide ongoing service to members and conduct outreach to them in order to retain them."

58. In this regard, the report explains that eHealth has two sets of costs: upfront and ongoing. Ongoing costs are the commissions paid to partners, and a percentage of Customer Care and Enrollment and Technology and Content expenses to retention of existing customers. And upfront costs are the Marketing and Advertising as well as Customer Care and Enrollment expenses not assigned to ongoing costs. According to the report, eHealth "minimizes the extent of ongoing costs [] pretending there is no need to service or act to retain existing customers," which is central to eHealth's

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

improper application of ASC 606.

59.   The report's calculations considering variable and annual fixed costs show that eHealth "will lose -$402 on every MA member" who submits an application. According to the report's authors, eHealth's "greatly increasing cash burn" shows "the value destruction that is occurring through EHTH's pursuit of [MA member] growth at all costs." Based on these considerations, the Muddy Waters report concluded that eHealth's "MA business is significantly loss-generating."

60.   Notably, the Muddy Waters report also disclosed significant insider trading transactions by the individual defendants and other nonparties between 2019 and 2020. According to the report, "insiders have sold $34.9 million of shares since the beginning of 2019" particularly Defendant Flanders, "who sold 15% of his stake in January 2020 alone."

61.   eHealth's stock price declined significantly in response to the revelations contained in the Muddy Waters report, including in particular that eHealth had materially overstated its commission revenue. From a closing price of $130.57 per share on April 6, 2020, eHealth's stock price fell to $116.90 per share the next day on April 7, 2020 before declining to $103.20 on April 8, 2020.

**F.     eHealth's Second Quarter Earnings Confirm Muddy Waters' Research.**

62.   eHealth's second quarter earnings results validated the conclusions asserted in the Muddy Waters report in terms of cash burning, inflated commission revenue and increased member churn, ongoing services and member retention, and inflated LTVs. Given the accounting model under ASC 606, eHealth's overly aggressive accounting was masking a loss-generating business.

63.   Significantly, the Muddy Waters report warned that eHealth was booking three years of revenue for a Medicare Advantage application even though it should expect to lose 47% of its members over the first year post-sale. This practice, as a result, was artificially inflating commission revenue. eHealth's second quarter results confirmed these warnings. In the second quarter, eHealth reported a higher churn rate in Medicare Advantage customers which spiked to 42% despite substantial investments in marketing/advertising and customer care and enrollment, together representing 68% of revenue.

64.   In addition, the Muddy Waters report also raised concerns about eHealth misleadingly downplaying the need for ongoing services and retention efforts and disagreed with eHealth's

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

recognizing more than one year of commissions in each period. The research found that eHealth had been aggressively applying ASC 606 to book multiple years of commission revenue by claiming that no further performance on its part was necessary to collect commissions. This ignored the reality that eHealth had to provide ongoing services to existing members and conduct outreach to them to retain them. The second quarter results, as well, confirmed these concerns. Flanders in the second quarter earnings call reported that "in the first half of this year, we saw increased levels of Medicare Advantage plan churn compared to our historic observations." Regarding the elevated churn seen in the second quarter, Flanders stressed that eHealth is "making a strategic decision to increase [its] focus on member retention and recapture[,]… to identify the key drivers of elevated churn[,] and to develop a comprehensive action plan to address it." Furthermore, in a recent interview with Jim Cramer on Mad Money, Flanders explained eHealth's strategy to improve member retention rates: "[I]t's absolutely critical that you retain your customers… When we saw churn tick up late in the second quarter, we jumped on it... [Our advisor] said 90% of the churn is due to our own actions or inactions. So we've already taken the steps … recommended… We really feel passionate about [growth] and maybe we needed to focus more on retention."

65. In the second quarter earnings call, Yung explained that the elevated churn levels in Medicare Advantage during the first half of the year "had a negative impact on our second quarter MA LTVs and our estimates for the full year 2020 LTVs." Further, Yung "project[ed] MA LTVs to decline up to 10% in the fourth quarter of 2020 and by mid-single digits for the full year, which has been reflected in our revised 2020 annual guidance." The second quarter results reported a decline of the constrained lifetime value of commissions per approved member from $983 a year ago to $945.

66. These collective actions, when revealed by the Muddy Waters report, and later confirmed by the second quarter results, caused a severe impact on eHealth's stock price resulting in economic damages to investors while Defendants profited from insider trading transactions and executive equity compensation during the Class Period.

67. These announcements largely confirmed the suspicions raised by Muddy Waters in its research report and further evidenced that eHealth's previous financial statements had been materially misleading. In response, eHealth's stock price declined from a closing price of $114 per share on July

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

23, 2020 to $79.17 per share on July 24, 2020.

## FALSE AND MATERIALLY MISLEADING STATEMENTS

68. Defendants' deception began upon eHealth's adoption of ASC 606. In order to gain financially, Defendants, unbeknownst to the public, made material misrepresentations and/or omissions to artificially inflate eHealth's stock. Defendants concealed eHealth's member churn and overstated its revenue and earnings.

### A.   March 19, 2018 – 2017 Annual Report

69. On March 19, 2018, eHealth filed its annual report on Form 10-K for the fiscal year ended December 31, 2018. The annual report provided investors with financial information about eHealth's operations and finances for the year 2017. Defendants Flanders and Francis signed the annual report.

70. In pertinent part, the annual report stated as follows:

> The adoption of the new standard will have a material impact to our opening balance sheet as of January 1, 2016 due to the cumulative effect of adopting the standard using the full retrospective method. In addition, our adoption of the new standard will have a material impact on our commission revenue and, as a result, on our consolidated balance sheets and consolidated statements of comprehensive income (loss) as of and for the years ended December 31, 2016 and 2017. ***Under the new standard,*** since ***our services associated with Medicare-related, individual and family and ancillary health insurance plans are complete once an application is approved by a carrier***, we will recognize Medicare-related, individual and family and ancillary health insurance plan commission revenue at the time the plan is approved by the carrier equal to the estimated commissions we expect to collect on the plan. The estimated commissions we expect to collect on a plan and that we will recognize as revenue upon approval of the application will vary based on product type and other factors, such as the estimated commission rates and the estimated life of the respective policies. These estimates will change with our actual experience after adoption.

Emphasis added.

71. eHealth's above statements identified in emphasis were false and/or materially misleading, as they concealed the fact that eHealth incurred costs in maintaining existing members. According to eHealth, elsewhere in the annual report it stated that "[h]istorically our revenue has been adversely impacted if our membership declines" or "[i]f we are not able to successfully retain existing members." In fact, eHealth's annual report stated further that "revenue depends in large part on the number of paying individual and family and Medicare-related health insurance members ***we are***

*successful in retaining* and on those we acquire during the enrollment periods" (emphasis added). Thus, contrary to the statements above, eHealth's services associated with Medicare-related, individual and family and ancillary health insurance plans are ***not*** complete once an application is approved by a carrier. eHealth instead must invest in operating expenses after an application has been approved in order to provide customer care service and retain existing members.

72. These additional costs were substantial and material, given the manner in which eHealth was obtaining customers. Beginning in 2017, eHealth was soliciting Medicare-related customers through direct response television advertising. These customers were prone to churn and more likely to cancel their policy within the first year. Without spending additional time and resources on these customers, they were unlikely to produce commission revenue and would negatively impact eHealth's LTV calculations.

73. eHealth made materially false statements when making these statements and left investors with the false impression that eHealth's costs in maintaining its relationship with existing members were nonexistent. By concealing the truth about eHealth's costs in retaining existing members and their potential impact to eHealth's cash flows and profitability, investors were deprived of the ability to properly and adequately assess the true risks associated with purchasing eHealth stock.

**B.   April 26, 2018 – Q1 2018 Earnings call**

74. On April 26, 2018, eHealth held its "Q1 2018 Earnings Call." During the first-quarter 2018 earnings call, eHealth provided investors with information about eHealth's operations and finances during the first quarter of 2018, and addressed questions posed by financial analysts. The earnings call transcripts contain statements from Flanders and Francis and a Q&A section.

75. In responding to questions from financial analysts, Flanders concealed the costs incurred by eHealth in providing customer care to existing members for the purpose of retaining their membership. This, in turn, provided investors with a false impression about eHealth's member churn and the impact it had on its commission revenues. In pertinent part, Flanders said:

> George Frederick Sutton, Craig-Hallum Capital Group LLC
> …
> So I wanted to walk through the commission receivables. So if I look at the combination
> of your short and your long-term receivables, even relative to your enterprise value, it's

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

basically equivalent. So effectively that represents receivables that you will be ultimately -- you will be receiving cash for under that constrained assumption. Are there any other real costs associated against that?

Scott N. Flanders eHealth, Inc. – CEO and Director
…
No, the costs attached to each of the receivable balances have essentially been absorbed as we generate the revenue in any particular quarter. ***So as the cash comes in, there is no additional cost attached to that. And the reason that those receivables are there is because there is no meaningful service component attached to them either.*** So according to our contracts with the carriers, these are all cash collection expectations that we have, both in the short term and long term.

Emphasis added.

76. The above statement identified in emphasis was false and/or materially misleading. Contrary to Flanders' statement, eHealth has additional operating expenses that it must incur in order to retain customers and keep them from cancelling their policies within the first year. Consequently, Flanders materially misled investors when making these statements because they were untrue and left investors with the false impression that the commission receivables reported by eHealth had no associated costs. By concealing the truth about the existence of eHealth's ongoing expenses to provide customer care services and retain existing members, investors were deprived of the ability to properly and adequately evaluate the profitability of eHealth's business and assess the true risks associated with purchasing eHealth common stock.

**C.** **<u>August 7, 2018 – Q2 2018 Quarterly Report</u>**

77. On August 7, 2018, eHealth filed its quarterly report on Form 10-Q for the second quarter ended June 30, 2018. The quarterly report provided investors with financial information about eHealth's operations and finances for the quarter. Defendants Flanders and Yung signed the quarterly report.

78. In pertinent part, the quarterly report materially misled investors by misrepresenting and concealing the true reasons for eHealth's decline in LTVs. When explaining the decline in LTVs of commissions per qualified health plan approved member, eHealth stated as follows:

The constrained lifetime value of commissions per approved member improved for Medicare Supplement, dental and vision products in the three months ended June 30, 2018 compared to the three months ended June 30, 2017. The improvement in constrained lifetime value of commissions per Medicare Supplement approved member

1
2
3
4
5
6
7
8
9

was driven by the more favorable lifetime value of commissions per approved member for Medicare Supplement plans sold since our acquisition of GoMedigap in January 2018. The improvement in constrained lifetime value of commissions per dental plan approved member was driven by an improvement in commission rates. The improvement in constrained lifetime value of commissions per vision plan approved member was driven by lower churn rates in the three months ended June 30, 2018 compared to the three months ended June 30, 2017. The constrained lifetime value of commissions per qualified health plan approved member decreased 17% in the three months ended June 30, 2018 compared to the three months ended June 30, 2017 ***driven by the timing of the open enrollment period for coverage effective in 2018***, which ran through December 2017, versus the open enrollment period for coverage effective in 2017, which ran through January 2017. Enrollments during the open enrollment period tend to have higher constrained lifetime value than enrollments outside of the open enrollment period. Since the open enrollment period for coverage effective in 2018 did not continue into the first quarter of 2018, the constrained lifetime value declined compared to the first quarter of 2017.

10   Emphasis added.

11   79.   The above statements identified in emphasis were false and/or materially misleading.

12   While eHealth told investors that the decline in LTVs was due to the "timing of the open enrollment

13   period," it was in fact caused by the member churn associated with eHealth's television advertising

14   customers. eHealth had invested heavily in direct response television advertising between 2017 and

15   2018 and, as a result, had successfully solicited a substantial amount of new customers. *See*

16   Background Allegations, Section A, *supra*. These customers, however, were prone to churn and had

17   been cancelling their policies within the first year of enrollment. *See id*., Section D, *supra*.

18   Consequently, the decrease in LTVs was being "driven" by lower quality enrollees in terms of member

19   retention and churn and not, as represented by eHealth, the "timing of the open enrollment period."

20   80.   This information was material. Even if the difference in the quality of the enrollees

21   played just a small part in the decrease in LTVs, that information would have been important because

22   it would have revealed that eHealth's direct response marketing campaign was failing to generate

23   quality customers and, in turn, leading to lower commission revenue and/or reversal of commission

24   revenue under ASC 606. Investors would have considered this information when deciding whether or

25   not to invest in eHealth.

26   **D.   February 21, 2019 – Q4 2018 Earnings Call**

27   81.   On February 21, 2019, eHealth held its "Q4 2018 Earnings Call." During the fourth-

28   quarter 2018 earnings call, eHealth provided investors with information about eHealth's operations

and finances during the fourth quarter and year 2018, and addressed questions posed by financial

analysts. The earnings call transcripts contain statements from Flanders and Yung and a Q&A section.

82.    In responding to a question regarding Medicare enrollment changes over the years, Yung

and Flanders misled the public denying a spike in member churn in late 2018:

David Anthony Styblo - Jefferies LLC
And then I don't think you guys formally break out churn rates or report those, but when
I look back and try to do the math on that and look at your 4Q churn rates back in 2016
and '17, it looks like it was about 6% in the fourth quarter in both of those years. When I
do that same math for the fourth quarter of '18, it spiked up to 17%, and as a result, your
Medicare enrollment was at least 5% below what I was looking for, so I'm just trying to
understand if you would agree with that math and what caused the spike in churn.

Derek N. Yung eHealth, Inc. – CFO
We may have to follow-up on your math, but that's not how we see it. Our lifetime of
Medicare Advantage enrollees is roughly about 3 to 3.5 years, and for Med Supp and
Part B, it's about 5 years, so we've typically put a 3.25 base on the range of products. Of
course, you can do the overall average of that across the product space and the mix of
our enrollments. In general, *we've actually seen some uptick and, therefore, uptick in
LTVs since we've been on 606, so we actually have not seen an increase in churn.
We've actually seen a decrease in churn, on average.*

Scott N. Flanders eHealth, Inc. – CEO & Director
So, Dave, we'll circle back and walk through the math with you, because I'm not sure
what you're looking at either, but *our persistency rates have improved with the margin
rather than turned south*.

Emphasis added.

83.    The above statements identified in emphasis were false and/or materially misleading.

According to statements provided by former eHealth employees, after the adoption of ASC 606,

eHealth grew concerned about member churn. By late 2018, eHealth management realized that new

enrolled customers quickly dropped from their plans, and eHealth and its senior executives became

concerned about member retention and its potential negative impact on the company's profitability.

Thus, contrary to Yung and Flanders' statements, "since [eHealth has] been on 606, [eHealth] actually

ha[s] … seen an increase in churn" and its "persistency rates have [not] improved." eHealth was so

worried about member churn that in late 2018 it introduced a modified bonus structure to reward sales

representatives whose customers stayed enrolled for 90 days, eHealth did so in its efforts to address

the issue of churn.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

84.   In addition, member churn by this point in time had been steadily increasing, contrary Yung and Flanders. Churn for the year was approximately 45%, an increase from the year prior which was just under 37%. The following table provides eHealth's member churn for Medicare Advantage customers:



85.   Flanders and Yung materially misled investors when making these statements because they were untrue and left investors with the false impression that eHealth had no problems associated with member retention.  By concealing the truth about member churn, investors were deprived of the ability to adequately evaluate eHealth's profitability and assess the true risks associated with purchasing eHealth common stock.

**E.**   **August 8, 2019 – Q2 2019 Quarterly Report**

86.   On August 8, 2019, eHealth filed its quarterly report on Form 10-Q for the second quarter ended June 30, 2019. The quarterly report provided investors with financial information about eHealth's operations and finances for the quarter. Defendants Flanders and Yung signed the quarterly report.

87.   In pertinent part, the quarterly report materially misled investors by misrepresenting and concealing important information concerning the cause behind eHealth's "decreased member retention rate" for Medicare Advantage members. When discussing its lower retention rates, eHealth stated as

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

follows:

> The constrained LTV of commissions per approved member for Medicare Advantage plans increased 15% in the three months ended June 30, 2019 compared to the three months ended June 30, 2018 primarily due to improved member retention on some of our member cohorts, favorable product mix and commission rate increases. When comparing the three months ended June 30, 2019 to the three months ended June 30, 2018, the constrained LTV of commissions per Medicare Supplement approved member decreased 6% primarily as a result of an increase in member churn, and the constrained LTV of commissions per Medicare Part D approved member decreased 12% primarily due to carrier mix. We experienced a decreased member retention rate in the Medicare Advantage members that we enrolled during the Medicare annual enrollment period in the fourth quarter of 2018. ***We believe the reintroduction of the Medicare open enrollment period during the first quarter of 2019 contributed to the decreased retention rate since Medicare Advantage members that we enrolled during the annual enrollment period in the fourth quarter of 2018 were able to enroll in another Medicare Advantage plan or disenroll from their Medicare Advantage plan and return to original Medicare during the Medicare open enrollment period.*** While the net impact of the Medicare open enrollment period was positive to our Medicare business, we expect the constrained LTVs for Medicare Advantage plans to decrease in the fourth quarter of 2019 compared to the fourth quarter of 2018, as we expect lower retention rates for Medicare Advantage members that we enroll during the fourth quarter going forward.

Emphasis added.

88.    The above statements identified in emphasis were false and/or materially misleading. While eHealth told investors that the "reintroduction . . . open enrollment period . . . contributed to the decreased retention rate," eHealth's television advertising clientele was also a material cause (if not the primary cause). These customers were prone to churn and had been cancelling their policies within the first year of enrollment. *See id.*, Section D, *supra*. Consequently, the decrease in retention was being caused by lower quality enrollees in terms of member retention and churn and not, as represented by eHealth, solely by the timing of an "open enrollment period."

89.    This information was material. eHealth had invested heavily in direct response television advertising between 2017 and 2018 and, as a result, had successfully solicited a substantial amount of new customers. *See* Background Allegations, Section A, *supra*. Thus, even if the difference in the quality of the enrollees played just a small part in the decrease of enrollment rates, that information would have been important because it would have revealed that eHealth's direct response marketing campaign was failing to generate quality customers and, in turn, leading to lower commission revenue and/or reversal of commission revenue under ASC 606. Investors would have considered this

information when deciding whether or not to invest in eHealth.

**F.**     **February 20, 2020 – Q4 2019 Earnings Call**

90.     On February 20, 2020, eHealth held its "Q4 2019 Earnings Call." During the fourth-quarter 2019 earnings call, eHealth provided investors with information about eHealth's operations and finances during the fourth quarter 2019, and addressed questions posed by financial analysts. The earnings call transcripts contain statements from Flanders and Yung and a Q&A section.

91.     In pertinent part, the earnings call transcripts state as follows:

**Questions and Answers**
…
Charles Gregory Peters Raymond James & Associates, Inc., Research Division – Equity Analyst
Okay. The final question would be, I know you highlighted the substantial growth in your commission receivable, both current and noncurrent. Can you talk about -- and I know you mentioned some of this in your prepared remarks, can you talk about the expense associated with that receivable? Maybe the biggest piece would be the noncurrent. Is there any expense associated with that? Or is that pure, pure cash?

Derek N. Yung eHealth, Inc. – Senior VP & CFO
So the commission receivable represents the cash collections to be collected associated with the commissions that we earn from carriers for the policies that we help acquire customers for them on their behalf. So once that's happened, and it's actually the reason why we recognize the revenue we do, our service obligation is completed, and therefore, we recognize the lifetime value of that. *From an operating perspective,* other than reconciling the cash coming in and the cash that we should be being paid as a broker record, *there's no other cost associated.*

Scott N. Flanders eHealth, Inc. – CEO & Director
There's no cost against it, Greg. It's all -- the costs have been expensed in period. And *it's all cash to be collected free of additional charge*.

Emphasis added.

92.     The above statements identified in emphasis were false and/or materially misleading. Contrary to Yung's statement, "commission receivable [does not] represent[] cash… to be collected [from] commissions … earn[ed] from carriers [because eHealth's] service obligation is [not] completed" by the time eHealth recognizes those commissions as revenue. Similarly, contrary to Flanders' statement, commission receivable is not "all cash to be collected free of additional charge" from carriers. After health insurance carriers approve Medicare applications, eHealth must incur in

ongoing operating expenses in providing customer care services to retain new and existing members and thereby limiting turnovers.

93.   Yung and Flanders materially misled investors when making these statements because they were untrue and left investors with the false impression that the commissions earned from carriers were free of associated costs.  By concealing the truth about eHealth's ongoing operating expenses to provide customer care services to retain new and existing customers, investors were deprived of the ability to adequately evaluate eHealth's profitability and assess the true risks associated with purchasing eHealth common stock.

**G.    March 2, 2020 – 2019 Annual Report**

94.   On March 2, 2020, eHealth filed its annual report on Form 10-K for the fiscal year ended December 31, 2019. The annual report provided investors with financial information about eHealth's operations and finances for the year 2019. Defendants Flanders and Yung signed the annual report.

95.   eHealth represented in the 2019 annual report that its revenue and operating profit for the year was $506,201,000 and $81,409,000, respectively. The following table provides eHealth's income statement for the year, as reported in the 2019 annual report:

|  | Year Ended December 31, 2019 |
|---|---|
| **Revenue** | |
| Commission | $       466,676 |
| Other | 39,525 |
| **Total revenue** | 506,201 |
| **Operating costs and expenses** | |
| Cost of revenue | 2,738 |
| Marketing and advertising | 150,249 |
| Customer care and enrollment | 134,304 |
| Technology and content | 47,085 |
| General and administrative | 64,150 |
| Change in fair value of earnout liability | 24,079 |
| Amortization of intangible assets | 2,187 |
| Restructuring charges | - |
| Acquisition costs | - |
| Total operating costs and expenses | 424,792 |

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

| Income (loss) from operations | | 81,409 |
|---|---|---|
| Other income, net | | 2,090 |
| **Income (loss) before provision (benefit) for income taxes** | | 83,499 |
| Provision (benefit) for income taxes | | 16,612 |
| **Net income** | $ | 66,887 |
| **Net income per share:** | | |
| Basic | $ | 2.90 |
| Diluted | $ | 2.73 |
| **Weighted-average number of shares used in per share amounts:** | | |
| Basic | | 23,075 |
| Diluted | | 24,539 |
| **Comprehensive income:** | | |
| Net income | $ | 66,887 |
| Foreign currency translation adjustment, net of taxes | | (11) |
| **Comprehensive income** | $ | 66,876 |

96.    eHealth's income statement for fiscal 2019 was false and/or materially misleading. In pertinent part, eHealth overstated its revenue and operating profit by $128 million and $263 million, respectively. eHealth's actual revenue and operating profit for fiscal 2019 was $378,201,000 and negative $181,591,000.

97.    eHealth overstated its revenue and, in turn, income from operations by inflating its LTVs when recognizing revenue. The LTV for Medicare Advantage members in 2019 was 28.1% less than what eHealth represented because the plan durations were 2.34 years, and not 3.0 years. The discrepancy was due to eHealth's undisclosed member churn and the toll it was taking on its policy renewals. Accordingly, eHealth materially misled investors when stating in the annual report that its LTV for Medicare Advantage policies was ***$1,013 per approved member***; in actuality, it was $728 per approved member.

98.    Revenue and income (loss) from operations were material pieces of information to investors, as they heavily determined the profitability of the business and otherwise communicated the financial strength of eHealth. eHealth, therefore, materially misled investors by providing them with the above false and misleading financial information.

**H.     April 23, 2020 –Q1 2020 Earnings Call**

99.   On April 23, 2020, eHealth held its "Q1 2020 Earnings Call." During the first-quarter 2020 earnings call, eHealth provided investors with information about eHealth's operations and finances during the first quarter 2020, and addressed questions posed by financial analysts. The earnings call transcripts contain statements from Flanders and Yung and a Q&A section.

100.   In pertinent part, the earnings call transcripts state as follows:

**Questions and Answers**

David Anthony Styblo Jefferies LLC, Research Division – Equity Analyst
Got it. And then just the last one for Derek on the LTVs for Medicare Advantage. I think guidance there, you mentioned, is still flat for the year, despite 1Q, I think, was up 5%, and I know the commission rates for brokers are up, I think, mid-single digits. So I'm just wondering, is that more of a conservative posture on your end? Or is there something -- some other element that comes in that would cause the -- that to not increase by, call it, mid-single digits?

Derek N. Yung eHealth, Inc. – Senior VP & CFO
Yes. So you're right that our Q1 LTV for MA were -- increase year-over-year was largely driven by the rate increase. It's actually been pretty much right in line. And really what -- the reason why ***we are forecasting flat LTVs*** is ***because of the increase of number of seniors we're seeing taking advantage of the open enrollment period that we see causing that higher churn in the AEP cohort.*** We are expecting that, similar to last year, that to normalize. And when that happens, ***this will be then kind of the new seasonal trend that we will see from here on out in terms of when we think a senior to churn, which is when they can switch, and when they won't after that***, which is they're in the plan that they want. So that's what we're anticipating, and that's why we're forecasting flat LTV.

Emphasis added.

101.   The above statements identified in emphasis were false and/or materially misleading. Contrary to Flanders' statement, "the increase of number of seniors … taking advantage of the open enrollment period [is not the only reason] causing that higher churn in the AEP cohort." By asserting that "this will be … the new seasonal trend that we will see from here on out in terms of when we think a senior to churn, which is when they can switch, and when they won't after that," Flanders concealed the high churn rate that eHealth experiences during the first year of the plans and the churn rates affecting the remaining years. According to eHealth's own MA Plan Member Turnover Rate by Year Member is on the Plan, 36% of new members did not renew their plans after the first year, an

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

average of 30% of the remaining plans are cancelled during the second and third year, an average of 18% of the remaining customers drop off their plans during the fourth, fifth, and sixth year, and 16% churn off their plains after the seventh year.

102.  Yung materially misled investors when making these statements because they were untrue and left investors with the false impression that member churn was limited to disenrollment during annual enrollment periods in the first quarter of the year. By concealing the truth about churn rates, investors were deprived of the ability to adequately evaluate eHealth's profitability and assess the true risks associated with purchasing eHealth common stock.

### ADDITIONAL SCIENTER ALLEGATIONS

**A.**   **Defendants Knew that eHealth's Direct Response Television Advertising Was Resulting in Increased Member Churn.**

103.  Defendants received "churn" data during the Class Period and, therefore, had contemporaneous access to data demonstrating that their statements were false and/or materially misleading.

104.  According to former eHealth employees, eHealth and its executives were aware of the churn issue and tracked member churn data monthly and daily. eHealth received a "book of business" (BOB) from each insurance carrier monthly. Defendants had access to the BOBs in which they reviewed data from carriers including new paid members and policy cancellations.

105.  eHealth tracked daily the number of MA plans sold, the number of MA plans that customers "turned over", the length of phone calls and customer waiting times. eHealth implemented this system to monitor the performance of its sales representatives and call centers. These daily reports calculated member churn, that is, the number of enrolled customers who subsequently dropped their MA plans.

106.  Flanders, Francis and Yung thus had access to contemporaneous data on member churn, and their assertions downplaying churn rates were a deliberate attempt to mislead investors and inflate eHealth's stock price to benefit financially for their own personal gain. Collectively, these facts further support a strong and cogent inference of their scienter.

107.  eHealth and its executives were not only generally aware of the churn issue, they also

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

had access to contemporaneous data that tracked member churn monthly and daily. According to statements from former employees, eHealth executives had access to, and reviewed, information from carriers including information on policy cancellations.

108. A former Commissions Specialist, who worked at eHealth's Marketing and Finance Department from October 2019 to March 2020 ("CW7"), explained that eHealth had procedures for recording and updating its files to reflect member churn rates. CW7 was primarily responsible for processing commission payments from and to health insurance carriers, including refunding commission payments to carriers for policyholders that had cancelled their policies. CW7 reported to Candace Mosby who, in turn, reported to senior managers at eHealth's headquarters in Santa Clara, California. According to CW7, each month CW7 would receive a hard drive from Stephanie Donahue, Senior Director, Revenue Operations, containing a "book of business" (BOB) from each insurance carrier. CW7 also noted that the BOBs listed in spreadsheets thousands of customers who had signed up for a Medicare Advantage plan for a given month. The BOBs also detailed, though not in a separate category, customers who had signed up but subsequently dropped off their plans. According to CW7, they "had to download the BOBs and separate out the cancelled from the current" by hand. CW7 noted that patients who had dropped off a plan would not show up in the monthly BOB until 2-3 months later. In explaining the delay, CW7 thought that the reason you would see cancellations from one to three months before was that senior management in California "was delaying getting that information to us." Finally, CW7 underscored that churn rates were rather unpredictable and hard to estimate: "the number of cancels could be a handful or thousands."

109. Similarly, according to CW4, he and other sales representatives received emailed data once a day from eHealth's Medicare Sales Director (Michael Wilson) showing various metrics from all of eHealth's call centers in the U.S. for a given day. The metrics included the number of MA plans sold, the number of MA plans that customers "turned over," meaning dropped, length of phone calls and customer waiting times. According to CW4, "it was a daily report—we would take a quick look at our numbers, see where we were compared with other call centers in relation to sales of MA plans. CW4 specified that the daily reports came from eHealth senior managers in Santa Clara, California. CW4 also confirmed that the daily reports calculated member churn—enrolled customers who

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

subsequently dropped their MA plans. CW4 stressed that salespeople received these reports daily. "[Managers] would send out sales data every day, and it would have [churn] data on it." According to CW4, eHealth's top executives were aware of the daily emails and the churn data they contained.

110.  In addition, Defendants' admissions during the Class Period show that eHealth was experiencing member churn throughout the Class Period and that they knew the increase in member churn was attributable to the direct response television advertising. On July 26, 2018, while discussing eHealth's operational and financial results for the second quarter of fiscal 2018, Francis described the "retention" issues eHealth was experiencing within the first 90 days of enrollment. In pertinent part, Francis stated as follows:

> Q <Tobey O'Brien Sommer SunTrust Robinson Humphrey, Inc., Research Division – MD>: Great. Could you describe the new retention tools you're putting in place? I'm curious if any of them are financial and [chance] you have ongoing profitability of renewing customers?
>
> A <Francis>: No, great question. I would put those -- put the retention efforts generally into 2 categories. One for making sure that the near-term retention in terms of sales that we've made, that we keep them in the boat past what's called *a rapid dis-enrollment or early cancellation period, so the first 90 days post sale*. And there are -- that is primarily an operational thing on our end to make sure that both our systems and our communication back and forth with the carriers is put together in as frictionless and complete a process as possible. That is an area that, quite frankly, the company has not focused on historically. *And the opportunities for us to significantly improve retention rates in that 90-day period post-sale are both substantial and reflect a lot of near-term opportunity that we are very much focused on at the moment*. No incremental costs associated with that kind of opportunity and to the extent that we're successful in meaningfully changing that amount of churn, that will ultimately reflect in meaningfully higher LTVs for Medicare customers in the relatively near future. . . . .

Emphasis added.

111.  eHealth's churn problems persisted over the next year and a half. On November 12, 2019, during an investor conference call, Flanders explained as follows why the television advertising resulted in lower quality customers in terms of member retention:

> Q <Jailendra P. Singh Crédit Suisse AG, Research Division – Research Analyst>: Okay. Make sure I have any no questions here. Can you talk about the tools you use to generate leads for Medicare and other businesses you have? How has been the conversion rate? And do you see any difference between the leads you generate internally versus through external sources? Any difference in terms of conversion rate?

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

A <Flanders>: Yes. Because -- I'll answer the last question first. Three years ago when I was appointed CEO, we generated almost 80% of our leads through third-party lead gen. And there's a lot of reasons to dislike that. We were a price taker. The flow and the agent balancing, workload balancing, was very challenging with -- leads just came in as an avalanche, it was highly inefficient. So a big part of our productivity improvement, our marketing cost has come from reversing that ratio. So in Q2 and Q3, we had about 20% of our leads generated by third-party lead sources. We generate about 62% of our leads through direct response TV and direct mail, 2/3 fully if you add online. And then about 1/3 come through strategic partnerships, which is about 20% of our total. That includes pharmacy partnerships and hospital partnerships that are doing really well this year, by the way, our partnership channel is overperforming, our plan, which is -- I always tell the team, not all enrollments are created equal in terms of their value to us. *The highest churn, for example, is direct response to TV. Think about it, the people that are sitting at home and just watching TV, they're easy to capture and they churn a lot, and they churn not -- 90% of them don't churn to us, they churn to a different plan from a different broker.* And so for us, while there's a lot of tonnage in the direct response TV and the direct mail, these -- all these other channels are more strategically valuable to us. And happily, they are growing faster than direct mail and direct response television.

Emphasis added.

112.  The above statements from former employees corroborate that eHealth and its executives had access to contemporaneous data on member churn on a monthly and daily basis, and knew that it was being caused by eHealth's direct response television advertising. On a monthly basis, eHealth received books of business from each insurance carrier including detailed information on new MA members and policy cancellations. And, on a daily basis, aimed at monitoring and improving salesforce performance, eHealth also tracked data on new members, turnovers (member churn), length of phone calls and customer waiting times. These daily reports were closely monitored by eHealth to determine the bonuses it paid to sales representatives to improve member retention. eHealth thus had access to contemporaneous data on member churn.

**B.** **eHealth's Insiders Capitalized on the Inflated Stock Price in Advance of the Truth being Revealed**

113.  During the time Defendants' materially false and/or misleading statements and/or omissions were alive in the marketplace, the Individual Defendants and other eHealth insiders sought to benefit financially by selling their eHealth holdings.

114.  These insiders had a duty to disclose to investors the issues regarding inflated commission revenue, overstated remaining lifetime value of approved plans, the extent of ongoing

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

costs including retention and service expenses, non-profitable enrollees, and higher member churn or abstain from trading. As they were in possession of this non-public information, each of the executives were under a duty to abstain from trading or to disclose this information prior to trading. As each of the below insiders chose to trade on non-public information, they were each under a duty to disclose the above-referenced issues.

115.   During the Class Period, Flanders sold 254,521 shares of eHealth common stock and reaped proceeds of $25,753,724 as result thereof. Notably, in May 2015, three years prior to the Class Period, Flanders sold 6,076 common shares, an insignificant number compared to the number of common shares he sold between 2019 and 2020. Other than this minor sale in May 2015, Flanders had no sales of eHealth stock prior to the Class Period.

116.   The following chart lists Flanders' sales of eHealth stock during the Class Period:

| Transaction Date | Transaction Type | Number of Shares of Stock Sold | Number of Securities Owned After the Transaction | Sales Price | Proceeds |
|---|---|---|---|---|---|
| 5/10/2019 | S-Sale | 17,851 | 748,191 | $ 60.3574 | $    1,077,440 |
| 5/10/2019 | S-Sale | 12,945 | 735,246 | $ 61.3939 | $      794,744 |
| 5/10/2019 | S-Sale | 3,209 | 732,037 | $ 62.4356 | $      200,356 |
| 7/30/2019 | S-Sale | 11,094 | 818,594 | $  101.64 | $    1,127,594 |
| 7/30/2019 | S-Sale | 10,659 | 807,935 | $  102.71 | $    1,094,786 |
| 7/30/2019 | S-Sale | 13,484 | 794,451 | $  103.81 | $    1,399,774 |
| 7/30/2019 | S-Sale | 39,221 | 755,230 | $  104.81 | $    4,110,753 |
| 7/30/2019 | S-Sale | 23,758 | 731,472 | $  105.53 | $    2,507,182 |
| 7/30/2019 | S-Sale | 1,300 | 730,172 | $  106.38 | $      138,294 |
| 1/22/2020 | S-Sale | 31,722 | 766,637 | $  100.28 | $    3,181,082 |
| 1/24/2020 | S-Sale | 24,478 | 742,159 | $  111.54 | $    2,730,276 |
| 1/24/2020 | S-Sale | 8,739 | 733,420 | $  112.47 | $      982,875 |
| 1/24/2020 | S-Sale | 19,859 | 713,561 | $  113.29 | $    2,249,826 |
| 1/24/2020 | S-Sale | 14,393 | 699,168 | $  114.22 | $    1,643,968 |
| 1/24/2020 | S-Sale | 21,009 | 678,159 | $  115.28 | $    2,421,918 |
| 1/24/2020 | S-Sale | 800 | 677,359 | $  116.07 | $       92,856 |
| *TOTALS* | | *254,521* | | | *$   25,753,724* |

117.   During the Class Period, Francis sold 28,000 shares of eHealth stock and reaped proceeds of nearly $3.6 million as a result thereof. These stock sales represented the first instances in which

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Francis sold eHealth stock and, therefore, strongly support an inference of scienter.

118.  The following chart lists Francis' sales of eHealth stock during the Class Period:

| Transaction Date | Transaction Type | Number of Shares of Stock Sold | Number of Securities Owned After the Transaction | Sales Price | | Proceeds | |
|---|---|---|---|---|---|---|---|
| 7/30/2019 | S-Sale | 1,000 | 228,562 | $ | 103.00 | $ | 103,000 |
| 8/12/2019 | S-Sale | 2,000 | 226,562 | $ | 109.54 | $ | 218,080 |
| 6/2/2020 | S-Sale | 5,954 | 237,661 | $ | 130.64 | $ | 770,830 |
| 6/2/2020 | S-Sale | 16,874 | 220,787 | $ | 131.50 | $ | 2,218,931 |
| 6/2/2020 | S-Sale | 2,172 | 218,615 | $ | 132.17 | $ | 287,073 |
| *TOTALS* | | *28,000* | | | | *$3,597,914.00* | |

119.  Since January 2018, and at all relevant times, non-party Robert Hurley has served as eHealth's President, Carrier and Business Development. During the Class Period, Hurley's Forms 4 filed with the SEC substantiates that he sold 32,313 shares of eHealth stock and reaped proceeds of $3,020,442 as a result thereof. It is noteworthy that, on August 7, 2019, in a single day, Hurley sold 14,313 shares of eHealth's common stock and reaped proceeds of $1,531,587 from this sale. Different from his other regular sales of 1,500 shares, this sizable sale was not pursuant to a 10b5-1 plan, and it was equivalent to almost half of the shares sold by Hurley during the entire Class Period. Notably, Hurley had not made any sales of eHealth stock for at least five years prior to the Class Period; his last sale is dated May 2014.

120.  The following chart lists Mr. Hurley's sales of eHealth stock during the Class Period:

| Transaction Date | Transaction Type | Number of Shares of Stock Sold | Number of Securities Owned After the Transaction | Sales Price | | Proceeds | |
|---|---|---|---|---|---|---|---|
| 5/1/2019 | S-Sale | 1,500 | 140,141 | $ | 60.47 | $ | 90,705 |
| 6/3/2019 | S-Sale | 1,500 | 136,781 | $ | 70.34 | $ | 105,510 |
| 7/1/2019 | S-Sale | 1,500 | 133,421 | $ | 87.82 | $ | 131,730 |
| 7/9/2019 | S-Sale | 6,000 | 127,421 | $ | 89.95 | $ | 539,700 |
| 8/1/2019 | S-Sale | 1,500 | 124,061 | $ | 103.74 | $ | 155,610 |
| 8/7/2019 | S-Sale | 6,770 | 123,791 | $ | 106.7031 | $ | 722,379 |
| 8/7/2019 | S-Sale | 6,313 | 117,478 | $ | 107.2271 | $ | 676,924 |
| 8/7/2019 | S-Sale | 1,230 | 116,248 | $ | 107.5480 | $ | 132,284 |
| 9/3/2019 | S-Sale | 1,500 | 111,171 | $ | 82.24 | $ | 123,360 |

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

| 10/01/2019 | S-Sale | 1,500 | 117,948 | $ 66.51 | $ 99,765 |
| 11/01/2019 | S-Sale | 1,500 | 116,448 | $ 69.39 | $ 104,085 |
| 12/02/2019 | S-Sale | 1,500 | 114,948 | $ 92.26 | $ 138,390 |
| *TOTALS* | | *32,313* | | | $ *3,020,442* |

121. Since 2006 and during all relevant times, non-party Michael Goldberg was one of eHealth's directors. Goldberg also served as the Chair of the Compensation Committee, member of the Nominating and Corporate Governance Committee, and as member and Chairman of the Audit Committee. During the Class Period, Goldberg's Forms 4 filed with the SEC substantiates that he sold 49,511 shares of eHealth stock and reaped proceeds in excess of $4,423,036 as a result thereof. Notably, the vast majority of these sales, 33,261 shares equivalent to $3,336,313, were not pursuant to a 10b5-1 plan. Moreover, Hurley had not made any sales of eHealth stock for at least six years prior to the Class Period; his last sale is dated May 2013.

122. The following chart lists Goldberg's sales of eHealth stock during the Class Period:

| Transaction Date | Transaction Type | Number of Shares of Stock Sold | Number of Securities Owned After the Transaction | Sales Price | Proceeds |
|---|---|---|---|---|---|
| 3/5/2019 | S-Sale | 2,337 | 73,891 | $ 58.00 | $ 135,546 |
| 5/8/2019 | S-Sale | 3,100 | 78,291 | $ 62.6517 | $ 194,220 |
| 5/8/2019 | S-Sale | 3,180 | 75,111 | $ 63.3031 | $ 201,303 |
| 5/8/2019 | S-Sale | 1,220 | 73,891 | $ 64.5082 | $ 78,700 |
| 5/30/2019 | S-Sale | 8,750 | 65,141 | $ 70.00 | $ 612,500 |
| 8/21/2019 | S-Sale | 4,057 | 63,306 | $ 102.2118 | $ 414,673 |
| 8/22/2019 | S-Sale | 7,013 | 56,293 | $ 102.1474 | $ 716,359 |
| 8/22/2019 | S-Sale | 9,404 | 46,889 | $ 97.1626 | $ 913,717 |
| 8/22/2019 | S-Sale | 900 | 45,989 | $ 97.9647 | $ 88,168 |
| 8/22/2019 | S-Sale | 800 | 45,189 | $ 102.00 | $ 81,600 |
| 4/30/2020 | S-Sale | 2,000 | 43,189 | $ 110.00 | $ 220,000 |
| 5/5/2020 | S-Sale | 2,000 | 41,189 | $ 110.00 | $ 220,000 |
| 5/7/2020 | S-Sale | 4,750 | 36,439 | $ 115.00 | $ 546,250 |
| *TOTALS* | | *49,511* | | | $ *4,423,036* |

123. Since June 2017 and during all relevant times, non-party Timothy Hannan has served as eHealth Chief Marketing Officer. As CMO, Hannan oversees all marketing efforts across eHealth business, including Individual & Family, Small Business and Medicare products. Hannan also serves as eHealth Chief Revenue Officer since December 2019.

124.  During the Class Period, Hannan's Form 4 filed with the SEC substantiates that he sold 19,785 shares of eHealth stock and reaped proceeds in excess of $2,043,193 as a result thereof. Notably, these sales were not pursuant to a 10b5-1 plan and they were transacted in a single day. Further, Hannan made subsequent sales of stock, but pursuant to a Rule 10b-5 trading plan, thus supporting the conclusion that the sales in 2019 were intentional and done while in possession of material adverse information.

125.  The following chart lists Hannan's sales of eHealth stock during the Class Period:

| Transaction Date | Transaction Type | Number of Shares of Stock Sold | Number of Securities Owned After the Transaction | Sales Price | | Proceeds | |
|---|---|---|---|---|---|---|---|
| 7/30/2019 | S-Sale | 4,500 | 58,855 | $ | 101.65 | $ | 608,044 |
| 7/30/2019 | S-Sale | 4,600 | 54,255 | $ | 102.72 | $ | 172,634 |
| 7/30/2019 | S-Sale | 5,587 | 48,668 | $ | 103.82 | $ | 133,886 |
| 7/30/2019 | S-Sale | 4,998 | 43,670 | $ | 104.58 | $ | 869,580 |
| 7/30/2019 | S-Sale | 100 | 43,570 | $ | 105.23 | $ | 243,350 |
| *TOTALS* | | *19,785* | | | | *$* | *2,043,193* |

126.  Since 2008 and during all relevant times, non-party Livingston Randall has served as one of eHealth's directors. Randall has also served as the Chairperson of the Audit Committee and as a member of the government and regulatory affairs committee of eHealth's Board of Directors.

127.  During the Class Period, Randall's Forms 4 filed with the SEC substantiates that he sold 35,750 shares of eHealth stock and reaped proceeds in excess of $2,058,616 as a result thereof. Notably, while these sales were pursuant to a 10b5-1 plan, they were significantly larger compared to Randall's sales prior to the Class Period. Between 2010 and 2015, before the Class Period, Randall made a dozen of sales, but each of them was for an amount between $8,000 and $54,000. Moreover, Hurley had not made any sales of eHealth stock for at least three years prior to the Class Period.

128.  The following chart lists Randall's sales of eHealth stock during the Class Period:

| Transaction Date | Transaction Type | Number of Shares of Stock Sold | Number of Securities Owned After the Transaction | Sales Price | | Proceeds | |
|---|---|---|---|---|---|---|---|
| 8/1/2018 | S-Sale | 10,000 | 64,704 | $ | 25.00 | $ | 250,000 |
| 8/1/2018 | S-Sale | 3,250 | 64,704 | $ | 25.00 | $ | 81,250 |

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

| | | | | | | |
|---|---|---|---|---|---|---|
| 8/1/2018 | S-Sale | 7,500 | 64,704 | $ 25.00 | $ 187,500 |
| 8/1/2019 | S-Sale | 1,561 | 65,365 | $ 101.1924 | $ 157,961 |
| 8/1/2019 | S-Sale | 8,267 | 57,098 | $ 102.1800 | $ 844,722 |
| 8/1/2019 | S-Sale | 2,437 | 54,661 | $ 103.2700 | $ 251,668 |
| 8/1/2019 | S-Sale | 2,000 | 52,661 | $ 104.1300 | $ 208,260 |
| 8/1/2019 | S-Sale | 735 | 51,926 | $ 105.1100 | $ 77,255 |
| 6/2/2020 | S-Sale | 5,000 | 46,926 | $ 130.00 | $ 650,000 |
| 6/2/2020 | S-Sale | 4,941 | 41,985 | $ 127.88 | $ 631,855 |
| 6/2/2020 | S-Sale | 59 | 41,926 | $ 128.20 | $ 7,563 |
| *TOTALS* | | *45,750* | | | *$ 2,058,616* |

129.  Since 2017 and during all relevant times, non-party Ian Kalin has served as eHealth's Chief Technology Officer. During the Class Period, Kalin's Form 4 filed with the SEC substantiates that he sold 5,500 shares of eHealth stock and reaped proceeds in excess of $566,500 as a result thereof. Notably, this sale was not pursuant to a 10b5-1 plan, and Kalin had no sales of eHealth stock prior to the Class Period.

130.  The following chart lists Hannan's sales of eHealth stock during the Class Period:

| Transaction Date | Transaction Type | Number of Shares of Stock Sold | Number of Securities Owned After the Transaction | Sales Price | Proceeds |
|---|---|---|---|---|---|
| 7/30/2019 | S-Sale | 5,500 | 29,603 | $ 103.00 | $ 566,500 |
| *TOTALS* | | *5,500* | | | *$ 566,500* |

131.  During the Class Period, the above-reference insiders collectively sold 435,380 shares of eHealth common stock and reaped of $41.4 million in proceeds by selling their shares during the Class Period at artificially inflated prices. Importantly and notably, most of these individuals had not made any sales of eHealth stock for at least three years prior to the Class Period. This evidences that these individuals traded stock in possession of insider trading information that was not disclosed to the public and were aware of the fraudulent statements. Collectively, these facts further support a strong and cogent inference of Individual Defendants' scienter.

C.     **Flanders, Francis and Yung Also Reaped Additional Gains from Equity Compensation.**

132.  Flanders, Francis and Yung received compensation in the form of base salary, annual cash bonus awards and a mix of performance-based and service-based long-term equity incentive

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

awards. Equity incentive awards are granted in the form of performance-based and service-based restricted stock units (RSUs). The performance-based RSUs are earned based on company performance and on achieving certain stock price thresholds over a four-year period.

133.  For the last three fiscal years, eHealth's equity award program has established stock price thresholds, which have been consistently met. Since the company reached those performance goals year-over-year, the executive officers were eligible to earn performance-based equity awards. Performance-based RSU awards for 2017 were approved when eHealth stock price was trading at $11.38 per share. To be eligible to vest in the shares subject to the performance-based RSU award, eHealth stock price had to increase a range of 23% to 128%.

134.  Performance-based RSU awards for 2018 were approved when eHealth stock price was trading at $16.11 per share. To be eligible to vest in the shares subject to the performance-based RSU award, eHealth stock price had to increase a range of 19% to 59%.

135.  Performance-based RSU awards for 2019 were approved when eHealth stock price was trading at $58.01 per share to be eligible to vest in the shares subject to the performance-based RSU award, eHealth stock price had to increase a range of 29% to 55%.

136.  In 2017, most of the stock price thresholds were met and shares subject to performance-based RSUs became eligible for one-year time-based vesting. In 2018, eHealth stock price appreciated 121% from $17.37 on December 31, 2017 to $38.42 on December 31, 2018. In 2019, eHealth stock price appreciated 150% from $38.42 on December 31, 2018 to $96.08 on December 31, 2019. As a result, all stock price thresholds for 2018 and 2019 were met and all outstanding shares subject to the stock price-based restricted stock units became eligible for one-year time-based vesting.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

137.  Defendants' false and materially misleading statements prompted the meteoric rise in eHealth's stock price that, in turn, triggered the performance-based requirements of these RSUs. In turn, these defendants were able to reap millions of additional dollars as a result of the alleged fraud. The following table lists the additional equity compensation Flanders, Francis, and Yung received:

| Defendant | 2017 | 2018 | 2019 |
|-----------|------|------|------|
| Flanders | $1,531,500 | $2,064,856 | $8,064,027 |
| Francis | $565,400 | $913,362 | $4,902,387 |
| Yung | n/a | $1,157875 | $4,004,177 |

138.  As demonstrated above, Flanders, Francis and Yung benefited significantly as a result of the alleged fraud, using false and misleading statements to artificially inflate the stock price and trigger millions of dollars in equity compensation. These amounts were material to these defendants, given the fact that their base salaries ranged between $188,000 and $600,000 during the relevant time period.

**D.    eHealth Benefited Financially as a Result of Its Artificially Inflated Stock Price.**

139.  On January 23, 2019, eHealth entered into an underwriting agreement with RBC Capital Markets, LLC and Credit Suisse Securities (USA) LLC as representatives of the several underwriters to issue and sell 2,400,000 shares of common stock.

140.  On January 28, 2019, eHealth sold a total of 2,760,000 shares of common stock, including 360,000 additional shares of common stock pursuant to an overallotment option exercised by the underwriters.

141.  The offering closed on January 28, 2019, at a price of $48.50 per share, for total net proceeds of $126.2 million, after deducting underwriting discounts and commissions and estimated offering expenses.

142.  But for eHealth's artificially inflated stock price, it would not have generated the amount of proceeds that it did during the offering. As a result of the alleged fraud, eHealth secured a discrete financial benefit at the expense of its ordinary investors.

**LOSS CAUSATION/ECONOMIC HARM**

143.  The Section 10(b) Defendants' materially misleading statements and omissions during

the Class Period resulted in Plaintiff and the other Class members purchasing eHealth's shares at artificially inflated prices, and thereby directly or proximately caused, or were a substantial contributing cause, of the damages sustained by Plaintiff and the other Class members.

144.  As alleged herein:

    a.     The market for eHealth's stock was open, well-developed and efficient at all relevant times;

    b.     The Section 10(b) Defendants' above-detailed materially misleading statements and/or material omissions had the effect of creating in the market an unrealistically positive assessment of eHealth and its prospects, thus causing eHealth's shares to be overvalued and the market price of eHealth's shares to be artificially inflated during the Class Period;

    c.     The Section 10(b) Defendants created an unrealistically positive assessment of eHealth and its prospects by, in part, concealing risks associated with member churn and accounting violations;

    d.     Plaintiff and the other Class members purchased or otherwise acquired eHealth stock relying upon the integrity of the market price for eHealth shares and market information relating to eHealth;

    e.     The risks associated with exposure arising from eHealth's member churn began to materialize and, in turn, investors began to discover that the Section 10(b) Defendants' public statements were materially misleading; and

    f.     Upon discovery of Defendants' materially misleading statements and/or material omissions, eHealth's share price suffered severe devaluation.

145.  The Section 10(b) Defendants' disclosures and/or events on the below dates resulted in damages to investors caused by misrepresentations and omissions in public statements. In each instance, the disclosure revealed material information related to the false statements.

146.  The Section 10(b) Defendants failed to disclose to investors material information concerning its member churn and accounting practices. As the Class Period progressed, investors became increasingly aware of these risks that were previously undisclosed to them by the Section

10(b) Defendants.  As the risks surrounding Defendants' conduct materialized during the Class Period, eHealth's stock price substantially decreased.  Each decline in eHealth's stock price is evidence that the risks concealed by the Section 10(b) Defendants gradually materialized.  The total decline in eHealth's stock price is attributable to the Section 10(b) Defendants' fraudulent and/or deliberately reckless conduct pursuant to the materialization-of-the-risk doctrine.

## **PRESUMPTION OF RELIANCE**

147.  Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

a.      Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.      the omissions and misrepresentations were material;

c.      eHealth's common stock traded in an efficient market;

d.      the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of eHealth's common stock; and

e.      Plaintiff and the other members of the Class purchased eHealth common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

148.  At all relevant times, the market for eHealth common stock was an efficient market for the following reasons, among others:

a.      eHealth common stock met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.      as a regulated issuer, eHealth filed periodic public reports with the SEC and the NASDAQ;

c.      eHealth regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

and other similar reporting services; and

d.   eHealth was followed by securities analysts employed by brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

149.  As a result of the foregoing, the market for eHealth's common stock promptly digested current information regarding eHealth from all publicly available sources and reflected such information in the price of eHealth's common stock. Under these circumstances, all purchasers of eHealth's common stock during the Class Period suffered similar injury through their purchase of eHealth's common stock at artificially inflated prices and a presumption of reliance applies.

150.  A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding eHealth's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

151.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here, and, therefore, *Affiliated Ute* provides a separate, distinct basis for finding the applicability of a presumption of reliance.

## SAFE HARBOR INAPPLICABLE

152.  The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged herein.  Many of the statements alleged were not identified as "forward-looking" when made, and, to the extent any statements were forward-looking, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements alleged, Defendants are liable for such statements because, at the time they were made, the

speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of eHealth who knew that those statements were false when made.

## COUNT I

### Violation of Section 10((b) and SEC Rule 10b-5(b) against the Section 10(b) Defendants

153.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

154.  This Count is asserted against the Section 10(b) Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

155.  During the Class Period, the Section 10(b) Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other Class members; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of eHealth's common stock; and (iii) cause Plaintiff and other Class members to purchase or otherwise acquire eHealth's common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, the Section 10(b) Defendants, and each of them, took the actions set forth herein.

156.  Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Section 10(b) Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for eHealth's common stock.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about eHealth's finances, accounting, and business prospects.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

157. By virtue of their positions at eHealth, the Section 10(b) Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other Class members, or, in the alternative, the Section 10(b) Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Section 10(b) Defendants. Said acts and omissions of the Section 10(b) Defendants were committed willfully or with reckless disregard for the truth. In addition, each Section 10(b) Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

158. Information showing that the Section 10(b) Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Section 10(b) Defendants' knowledge and control. As the senior officers of eHealth, the Section 10(b) Defendants had knowledge of the details of eHealth's internal affairs.

159. The Section 10(b) Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Section 10(b) Defendants were able to and did, directly or indirectly, control the content of the statements of eHealth. As officers of a publicly-held company, the Section 10(b) Defendants had a duty to disseminate timely, accurate, and truthful information with respect to eHealth's business operations, accounting, and finances. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of eHealth's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning eHealth's business, accounting, and financial condition which were concealed by the Section 10(b) Defendants, Plaintiff and the other Class members purchased or otherwise acquired eHealth's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and upon the statements disseminated by the Section 10(b) Defendants, and were damaged thereby.

160. During the Class Period, eHealth's common stock was traded on an active and efficient market. Plaintiff and the other Class members, relying on the materially false and misleading statements described herein, which the Section 10(b) Defendants made, issued or caused to be

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of eHealth's common stock at prices artificially inflated by the Section 10(b) Defendants' wrongful conduct.  Had Plaintiff and the other Class members known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of eHealth's common stock was substantially lower than the prices paid by Plaintiff and the other Class members. The market price of eHealth's common stock declined sharply upon materialization of undisclosed risks and/or public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

161.  By reason of the conduct alleged herein, the Section 10(b) Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

162.  As a direct and proximate result of the Section 10(b) Defendants' wrongful conduct, Plaintiff and the other Class members suffered damages in connection with their respective purchases, acquisitions and sales of eHealth's common stock during the Class Period, upon the disclosure that eHealth had been disseminating false and/or misleading statements and information to the investing public.

## COUNT II

### Violation of Section 20((a) of the Exchange Act against the Section 20(a) Defendants

163.  Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

164.  During the Class Period, the Section 20(a) Defendants participated in the operation and management of eHealth, and conducted and participated, directly and indirectly, in the conduct of Health's business affairs.  Because of their senior positions, they knew the adverse non-public information about eHealth's misstatement of construction delays, and contingent liabilities.

165.  As officers of a publicly owned company, the Section 20(a) Defendants had a duty to disseminate accurate and truthful information with respect to eHealth's financial condition and results of operations, and to correct promptly any public statements issued by eHealth which had become

materially false or misleading.

166.  Because of their positions of control and authority as senior officers, the Section 20(a) Defendants were able to, and did, control the contents of the various reports, press releases and public filings which eHealth disseminated in the marketplace during the Class Period concerning eHealth's operations.  Throughout the Class Period, the Section 20(a) Defendants exercised their power and authority to cause eHealth to engage in the wrongful acts complained of herein. The Section 20(a) Defendants therefore, were "controlling persons" of eHealth within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of eHealth's common stock.

167.  Each of the Section 20(a) Defendants, therefore, acted as a controlling person of eHealth. By reason of their senior management positions of eHealth, each of the Section 20(a) Defendants had the power to direct the actions of, and exercised the same to cause, eHealth to engage in the unlawful acts and conduct complained of herein. Each of the Section 20(a) Defendants exercised control over the general operations of eHealth and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other Class members complain.

168.  By reason of the above conduct, the Section 20(a) Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by eHealth.

## **CLASS ACTION ALLEGATIONS**

169.  Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities who purchased or otherwise acquired shares of eHealth common stock on the public market between March 19, 2018 and April 7, 2020, inclusive, and who were damaged upon revelation of the truth. Excluded from the Class are Defendants and their families, the officers, directors, and affiliates of the Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

170.  The Class members are so numerous that joinder of all members is impracticable. eHealth's stock is actively traded on the New York Stock Exchange under the ticker symbol "EHTH" and millions of shares were sold during the Class Period.

171. As of July 31, 2020, there were 25,749,916 shares of eHealth's common stock outstanding.

172. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believe that there are thousands if not millions of members in the proposed Class.

173. Record owners and other Class members may be identified from records maintained by eHealth or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

174. Plaintiff's claims are typical of the claims of the Class members, as all Class members are similarly affected by defendants' conduct in violation of federal securities law that is complained of herein.

175. Plaintiff will fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class and securities litigation.

176. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business operations, financial statements, and accounting of eHealth;

c. whether Defendants caused eHealth to issue false and misleading statements during the Class Period; and

d. whether the Class members have sustained damages and, if so, what is the proper measure of damages.

177. A class action is superior to all other available methods for the fair and efficient

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the class representative;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


Dated: August 25, 2020                          Respectfully submitted,

                                                **LEVI & KORSINSKY, LLP**

                                                 */s/ Adam M. Apton*
                                                Adam M. Apton (SBN 316506)
                                                Adam C. McCall (SBN 302130)
                                                388 Market Street, Suite 1300
                                                San Francisco, CA 94111
                                                Tel.: (415) 373-1671
                                                Fax: (415) 484-1294
                                                Email: aapton@zlk.com
                                                Email: amccall@zlk.com

                                                  -and-

                                                Nicholas I. Porritt
                                                **LEVI & KORSINSKY, LLP**

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1101 30th Street N.W., Suite 115
Washington, D.C. 20007
Tel.: (202) 524-4290
Fax: (212) 363-7171
Email: nporritt@zlk.com
(*to be admitted pro hac vice*)

*Attorneys for Lead Plaintiff and*
*Lead Counsel for the Class*

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS