1    JEROME F. BIRN, JR., State Bar No. 128561
     CATHERINE E. MORENO, State Bar No. 264517
2    BETTY CHANG ROWE, State Bar No. 214068
     WILSON SONSINI GOODRICH & ROSATI
3    Professional Corporation
     650 Page Mill Road
4    Palo Alto, CA 94304-1050
     Telephone:  (650) 493-9300
5    Facsimile:  (650) 565-5100
     Email: jbirn@wsgr.com
6            cmoreno@wsgr.com
            browe@wsgr.com
7

8    Attorneys for Defendants
     eHealth Inc., Scott N. Flanders,
     Derek N. Yung, and David K. Francis
9

10              **UNITED STATES DISTRICT COURT**

11           **NORTHERN DISTRICT OF CALIFORNIA**

12

13    IN RE eHEALTH INC. SECURITIES      )    CASE NO.:  4:20-cv-02395-JST
     LITIGATION                           )
14                                     )    **DEFENDANTS' NOTICE OF**
                   .          )    **MOTION AND MOTION TO**
15                                       )    **DISMISS AMENDED COMPLAINT**
                                      )    **FOR VIOLATIONS OF THE**
16                                       )    **FEDERAL SECURITIES LAWS**
                                      )
17                                       )    Hearing Date:  February 17, 2021
                                      )    Time:  2:00 p.m.
18                                       )    Courtroom:  6
                                      )    Honorable Jon S. Tigar
19    _____ )

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 3

    A.    eHealth's Business. ................................................................................... 3

    B.    eHealth's Revenue Recognition Is Mandated By A New Accounting Standard. ................................................................................................... 4

        1.    eHealth Recognizes as Revenue Less Than the Full Lifetime Value of a Policy and Its Practice Has Proven Conservative. ................... 4

        2.    eHealth Warned Extensively of the Risks That Are the Basis for Plaintiff's Case. ................................................................................. 6

    C.    The Misguided Short Seller Attack And The Market's Reaction ......................... 7

    D.    eHealth's Financial Results For 1Q 2020 And 2Q 2020 Exceeded Expectations, But Churn Rates Were Disappointing. ................................. 9

    E.    Plaintiff's Allegations. ............................................................................. 9

ARGUMENT ...................................................................................................................... 9

I.    THE STANDARDS APPLICABLE TO THIS REFORM ACT CASE ............................ 9

II.    PLAINTIFF FAILS TO PLEAD AN ACTIONABLE MISSTATEMENT OR OMISSION .................................................................................................... 10

    A.    Plaintiff Fails To Plead Particularized Facts Showing That Reported Member Churn Rates And LTVs Were False. ......................................... 10

        1.    No Specific Facts are Pled Showing Higher Churn or Inflated LTVs During 2019 ................................................................................ 10

        2.    Statements About LTVs and Churn are Inactionable Opinions. .............. 12

        3.    The February 21, 2019 Statements Are Not False or Misleading. ............ 14

        4.    Plaintiff Improperly Pleads Fraud by Hindsight and Ignores eHealth's Robust Disclosures ................................................................ 15

    B.    Plaintiff Fails To Plead An Actionable Omission Based On DTV Marketing. ............................................................................................. 16

    C.    eHealth's Flat LTV Forecast For 2020 Is Protected By The Safe Harbor. ........... 18

    D.    Statements Regarding Costs Are Not False or Misleading. ................................. 19

III.    PLAINTIFF FAILS TO ESTABLISH SCIENTER ................................................... 20

A.   Plaintiff Fails To Plead Specific Facts Showing That Defendants Knew That Revenue Was Overstated Because Of DTV-Related Churn. ........................ 20

1.   The CW Allegations Do Not Raise a Strong Inference of Scienter. .......... 20

2.   The "Admissions" Do Not Raise a Strong Inference of Scienter. ............ 22

B.   The Individual Defendants' Stock Trading And Compensation Do Not Support An Inference of Scienter. .......................................................... 23

CONCLUSION ..................................................................................................... 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

Pages

## CASES

*Applestein v. Medivation, Inc.,*
    2011 WL 3651149 (N.D. Cal. Aug. 18, 2011) ................................................................24

*Bodri v. GoPro, Inc.,*
    252 F. Supp. 3d 912 (N.D. Cal. 2017) ...............................................................17, 18, 22

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.,*
    65 F. Supp. 3d 840 (N.D. Cal. 2014), *aff'd*, 856 F.3d 605 (9th Cir. 2017)...................11, 16

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.,*
    856 F.3d 605 (9th Cir. 2017)...........................................................................12, 13

*City of Roseville Ret. Sys. v. Sterling Fin. Corp.,*
    963 F. Supp. 2d 1092 (E.D. Wash. 2013), *aff'd*, 691 F. App'x 393 (9th Cir.
    2017)........................................................................................................25

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.,*
    880 F. Supp. 2d 1045 (N.D. Cal. 2012) ..............................................................22

*Curry v. Yelp Inc.,*
    2015 WL 7454137 (N.D. Cal. Nov. 24, 2015) (Tigar, J.), *aff'd*, 875 F.3d
    1219 (9th Cir. 2017)......................................................................................20

*Fait v. Regions Fin. Corp.,*
    655 F.3d 105 (2d Cir. 2011)............................................................................12

*Harris v. AmTrust Fin. Servs.,*
    135 F. Supp. 3d 155 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016) ...............11, 13

*Hong v. Extreme Networks, Inc.,*
    2017 WL 1508991 (N.D. Cal. Apr. 27, 2017) .......................................................17

*In re Accuray Inc. Sec. Litig.,*
    757 F. Supp. 2d 936 (N.D. Cal. 2010) ................................................................20

*In re Bus. Objects S.A. Sec. Litig.,*
    2005 WL 1787860 (N.D. Cal. July 27, 2005) .....................................................20, 21

*In re Convergent Tech. Sec. Litig.,*
    948 F.2d 507 (9th Cir. 1991)............................................................................14

*In re Cutera Sec. Litig.,*
    610 F.3d 1103 (9th Cir. 2010)........................................................................18, 19

*In re Mellanox Techs. Ltd. Sec. Litig.,*
    2014 WL 12650991 (N.D. Cal. Mar. 31, 2014) ...................................................15, 23

*In re Metricom Sec. Litig.,*
    2004 WL 966291 (N.D. Cal. Apr. 29, 2004), *aff'd sub nom. Young v.*
    *Dreisbach*, 182 F. App'x 714 (9th Cir. 2006)........................................................25

*In re Nektar Therapeutics*,
  2020 WL 3962004 (N.D. Cal. Jul. 13, 2020) ..................................................................11

*In re Netflix, Inc. Sec. Litig.*,
  964 F. Supp. 2d 1188 (N.D. Cal. 2013), *aff'd*, 647 F. App'x 813 (9th Cir.
  2016)..............................................................................................................................21

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014) .......................................................................................10

*In re Pivotal Sec. Litig.*,
  2020 WL 4193384 (N.D. Cal. Jul. 21, 2020) ................................................................14

*In re Rigel Pharm., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012)..........................................................................................24

*In re Silicon Graphics Inc. Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999).....................................................................................16, 20

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
  160 F. Supp. 2d 1059 (N.D. Cal. 2001) .........................................................................24

*In re Vantive Corp.*,
  283 F.3d 1079 (9th Cir. 2002)..........................................................................16, 22, 23

*In re Velti PLC Sec. Litig.*,
  2015 WL 5736589 (N.D. Cal. Oct. 1, 2015) ............................................................13, 16

*In re Verifone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012)..........................................................................................23

*In re Veritas Software Corp. Sec. Litig.*,
  2003 WL 27386177 (N.D. Cal. Dec. 10, 2003) .............................................................23

*Irving Firemen's Relief & Ret. Fund v. Uber Techs.*,
  2018 WL 4181954 (N.D. Cal. Aug. 31, 2018) ...............................................................17

*Lipton v. Pathogenesis Corp.*,
  284 F.3d 1027 (9th Cir. 2002)..................................................................................22, 24

*Lopes v. Fitbit, Inc.*,
  2020 WL 1465932 (N.D. Cal. Mar. 23, 2020), *appeal docketed*, No. 20-
  16033 (9th Cir. May 28, 2020)..................................................................................22, 25

*Lu v. Align Tech., Inc.*,
  417 F. Supp. 3d 1266 (N.D. Cal. 2019) ....................................................................17, 19

*McGovney v. Aerohive Networks, Inc.*,
  2019 WL 8137143 (N.D. Cal. Aug. 7, 2019) ............................................................15, 19

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
  540 F.3d 1049 (9th Cir. 2008)........................................................................................10

*Omnicare, Inc. v. Laborers Dist. Council Constr. Ind. Pension Fund*,
  575 U.S. 175 (2015) .......................................................................................................13

*Oregon Public Emps. Ret. Fund v. Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014) .................................................................................15

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) .......................................................................20, 25

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ........................................................................10, 25

*Seaman v. Cal. Bus. Bank*,
    2013 WL 5890726 (N.D. Cal. Oct. 30, 2013) .........................................................25

*Seaman v. Cal. Bus. Bank*,
    2014 WL 1339649 (N.D. Cal. Apr. 2, 2014) ....................................................13, 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ............................................................................................10

*Webb v. SolarCity Corp.*,
    884 F.3d 844 (9th Cir. 2018) .................................................................................10

*West v. eHealth, Inc.*,
    2016 WL 948116 (N.D. Cal. Mar. 14, 2016) ..............................................15, 17, 18

*Wozniak v. Align Tech., Inc.*,
    850 F. Supp. 2d 1029 (N.D. Cal. 2012) ..........................................................22, 24

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ...........................................................20, 21, 23, 25

**STATUTES**

15 U.S.C. § 77z-2(i)(1) ...............................................................................................18

15 U.S.C. § 78u-4(b)(1)(B) .........................................................................................10

15 U.S.C. § 78u-4(b)(2)(A) .........................................................................................10

15 U.S.C. § 78u-4(b)(3)(A) .........................................................................................10

15 U.S.C. § 78u-5(c)(1) ..............................................................................................18

15 U.S.C. § 78u-5(i)(1) ...............................................................................................18

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on February 17, 2021 at 2:00 p.m., before The Honorable Jon S. Tigar, United States District Court, Oakland Courthouse, Courtroom 6, 2d Floor, at 1301 Clay Street, Oakland, California, Defendants eHealth, Inc. ("eHealth" or the "Company"), and Scott N. Flanders, Derek N. Yung, and David K. Francis ("Defendants") will move to dismiss Plaintiff's Amended Complaint ("Complaint") pursuant to the Private Securities Litigation Reform Act of 1995 ("Reform Act"), 15 U.S.C. § 78u-4(a) *et seq.*, and Fed. R. Civ. P. 9(b) and 12(b)(6). This Motion is based on this Notice of Motion and Motion; Memorandum of Points and Authorities; Defendants' Request for Judicial Notice; the Declaration of Betty Chang Rowe ("Rowe Decl.") and accompanying exhibits ("Ex."); and, other matters before the Court.

**STATEMENT OF ISSUES (CIVIL L.R. 7-4(a)(3))**

1. Whether the Complaint states a claim for a violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5?

2. Whether the Complaint states a claim for "controlling person" liability under Section 20(a) of the Exchange Act?

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

eHealth acts as a health insurance broker, providing online and tele-sales assistance to consumers seeking to buy insurance from health insurers. This putative securities action was filed on the same day that a self-described short seller published a report speculating that eHealth had overstated its 2019 revenue by using "aggressive" accounting assumptions in its application of a new, complex accounting standard for revenue recognition (ASC 606). There is no basis for the short-seller's assertion. Since its mandatory adoption of ASC 606 in 2018, eHealth's financial statements have received unqualified audit opinions from its independent accountants, Ernst & Young LLP. There has been no financial restatement of previously-recorded revenue; indeed, eHealth's application of ASC 606 was conservative, resulting in additional revenue for 2017, 2018, 2019, and Q1 2020 because of better than expected collections.

The securities laws are not designed to perpetuate the flawed opinions and self-interested

1   attacks of short-sellers out to profit from a decline in eHealth's stock price.  Since adopting ASC

2   606, eHealth has extensively disclosed its method for applying the new accounting standard and

3   the assumptions it uses to do so.  ASC 606 requires eHealth to estimate the amount of commissions

4   it expects to receive over the lifetime of a consumer's health policy – the "Lifetime Value" or LTV

5   – and record all that revenue immediately.  And that is precisely what eHealth has done, disclosing

6   its accounting assumptions all along.  Even by Plaintiff's own allegations, "*ASC 606, allowed*

7   *eHealth to recognize immediately the entirety of the commissions it expected to receive over the*

8   *expected life of the policies*."  ¶ 2 (emphasis added).

9        Plaintiff's accounting fraud claims simply parrot the short-seller.  The short-seller, who

10  admits its disdain of ASC 606, claims that 2019 revenue was overstated because eHealth should

11  have applied even more conservative assumptions in estimating LTVs.  The short seller expressed

12  the opinion that (1) eHealth should assume an average contract length of one year versus the three

13  years eHealth used, and (2) member "churn" (shorthand for member attrition, consumers who

14  cancel or stop paying their health insurance premiums, ¶ 39) was higher for Medicare Advantage

15  plans because of increased (and allegedly undisclosed) churn associated with eHealth's direct

16  television advertising, or DTV.  The short-seller's opinions, however, are not facts, and Plaintiff

17  fails to plead any *facts* to support this overarching theory.

18       Plaintiff pleads no particular facts to show that LTVs were inflated in the first instance, let

19  alone due to DTV-related churn.  There are no contemporaneous facts alleged showing that churn

20  or LTV was different from what eHealth reported.  eHealth's use of DTV, one of many marketing

21  channels, was no secret.  Critically, the Complaint is devoid of specific facts showing whether,

22  how and to what extent DTV-related churn impacted LTVs of Medical Advantage plans and 2019

23  revenue.  Plaintiff likewise fails to plead facts showing that LTVs for Medicare Advantage plans

24  must be based on a one-year retention assumption, or to undermine any of eHealth's other

25  assumptions and modeling.  eHealth extensively disclosed LTVs, membership and churn levels

26  and, beginning in October 2019, specific churn rates for Medicare Advantage.

27       In short, Plaintiff has failed to plead a single material misstatement or omission.  Although

28  eHealth reported increased trailing twelve-month churn of 42% in Q2-20 (compared to 38% in

Q1), and investors were disappointed, Plaintiff fails to plead particularized facts showing that churn rates were actually higher earlier, much less that higher churn resulted in an overstatement of revenue. As eHealth explained, the increased Q2-20 churn was due in part to an additional enrollment period opened during Q1, which provided another opportunity for consumers to switch insurance plans – hardly a tale of accounting fraud.

Moreover, no facts are alleged to suggest that eHealth's application of the new accounting standard was deliberately reckless or fraudulent. None of the confidential witnesses said anything about revenue recognition. None identified specific information provided to any Defendant inconsistent with a public statement, or offered facts showing any Defendant's contemporaneous knowledge of alleged misconduct. The Individual Defendants' stock sales refute an inference of scienter: CEO Flanders and COO Francis each sold small percentages of their available holdings, held more shares at the end of the Class Period than at the beginning, and many sales were pursuant to Rule 10b5-1 trading plans.

In sum, the Complaint falls far short of the Reform Act's heightened pleading standards and should be dismissed in its entirety.

## STATEMENT OF FACTS

### A.      eHealth's Business.

eHealth is a leading health insurance marketplace and broker that allows consumers to obtain quotes from health insurance carriers, compare plans, and apply for and purchase plans. ¶ 20; Ex. 1 at 4, 45. eHealth brokers Medicare plans, Individual and Family plans, and Small Business plans and is paid commissions by health insurers. ¶¶ 20, 22, 27; Ex. 1 at 4-5.[1] For the last four years, eHealth has sold primarily Medicare-related health insurance, which accounted for approximately 88% of its commission revenue in 2019. Ex. 1 at 44. This case concerns the Medicare Advantage (MA) product within eHealth's Medicare business, and the facts alleged and discussed below primarily concern MA plans.

---

[1] All exhibits are attached to the Declaration of Betty Chang Rowe. The Court may consider all exhibits cited under the doctrine of incorporation by reference and/or judicial notice. *See* Defendants' Request for Judicial Notice.

eHealth's business is extraordinarily seasonal because, absent certain life events, health insurance plans must be sold during specified open or annual enrollment periods, which occur in Q4 and last only one to two months. *Id.* at 17. Thus, eHealth's commission revenue is highest in Q4, during the Medicare annual enrollment period. *Id.* Beginning January 1, 2019, an additional Medicare enrollment was reintroduced, allowing MA members to switch plans or disenroll from their plan during Q1 of each year. Ex. 2 at 18; *see* Ex. 1 at 17.

**B.      eHealth's Revenue Recognition Is Mandated By A New Accounting Standard.**

Historically, eHealth recognized revenue as it was paid commissions by the insurers, based on payments received by the insurers from their customers. ¶ 28. As of January 1, 2018, however, eHealth was *required* to adopt a dramatically new accounting standard, Accounting Standards Update 2014-09, *Revenue from Contracts with Customers* ("ASC 606"). ¶ 29; Ex. 2 at 48. Under the new standard, eHealth is required to estimate and recognize immediately all the commission revenue it projects it will receive over the expected life of each policy it brokers. ¶¶ 2, 29. This amount of revenue is referred to as the Lifetime Value or "LTV." For Medicare-related plans, eHealth recognizes the revenue when the insurer approves an application submitted by a customer (¶¶ 29, 37) because at that time eHealth's contractual obligation to the insurer is complete. Ex. 1 at 65 (revenue recognized when "related performance obligation is satisfied by transferring the promised good or service to the customer.").

The adoption of ASC 606 was a dramatic change in the revenue recognition rules. eHealth used third-party consultants to develop the methodologies for its application of ASC 606. Ex. 3 at 11. Ernst & Young LLP (E&Y) has audited these processes and methodologies and eHealth's financial statements and has consistently provided unqualified audit opinions stating that they comply with generally accepted accounting principles. Ex. 1 at 72-73.

**1.      eHealth Recognizes as Revenue Less Than the Full Lifetime Value of a Policy and Its Practice Has Proven Conservative.**

eHealth applies ASC 606 conservatively. It does not recognize the full LTV as revenue when a consumer is approved by an insurer, but only a percentage of the LTV, called the "constrained LTV." *Id.* at 48 n.1, 65-66, 81; ¶ 37. While eHealth expects to collect 100% of the

LTV, the "constraint" is meant to account for volatility in LTV for potential future changes in estimates of the projected duration of insurance plans; for example, consumers may cancel or switch plans at some earlier or later time than expected. *See* Ex. 1 at 85. In 2017, 2018, and 2019, eHealth applied a 7% constraint to the estimated LTV for MA plans (*id.* at 52), meaning that eHealth initially recognized as revenue only 93% of what it expected to receive.[2]

Obviously, predicting how long into the future persons whose applications are approved by insurers will pay their premiums can be a challenge. eHealth has warned investors that its constrained LTVs (the basis for revenue recognition) "are estimates" based on "assumptions," which themselves are "estimates" and "forecasts." *Id.* at 14. For example, the assumptions include "estimates of the conversion rates of approved members into paying members," "forecasted average plan duration" and "forecasted commission rates" that eHealth expects to receive per approved member's plan. *Id.* at 14-15, 66. eHealth has expressly cautioned that "[t]hese assumptions are based on historical trends and *require significant judgment* by our management in interpreting those trends and applying constraints." *Id.* at 15 (emphasis added); *see id.* at 81.

To predict "average plan duration," eHealth must estimate when and how many of its members may cancel their health insurance – called member attrition or "churn," which is reported as a trailing twelve-month rate. *See* ¶ 38; Ex. 1 at 15, 18, 23. eHealth forthrightly disclosed information about churn and LTVs throughout the Class Period. It regularly disclosed approved and estimated membership levels as well as the constrained LTV per approved member (*e.g.*, Ex. 4 at 35-38), discussed churn and LTV rates and trends,[3] disclosed the pattern of churn for Medicare,[4] and disclosed that the average duration for MA plans was approximately 3 years, but some plans last up to 12 years. Ex. 1 at 66, 81. Beginning in October 2019, eHealth also provided

---

[2] eHealth adopted ASC 606 on a full retrospective basis in 2018, meaning that eHealth has also reported 2017 financial results as if ASC 606 applied. Ex. 2 at 48, 85.

[3] *See, e.g.*, Ex. 5 at 7 (3% increase in LTV); Ex. 6 at 7 (10% increase in LTV); Ex. 7 at 6 (increase in churn on Q4 2018 cohort that was immaterial to LTV because of eight-quarter look back); *id.* at 6-7 (1Q 2019 had "higher churn"); Ex. 8 at 7 (LTV increased 2% in 4Q 2019 and 5% for full year 2019); Ex. 9 at 11 ("we saw an elevated churn in Q1 of 2019 off of the heavy enrollment in Q4 2018" because of Q1 enrollment period).

[4] *E.g.*, Ex. 11 at 12 (reflecting member turnover is highest during the first year of enrollment and declines with each sequential year); Ex. 10 at 51.

specific historical and current estimates of trailing twelve-month MA churn:

|  | Q4 2018 | Q1 2019 | Q2 2019 | Q3 2019 | Q4 2019 | Q1 2020 | Q2 2020 |
|---|---|---|---|---|---|---|---|
| **Churn Rate** | 36% | 32% | 35% | 34% | 31% | 38% | 42% |

Ex. 11 at 10; Ex. 12 at 10.

To recognize revenue, eHealth separately estimates the constrained LTV for each "cohort" (a group of approved members who purchase a type of plan in a certain month) based on historical trends and future expectations. Ex. 1 at 14, 66, 81. On a quarterly basis, eHealth recomputes LTV for each cohort, reviews and monitors changes in the data used to estimate that LTV, and compares cash received to original estimates. *Id.* at 81. The LTV estimation process is complicated because there is a significant time lag before eHealth learns of member attrition. On the front end, eHealth does not know whether a person approved by an insurer will start to pay premiums until payments are made. Ex. 13 at 26. This lag is especially pronounced around the annual open enrollment periods, when there is a flood of approved applicants. *See* Ex. 14 at 15. On the back end, eHealth does not have immediate visibility into member cancellations until notified by the insurer. Ex. 1 at 49 ("majority of our members who terminate their plans do so by discontinuing their premium payments to the carrier and do not inform us of the cancellation.").

During the Class Period, eHealth's constrained LTVs – and therefore recognized revenue – were conservative. On an annual basis, eHealth has *underestimated* the cash it will receive such that it recorded additional positive adjustment, or "tail," revenue for 2017, 2018 and 2019. *Id.* at 85. In other words, for those fiscal years, eHealth ended up recording more revenue to account for better than expected collections. Tail revenue for 2019 was $88.1 million. *Id.*

## 2. eHealth Warned Extensively of the Risks That Are the Basis for Plaintiff's Case.

eHealth repeatedly and in detail cautioned investors about the judgments and risks associated with its estimates of constrained LTVs and revenue recognition. For example:

- The constrained lifetime value for each product line is an *estimate* and is based on a number of *assumptions [including] estimates of the conversion rates of approved members into paying members, forecasted member churn and forecasted commission amounts we expect to receive per approved member. These assumptions are based on historical trends and incorporate management's judgment.* . . . [N]egative changes in the factors upon which we estimate constrained lifetime values, such as reduced

conversion of approved members to paying members, increased member churn or a reduction in the lifetime commission amounts we expect to receive for selling the plan to a member or other changes outside our control, would harm our business, operating results and financial condition.  Ex. 2 at 15-16 (emphasis added); Ex. 1 at 14-15.

- Projections are based upon a number of assumptions and estimates that, while presented with numerical specificity, are *inherently subject to significant business, economic and competitive uncertainties and contingencies, many of which are beyond our control* and are based upon specific assumptions with respect to future business decisions, some of which will change . . . [and] vary over time.  Ex. 10 at 40 (emphasis added); Ex. 2 at 37; Ex. 1 at 37.

eHealth also explicitly warned that changes in its estimates of member retention and churn could impact its LTV and revenue:

- "*Any decrease in the amount of time we retain our members . . . could adversely impact the estimated constrained LTV we use for purposes of recognizing revenue*[.]" Ex. 1 at 18 (emphasis added); Ex. 2 at 19.

- If eHealth experienced "higher health insurance plan termination rate" or "higher member turnover . . . than we estimated when we recognized commission revenue, we may not collect all of the related commission receivable, which could result in a write-off of commission receivable[.]"  Ex. 1 at 14, 18.

Further, eHealth cautioned that "the open enrollment period could cause us to experience an increased Medicare Advantage plans termination rate[.]"  *Id.* at 18.  Finally, eHealth cautioned about the risks related to its direct marketing channel (which includes direct mail, email marketing, television, radio and print advertising).  *Id.* at 9.  eHealth warned that its success in the Medicare market depends on "[its] success in marketing to Medicare-eligible individuals, including television advertising, online marketing and direct mail marketing[.]"  *Id.* at 20.

### C.    The Misguided Short Seller Attack And The Market's Reaction

On April 8, 2020, Muddy Waters Capital LLC ("Muddy Waters"), an admitted and notorious short-seller, issued a report attacking eHealth.[5]  Muddy Waters alleged that, since the adoption of ASC 606, eHealth has been "mask[ing] a significantly unprofitable business" by understating churn. ¶ 48. According to the report, eHealth's use of TV advertising attracted lower-

---

[5] The authors admittedly "have a short position in" eHealth and "stand to realize significant gains" if the price of eHealth stock declines.  Ex. 15 at 1.  The report disclaims any representations as to the accuracy or completeness of its contents, merely "expresses the opinion[s]" of Muddy Waters which are "subject to change without notice" and is "based on generally available information" "obtained from public sources."  *Id.*

quality MA members who churn more rapidly.  ¶¶ 48, 50-51.

The gravamen of the report is not that eHealth engaged in fraud but that the assumptions used by eHealth in calculating LTVs—member churn and average plan duration for MA plans— were "overly optimistic" and "aggressive." Ex. 15 at 4; ¶ 51.  Concocting and substituting its own formula for MA member churn, the short seller opined that churn has "skyrocketed" to 47% over the past two years and that the average MA plan duration is 2.1 years, not 3 years as disclosed by eHealth. Ex. 15 at 5, 14; *see* ¶¶ 51, 55.  The report "wholly disagree[d] with EHTH's recognizing more than one year of commissions in each period" (Ex. 15 at 10) and disagreed that "EHTH may apply ASC 606 as it does[.]"  *Id.* at 14.  Based upon its own application of ASC 606, Muddy Waters proclaimed that eHealth's 2019 revenue should be reduced by 25%, that commission receivables were overstated by $128 million, and dismissed eHealth as "[l]ittle [m]ore than a [s]tock [p]romotion." *Id.* at 14-15.[6]

The day the short-seller report was issued, Plaintiff filed this lawsuit.  Although eHealth's stock price declined from $116.90 on April 7 to $103.20 on April 8, 2020 (¶ 61), it recovered within a week.  Ex. 16 at 13 ($120.79 on April 14).  Several sell-side analysts disputed Muddy Waters.  They noted that the short-seller's "concerns around LTV assumptions and churns are not new" (Exs. 17 and 18) and that they were "comfortable with EHTH accounting" (Ex. 19) because eHealth has "been conservative in its accounting" (Ex. 17) as evidenced by the adjustment revenue and its 3.1-year plan duration assumption that was *shorter* than used by some peers.  Exs. 17-19. The analysts pointed out numerous errors in the report and concluded that eHealth's business and outlook remained strong.[7]  Even one of Muddy Waters' supposed sources (Executive B) agreed that three years was "probably accurate" for the LTV of direct TV consumers.  Ex. 15 at 7.

---

[6] The report further stated that eHealth ignored supposed expenses related to member services and retention after an insurer approved an application.  ¶¶ 57-58; *see* Ex. 15 at 9-13.

[7] *See* Ex. 18 at 1 ("if one were to consider only Year 1 churn, of course the LTV would be lower – but churn should be based on multiple years" and is considerably lower in subsequent years); Ex. 20 (report failed to acknowledge that seniors who bought plan in 4Q18 were allowed to switch in 1Q19 which would elevate churn compared to 1Q18).

**D.      eHealth's Financial Results For 1Q 2020 And 2Q 2020 Exceeded Expectations, But Churn Rates Were Disappointing.**

On April 23, 2020, eHealth reported excellent financial results for Q1-20.  Total revenue was up 55% year-over-year; Medicare revenue increased 75%.  Ex. 21 at 1.  The Company reported that the trailing twelve-month churn for MA had been higher than expected in Q1 (38%), driven primarily by a new enrollment period in Q1.  Ex. 9 at 7, 11; Ex. 3 at 12.  eHealth reported that it had observed the same pattern in Q1-19 and believed churn was again higher because more seniors switched plans during this period compared to a year ago.  Ex. 9 at 7.  eHealth conservatively forecasted flat MA LTVs for 2020 (*id.* at 7, 17) and increased its 2020 annual revenue guidance from $580-$620 million to $600-640 million.  Ex. 21 at 3.

On July 23, 2020, eHealth announced Q2 financial results; again, the results were excellent.  Revenue increased 35% year-over-year, with Medicare revenue up 54%.  Ex. 22 at 1.  eHealth increased its annual revenue guidance from $600-$640 million to $630-$670 million.  Ex. 23 at 9.  eHealth reported that the trailing twelve-month MA churn had not normalized as expected but had increased from 38% in Q1 to 42% in Q2.  Ex. 12 at 10.  eHealth believed the increased churn was caused in part by greater numbers of MA members switching plans than historically. Ex. 23 at 6-7.

**E.      Plaintiff's Allegations.**

The Complaint alleges that Defendants made false and misleading statements in SEC filings and quarterly earnings calls from Q1 2018 to Q2 2020.  The challenged statements fall into four categories:  (1) statements about the churn rate, including the alleged overstatement of 2019 commission revenue (¶¶ 82-84, 96-97); (2) the alleged failure to disclose that higher churn for MA members was caused by "low quality" members resulting from DTV advertising (¶¶ 78-79, 87-88); (3) the alleged failure to disclose that churn for MA members was higher in the first year (¶¶ 100-101); and (4) statements regarding the absence of costs related to commission receivables (¶¶ 70-71, 75-76, 91-93).

**ARGUMENT**

**I.      THE STANDARDS APPLICABLE TO THIS REFORM ACT CASE**

To state a claim under Section 10(b) and Rule 10b-5, Plaintiff must plead specific facts

showing: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Webb v. SolarCity Corp.*, 884 F.3d 844, 850 (9th Cir. 2018) (citation omitted). Plaintiff must satisfy both the heightened requirements of Rule 9(b) and the Reform Act's "formidable pleading requirements[.]" *Metzler Inv. GMBH v. Corinthian Colls.*, *Inc.*, 540 F.3d 1049, 1054-55 (9th Cir. 2008). To plead falsity, "the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why [it] is misleading[.]" 15 U.S.C. § 78u-4(b)(1)(B). A plaintiff must "specify facts or evidence that show why the statement was false at the time it was made[.]" *Ronconi v. Larkin*, 253 F.3d 423, 431 (9th Cir. 2001). Plaintiff must also "state with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2)(A). Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052-53 (9th Cir. 2014) (citation omitted). Scienter requires deliberate recklessness or conscious misconduct. *Id*. "Deliberate recklessness is an extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *SolarCity*, 884 F.3d at 851 (citation omitted). In evaluating scienter, courts must "consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (2007). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. at 324. A complaint not meeting these requirements "shall" be dismissed. 15 U.S.C. § 78u-4(b)(3)(A).

## II.   PLAINTIFF FAILS TO PLEAD AN ACTIONABLE MISSTATEMENT OR OMISSION

### A.   Plaintiff Fails To Plead Particularized Facts Showing That Reported Member Churn Rates And LTVs Were False.

#### 1.   No Specific Facts are Pled Showing Higher Churn or Inflated LTVs During 2019.

Plaintiff fails to plead with particularity facts showing that LTVs in 2019 were "inflated,"

1   that churn was increasing, or that eHealth disregarded evidence of churn in estimating LTVs.

2   Thus, there is no basis for Plaintiff's allegation that revenue was improperly recognized.

3       At the outset, Plaintiff ignores that eHealth initially guided for *flat* LTVs for 2019 (Ex. 6

4   at 9-10) and, after Q3-19, for a 1%-2% *decrease* in LTVs.  Ex. 7 at 6.  And, MA churn rates were

5   *lower* in each quarter of 2019 than in 4Q-18.  *See* Ex. 12 at 10.  After Q2-19, the churn rate *declined*

6   each quarter for the remainder of 2019.  *Id.*  Thus, far from using "inflated" LTVs, eHealth's LTV

7   assumptions for 2019 were conservative.

8       Plaintiff offers no facts to dispute what eHealth disclosed.  Plaintiff's reliance on Muddy

9   Waters cannot sustain Plaintiff's burden.  The biased "opinion" from an anonymous short-seller

10  who admittedly "stand[s] to realize significant gains" from a decline in eHealth's stock price

11  cannot support falsity.  Ex. 15 at 1; *id.* at 6-9, 13, 15 ("we believe," "we think," and "in our view"

12  statements); *see In re Nektar Therapeutics*, 2020 WL 3962004, at *10 (N.D. Cal. Jul. 13, 2020)

13  (short-seller cannot show falsity given "disclosures detailing that it stood to benefit from a poor

14  performance" and unreliability of its "opinions on the highly-technical matters").

15      At its base, the Muddy Waters report is nothing more than a disagreement with eHealth's

16  application of ASC 606.  Ex. 15 at 14 ("We wholly disagree" that "EHTH may apply ASC 606 as

17  it does").  Indeed, while the report "wholly disagrees with EHTH's recognizing more than one

18  year of commissions in each period" (*id.* at 10), Plaintiff admits that "ASC 606, *allowed eHealth*

19  *to recognize immediately the entirety of the commissions it expected to receive over the expected*

20  *life of the policies*."  ¶ 2 (emphasis added).  This concession undercuts the heart of Plaintiff's case:

21  ASC 606 does not require eHealth to recognize revenue by assuming plans will last only one year,

22  which is the basis for Muddy Waters' imagined overstatement of revenue.  This crucial example

23  illustrates that Muddy Waters' subjective opinions are not well-plead *facts.  See City of Dearborn*

24  *Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 65 F. Supp. 3d 840, 852 (N.D. Cal.

25  2014) (Plaintiff's calculations of fair value "represent Plaintiff's *opinion* as to how Align could

26  have or should have calculated the fair value of its reporting units in 4Q11, and are not a substitute

27  for *facts*"), *aff'd*, 856 F.3d 605, 613 (9th Cir. 2017); *Harris v. AmTrust Fin. Servs.*, 135 F. Supp.

28  3d 155, 171 (S.D.N.Y. 2015) ("accounting assumptions" "are, by definition, not statements of

1    fact"), *aff'd*, 649 F. App'x 7 (2d Cir. 2016).

2        The CWs also do not support Plaintiff's accounting claims.  Not a single CW mentions

3    LTVs, let alone facts showing that LTVs were inflated in 2019 (or at any time).  Not a single CW

4    stated that Defendants ignored churn trends in calculating LTVs in 2019 (or at any time).  And,

5    not a single CW stated that eHealth's commission revenue was overstated in 2019 (or at any time).

6    This is hardly surprising because not a single CW claims to have been involved in the calculation

7    of LTVs or commission revenue.  *See* ¶ 108 (the only CW who allegedly worked in the finance

8    department was responsible for processing commission payments).

9        Moreover, far from showing that eHealth "disregard[ed]" churn trends, the CW allegations

10   establish that churn was considered.  Three CWs vaguely stated that senior management was

11   cognizant of churn trends in 2018 and employed measures to address them.[8]   In short, the

12   Complaint is devoid of specific facts showing that churn was higher or that LTVs were inflated

13   during 2019, and that revenue was overstated in 2019 (or any time).

14              **2.     Statements About LTVs and Churn are Inactionable Opinions.**

15       As eHealth disclosed, the constrained LTV and underlying assumptions are "estimates"

16   that require "significant judgment."  Ex. 1 at 15.  eHealth's outside auditors have attested to "the

17   subjectivity required by the Company to estimate the amount and timing of future cash flows" and

18   the constraint. *Id.* at 73.  Even Muddy Waters concedes that the accounting at issue is "subjective."

19   Ex. 15 at 2.  Statements based on these metrics thus are opinions.  *See Fait v. Regions Fin. Corp.*,

20   655 F.3d 105, 110-11 (2d Cir. 2011) (goodwill estimates are statements of opinion as they depend

21   on "management's determination of the 'fair value' of the assets acquired and liabilities assumed,"

22   which "will vary depending on the particular methodology and assumptions used"; not "objective

23   factual matters"); *Align*, 856 F.3d at 613 (similar).[9]

24

25       [8] *See* ¶ 40 (CW2, who left eHealth in March 2018, alleges that "senior executives" discussed
     member churn and "formed a team 'focused on developing strategies to retain' customers"); ¶ 43
26   (CW4:  "in December 2018 his supervisors grew concerned about 'increased turnover'" and "to
     address the churn issue, eHealth introduced a bonus structure"); ¶ 44 (CW5 "corroborated that
27   senior management was aware of 'quite a bit' of churn in 2018").

28       [9] Although Plaintiff alleges that the LTV assumptions are "not particularly judgmental"
     because they are based on historical data.  ¶ 38.  Plaintiff does not dispute that management
     exercises judgment in interpreting the historical data and current trends and in calculating the

Statements of opinion are actionable only if (1) "the speaker did not hold the belief she professed," (2) the "supporting fact [the speaker] supplied were untrue," or (3) the belief omitted to mention facts that conflict with what a reasonable investor would take away from the statements themselves. *Omnicare, Inc. v. Laborers Dist. Council Constr. Ind. Pension Fund*, 575 U.S. 175, 185-86 (2015). Here, the Complaint does not satisfy *Omnicare*. Plaintiff fails to plead facts showing that Defendants either (1) did not believe in the estimated constrained LTVs and underlying assumptions used in 2019 (*see* Section II., *infra*), or (2) supplied untrue facts, or (3) that their beliefs conflicted with any undisclosed facts they knew. *See Align*, 856 F.3d at 617-18.

Significantly, Plaintiff does not allege that eHealth violated any provision of GAAP in estimating constrained LTVs, the underlying assumptions, or revenue. *See Seaman v. Cal. Bus. Bank*, 2014 WL 1339649, at *6 (N.D. Cal. Apr. 2, 2014) (Tigar, J.) (dismissing § 10(b) claim with prejudice; "Plaintiff does not suggest that in making its projections [of loss reserves]. . . Plaintiff [sic] deviated from accepted accounting procedures"); *Harris*, 135 F. Supp. 3d at 171 (complaint "alleged no *facts* indicating that AmTrust exercised its judgment in a way that violated GAAP beyond its disagreement with management's choices among alternative estimates"). Plaintiff simply adopts and repackages Muddy Waters' dislike of ASC 606 and opinion that eHealth should have recorded revenue based on only one-year plan duration, even though MA policies historically have lasted three years on average. *See, e.g.*, ¶ 64. Yet, "[d]isagreement with [eHealth's] judgment calls is insufficient to allege that [eHealth] misstated facts in its consolidated financial statements in violation of § 10(b) of the Exchange Act[.]" *Harris*, 135 F. Supp. 3d at 171; *see In re Velti PLC Sec. Litig.*, 2015 WL 5736589, at *26 (N.D. Cal. Oct. 1, 2015) ("Whatever differences there are between the method of calculating bad debt reserves that Velti disclosed . . . and that described by Ross in his interviews with plaintiff's counsel, they are insufficient to create liability for a material misstatement or omission."). At bottom, Plaintiff "does not plausibly allege a misstatement of fact; at best it alleges a difference of opinion regarding the reasonableness of" eHealth's "accounting assumptions." *Harris*, 135 F. Supp. 3d at 173.

---

*constrained* LTVs, which are the basis for revenue recognition. *See* Ex. 1 at 15. The constrained LTV is a prediction or opinion of future commission collections.

Finally, Plaintiff does not and cannot allege that E&Y disagreed with any of eHealth's assumptions and methodologies.  ASC 606 was a brand-new accounting standard that required estimates.  Put succinctly, E&Y was all over it.  E&Y involved its "valuation specialists" to assist in its "testing of the estimated average plan duration, which includes member attrition assumptions, used to develop the [MA] LTV, including performing certain corroborative calculations."  Ex. 1 at 73.  E&Y audited "management's determination of the LTV of commission revenue," which included "evaluating the methodology used and significant assumptions," "testing the completeness and accuracy of the underlying data," and testing eHealth's processes and controls, such as "those covering the models and methods used to calculate LTV" and "the use of management judgment to determine the constraint applied to LTV[.]"  *Id.*  As a result of its extensive audit work, E&Y provided clean audit opinions for both 2018 and 2019.  *Id.* at 72.

### 3.     The February 21, 2019 Statements Are Not False or Misleading.

Plaintiff challenges two statements made during the February 21, 2019 earnings call:

- Mr. Yung said: "we've actually seen some uptick [in the mix of our enrollments] and, therefore, uptick in LTVs since we've been on 606, so we actually have not seen an increase in churn.  We've actually seen a decrease in churn, on average."

- Mr. Flanders said: "our persistency rates have improved with the margin rather than turned south."

¶ 82.  Plaintiff fails to plead contemporaneous facts showing that these statements were false.  eHealth disclosed that churn did not decline in Q1-19 relative to Q4-18.  *See* Section A.1., *supra* (table).  Even according to Muddy Waters' data (which Plaintiff cribs), MA churn declined from Q4-18 (45.6%) to Q1-19 (40.3%).  ¶ 84; Ex. 15 at 5.

Plaintiff claims the statements "left investors with the false impression that eHealth had no problems associated with member retention."  ¶ 85.  This allegation clearly fails.  It has long been the law in the Ninth Circuit that true statements of historical fact do not imply anything about the future.  *See In re Convergent Tech. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991).  The fact that member churn decreased from the prior quarter in no way implies an absence of future issues with member retention.  *See In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *12 (N.D. Cal. Jul. 21, 2020) ("nothing in the challenged statements affirmatively created an impression that Pivotal did

1    not have 'long, varying sales cycles, competition, attrition, or face challenges.'"); *In re Mellanox*

2    *Techs. Ltd. Sec. Litig.*, 2014 WL 12650991, at *17 (N.D. Cal. Mar. 31, 2014) (Tigar, J.) ("Plaintiffs

3    have not explained why such statements were rendered false or misleading even assuming

4    Defendants had knowledge of the inventory buildup.").

5         Even worse, Plaintiff overlooks that later in the same earnings call, Mr. Yung expressly

6    acknowledged member retention issues:  "we're hoping that we will have initiatives that will start

7    to make an impact, but we haven't seen it yet, is really on the customer retention side[.]"  Ex. 6 at

8    11.  eHealth has always warned that member retention was an ongoing risk to its business.  *See*

9    *supra* at 7.  Indeed, seven months earlier, in July 2018, eHealth disclosed "customer retention

10   initiatives to mitigate customer leakage[.]"  Ex. 24 at 7, 13-14.  Thus, "Plaintiffs' omissions theory

11   fails to state a claim because the Defendants clearly disclosed material information to investors."

12   *Oregon Public Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014); *McGovney*

13   *v. Aerohive Networks, Inc.*, 2019 WL 8137143, at *12 (N.D. Cal. Aug. 7, 2019) (company

14   disclosed what Plaintiffs allege was omitted).

15              **4.    Plaintiff Improperly Pleads Fraud by Hindsight and Ignores**
                        **eHealth's Robust Disclosures.**
16

17        Plaintiff alleges that eHealth's reported Q2-20 trailing twelve-month MA churn rate of

18   42% and decline in constrained LTV levels "validated" Muddy Waters' conclusions.  ¶¶ 62-65,

19   67.  Not so.

20        In that earnings call, however, eHealth explained its belief that the higher Q2-20 churn was

21   due in part to the additional MA enrollment period in 1Q, which gave consumers an opportunity

22   to switch plans.  Ex. 23 at 6.  The fact that people switched their health plans during the first half

23   of 2020, however, does not prove that eHealth falsely reported lower churn rates in 2019.  When

24   the Affordable Care Act became effective, eHealth also experienced unexpectedly increased churn,

25   leading to a prior class action.  In dismissing that case, Judge Donato recognized that "a general

26   description of such a pattern [of churn] does not prove that defendants' earlier statements about

27   churn were false when made."  *West v. eHealth, Inc.*, 2016 WL 948116, at *3 (N.D. Cal. Mar. 14,

28   2016).  The old adage about fraud by hindsight is directly on point here.  *See In re Silicon Graphics*

*Inc. Sec. Litig.*, 183 F.3d 970, 988 (9th Cir. 1999) (Reform Act was intended "to put an end to the practice of pleading 'fraud by hindsight.'"); *In re Vantive Corp.*, 283 F.3d 1079, 1089 (9th Cir. 2002) (rejecting allegations of "hind-sight speculation").[10]  eHealth's repeated warnings about churn and LTV estimates are the antithesis of fraud and highlight the impropriety of Plaintiff's hindsight allegations.  *See supra* at 6-7; *Velti*, 2015 WL 5736589, at *26 (no misstatement where "disclosures informed investors" that reserves calculated "based on assumptions gleaned from its historical track record and from 'relevant facts and circumstances.'").  Moreover, as this Court has found in the context of estimating loan loss reserves, offering a projection "necessarily involves some degree of judgment about the possibility of future loss, and it is not securities fraud for that judgment to be in error."  *Seaman*, 2014 WL 1339649, at *6.  So, too, with constrained LTVs.

**B.**   **Plaintiff Fails To Plead An Actionable Omission Based On DTV Marketing.**

Plaintiff adopts Muddy Waters' theory that DTV marketing attracts members who "don't have loyalty" (Ex. 15 at 7), asserting that eHealth's quarterly SEC filings falsely attributed the Q2-18 decline in constrained LTVs and the Q2-19 decline in retention rate to changes in the open enrollment periods.  ¶¶ 78, 87  Plaintiff asserts that the declines were caused by "lower quality customers" solicited through DTV advertising who were "prone to churn" (¶¶ 79, 88).  But Plaintiff pleads no facts to support this assertion.

First, Plaintiff has misread a challenged statement.  The Q2-18 statement concerns a decline in the constrained LTV of commissions "per qualified health plan approved member" (¶ 78), which refers to Individual and Family Plans, *not Medicare plans* (let alone MA plans).  *See* Ex. 25 at 12 n.1 ("Individual and family health insurance plans include both Qualified and Non-Qualified plans.").  Plaintiff's case is about MA plans, not individual and family plans.  ¶ 39.

Second, Defendants' statements about the reasons for the decline in these metrics are statements of opinion.  ¶ 87 ("We believe the reintroduction [of open enrollment] contributed to the decreased retention rate); ¶ 78 (decrease in constrained LTVs was "driven by" the timing of

---

[10] *Velti*, 2015 WL 5736589, at *36 ("merely pleading that bad debt reserves turned out to be inadequate" insufficient); *City of Dearborn*, 65 F. Supp. 3d at 854 ("Without the benefit of hindsight . . . the Court cannot reasonably infer that Align's judgments concerning goodwill . . . were false and not believed at the time that they were made.").

open enrollment).  *West* is instructive.  There, Judge Donato rejected an allegation that eHealth "falsely implied that the decline in the conversion rate was primarily driven by problems with the insurance carriers."  2016 WL 948116, at *7.  The court held that defendants were "expressing their subjective opinion about what they believed had caused the decline in the conversion rate and none of the statements were 'capable of objective verification' that can 'constitute material misrepresentations.'"  *Id.* (citation omitted).  Likewise, Defendants here "were entitled to form an opinion that [the timing of enrollment periods] were the primary driver of the low" LTV or retention rates.  *Id.*  As in *West*, the statements are "inherently subjective" and "do not provide the basis for a securities violation."  *Id.*

Third, eHealth never said that the Q2-19 retention rate decline was caused "solely" by the timing of an open enrollment period.  ¶ 88.  Rather, eHealth expressed its belief that the reintroduction of the MA open enrollment period in Q1 "contributed to" the decreased retention rate in 2Q.  ¶ 87.  Plaintiff cannot rewrite eHealth's actual words.  "By cherry-picking portions of Defendants' statements and ignoring other portions, Plaintiff asks the Court to make inferences contradicted by the statements viewed properly as a whole."  *Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1276 (N.D. Cal. 2019) (dismissing § 10(b) claim).

Fourth, Plaintiff fails to plead any facts showing that the declines *were* caused by DTV-related churn, as Plaintiff does not even allege that Individual and Family Plans were marketed through DTV.  *See* ¶¶ 25-26 (DTV marketing was a Medicare-related initiative).  In any event, the alleged advertising shortcoming is not contrary to eHealth's statements that changes to enrollment period timing contributed to quarterly declines.  *See Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 928 (N.D. Cal. 2017) (Tigar, J.) ( "Plaintiff's allegation . . . does not directly contradict any of Defendants' statements").  In short, Plaintiff's factual allegations "are almost entirely untethered to the actual statements made[.]"  *Lu*, 417 F. Supp. 3d at 1277.[11]

---

[11] *See Irving Firemen's Relief & Ret. Fund v. Uber Techs.*, 2018 WL 4181954, at *5 (N.D. Cal. Aug. 31, 2018) (no omission where alleged misconduct "are unconnected to the actual challenged statements."); *Hong v. Extreme Networks, Inc.*, 2017 WL 1508991, at *15 (N.D. Cal. Apr. 27, 2017) ("the reasons Plaintiffs offer as to why the statements are false or misleading bear no connection to the substance of the statements themselves").

**C.     eHealth's Flat LTV Forecast For 2020 Is Protected By The Safe Harbor.**

Plaintiff challenges Mr. Yung's April 23, 2020 statement, "we are forecasting flat LTVs . . . because of the increase of number of seniors we're seeing taking advantage of the open enrollment period that we see causing that higher churn in the AEP [Annual Enrollment Period] cohort." ¶ 100.  Plaintiff claims this statement was false because it "concealed the high churn rate that eHealth experiences during the first year of the plans and the churn rates affecting the remaining years." ¶ 101.  This assertion is without merit.

Mr. Yung's prediction for flat LTVs in 2020 cannot give rise to a claim because it is protected by the Reform Act's Safe Harbor.  The Safe Harbor protects forward-looking statements and "the assumptions underlying or relating to" them, 15 U.S.C. § 77z-2(i)(1), that are (1) so identified and accompanied by meaningful cautionary language, or (2) made without actual knowledge of falsity.  15 U.S.C. § 78u-5(c)(1).  Mr. Yung's forecast of flat LTVs (based upon his assumption that seniors would continue to take advantage of the extended open enrollment period) are quintessential forward-looking statements and assumptions "underlying or relating" to them. *See id*. § 78u-5(i)(1).  They were made during an earnings call prefaced by cautionary language that pointed to risk factors in eHealth's SEC filings, which contained extensive warnings, including about LTV estimations.[12]  *Supra* at 6-7; Ex. 9 at 4; *see West*, 2016 WL 948116, at *8 (financial guidance and membership estimates are protected by safe harbor); *Cutera*, 610 F.3d at 1111 ("earning[s] projection[s] [are] by definition . . . forward-looking statement[s]"); *Bodri*, 252 F. Supp. 3d at 929 (defendants' guidance statements based on expected channel inventory protected).

In alleging that Defendants concealed the pattern of churn through the life of a MA plan (¶ 101), Plaintiff has failed to read the earnings call he cites.  Mr. Yung disclosed this very fact: "*churn in our member base is highest in year 1 and decline[s] significantly in subsequent years*." Ex. 9 at 7 (emphasis added).  Indeed, eHealth has disclosed this pattern for many years.  *See, e.g.*, Ex. 11 at 12; Ex. 10 at 51.  Mr. Yung even disclosed the specific average churn rates for MA members by year:  mid-30% for year 1, under 20% in year 2, 11% in year 3, and single digit

---

[12] The second prong of the Safe Harbor also applies because there are no particularized facts that Mr. Yung had *actual knowledge* that the statements were false when made.  *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010).

percentages in year 4 and beyond.  *See* Ex. 9 at 7.  Thus, Plaintiff's claim fails because Defendants disclosed what allegedly was omitted.  *See, e.g.*, *Aerohive*, 2019 WL 8137143, at *3.[13]

**D.      Statements Regarding Costs Are Not False or Misleading.**

Again echoing Muddy Waters (¶¶ 57-59), Plaintiff claims that Defendants falsely represented that there were no costs associated with commission receivables when in fact eHealth had ongoing customer care and retention costs, suggesting that revenue was prematurely recognized.  ¶¶ 70-71, 75-76, 91-92.  But Plaintiff has conflated ASC 606 revenue recognition requirements with irrelevant operational expenses.

eHealth has disclosed that it recognizes revenue when a submitted application is approved by an insurer, because its services to the insurer are then complete and it is entitled to receive commission payments.  Ex. 1 at 66; ¶ 70; ¶ 75 (Ex. 26 at 11); ¶ 91 (Ex. 8 at 13).  This is consistent with ASC 606, which requires that revenue be recognized at the time eHealth's "performance obligation" that is "promised in a contract" "is satisfied."  Ex. 1 at 65.  Plaintiff does not plead that eHealth is required by its insurance contracts to provide ongoing customer care.  Thus, there is no basis to find that such services impact revenue recognition under ASC 606.  That eHealth may choose to provide such services has no impact on revenue recognition.  Plaintiff cannot ignore Defendants' actual statements "and draw[] 'unwarranted inferences[,]'" *Lu*, 417 F. Supp. 3d at 1275, which "are insufficient to defeat a motion to dismiss[.]"  *Cutera*, 610 F.3d at 1108.

Plaintiff argues that eHealth left investors "with the false impression that eHealth's costs in maintaining its relationship with existing members *were nonexistent*."  ¶ 73 (emphasis added).  This argument is squarely refuted by the SEC filing that Plaintiff claims is misleading.  eHealth disclosed that its new member acquisition cost was "greater than *the cost involved in maintaining our relationship with an existing member*," a plain acknowledgement of the existence of retention costs.  Ex. 10 at 22 (emphasis added).  eHealth also discussed its customer retention efforts

---

[13] To the extent Plaintiff alleges the April 23, 2020 statement "left investors with the false impression that member churn was limited to disenrollment during annual enrollment periods in the first quarter of the year" (¶ 102), such allegations fail like those discussed in Section I.B., *supra*.

1   throughout the Class Period.[14]  Indeed, the retention costs were disclosed in its financial statements

2   as "customer care and enrollment" expense.  *E.g.*, *id.* at 45; Ex. 1 at 53; *see Curry v. Yelp Inc.*,

3   2015 WL 7454137, at *5 (N.D. Cal. Nov. 24, 2015) (Tigar, J.) (statement not misleading "in light

4   of Defendant's previous acknowledgements"), *aff'd*, 875 F.3d 1219 (9th Cir. 2017).

5   ## III.   PLAINTIFF FAILS TO ESTABLISH SCIENTER

6   ### A.   Plaintiff Fails To Plead Specific Facts Showing That Defendants Knew That Revenue Was Overstated Because Of DTV-Related Churn.

7

8   Plaintiff fails to plead particularized facts supporting his allegations that Defendants were

9   "generally aware of the churn issue" from "contemporaneous data on member churn" (¶¶ 104,

10   106-107, 112) and "knew" that DTV "was resulting in increased member churn" (¶ 31).

11   #### 1.   The CW Allegations Do Not Raise a Strong Inference of Scienter.

12   Plaintiff relies on general CW allegations that churn was a topic of discussion among

13   executives.  However, "[t]he Ninth Circuit has warned against the use of unnamed sources[.]"  *In*

14   *re Bus. Objects S.A. Sec. Litig.*, 2005 WL 1787860, at *5 (N.D. Cal. July 27, 2005) (citing *SGI*,

15   183 F.3d at 985).  CW allegations are not to be credited unless (1) the CWs are "described with

16   sufficient particularity to establish their reliability and personal knowledge," and (2) their

17   statements "must themselves be indicative of scienter."  *Zucco Partners, LLC v. Digimarc Corp.*,

18   552 F.3d 981, 995 (9th Cir. 2009).  Plaintiff fails to clear both hurdles.

19   At the outset, none of the CWs had direct, substantive contact with the Individual

20   Defendants.  CW4, CW5, CW6 and CW7 are not alleged to have had any such contact.  CW1's

21   and CW3's alleged minor contact with Mr. Francis and Mr. Flanders did not concern churn at all.

22   Thus, none of these CWs (CW1, CW3, CW4, CW5, CW6 and CW7) provide probative

23   information, as they all lack both "direct access to the executives" and "first hand knowledge

24   regarding what the individual defendants knew" about churn generally or DTV-related churn.

25   *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062-63 (9th Cir. 2014); *In*

26   *re Accuray Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 949 (N.D. Cal. 2010) (similar).

27

28   ---
    [14] *See* Ex. 26 at 7; Ex. 24 at 7; *id.* at 13-14; Ex. 27 at 18; *id.* at 43; *id.* at 44-45; Ex. 28 at 8; Ex. 23 at 6-8.

CW2, who allegedly reported to Mr. Francis, left eHealth in "March 2018" (¶ 40), either before or shortly after the beginning of the Class Period on March 19, 2018.  CW2 thus knows nothing about any Defendant's mental state during the Class Period.  *See, e.g.*, *Zucco*, 552 F.3d at 996 (rejecting two CWs who "were not employed by Digimarc during the time period in question"); *In re Netflix, Inc. Sec. Litig.*, 964 F. Supp. 2d 1188, 1198 (N.D. Cal. 2013) (similar), *aff'd*, 647 F. App'x 813 (9th Cir. 2016).  CW2 did not work in accounting or finance (*see* ¶ 40) and thus cannot speak to whether or how churn was factored into LTVs.  The sum total of CW2's statements is that the Medicare business was eHealth's "bread and butter," that CW2 had "discussions with Francis about churn" and attended meetings with executives, and that "senior managers" were "excited" about the "new [accounting] rule 'that it's coming."  ¶¶ 35, 40-41.  None of these general, vague statements lead to a reasonable inference that Defendants committed accounting fraud.  Moreover, some of CW2's statements are demonstrably wrong.  For example, CW2 could not have "attend[ed] regular meetings with . . . Yung" (¶ 35) because CW2 left eHealth in March 2018, months before Mr. Yung joined in June 2018. ¶ 15.  Nor could CW2 have overhead Mr. Yung's excitement for "the new [accounting rule] 'that it's coming'" (¶ 35) because Mr. Yung joined eHealth months *after* the implementation of ASC 606.

Significantly, no CW offers any specific facts about how churn or DTV-related churn impacted LTVs or revenue.  As discussed in Section I.A.1, *supra*, no CW refers to an alleged overstatement of revenue or Defendants' knowledge thereof.  No CW refers to DTV advertising or DTV-related churn.  At best, the CW allegations (including CW2) show that churn generally existed during the Class Period – an unremarkable fact that eHealth disclosed to investors.

Plaintiff cannot speculate about what the Individual Defendants *might* have known.  *See Business Objects*, 2005 WL 1787860, at *6 (claims "are long on speculation, but short on relevant detail").  CW4 refers to a "daily report" of metrics that included MA plan "turn over" data and alleges that "eHealth's top executives were aware of the daily emails and the churn data they contained"; CW7 inconsistently refers to a monthly "book of business" containing MA plan terminations that was provided *several weeks after the close of a month*.[15]  ¶¶ 108-109.  Yet,

---

[15] CW 7 is alleged to have been responsible for processing commission payments from and to

1    Plaintiff fails to cite any metrics contained in any such reports, much less specific facts showing

2    that such unpled metrics were known to the Individual Defendants and were inconsistent with their

3    public statements.  *See Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1042 (N.D. Cal. 2012)

4    (allegations "fail" "in that they include no 'hard numbers' or other specifics"); *City of Royal Oak*

5    *Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1068 (N.D. Cal. 2012) (allegations

6    "come nowhere close to identifying 'hard numbers'" or knowledge of "slumping sales"); *Bodri*,

7    252 F. Supp. 3d at 932 ("particularity requires pleading the who, what, where, when, and how

8    regarding *each* Defendant's access to the relevant information that belies fraudulent intent.")

9    (emphasis added) (citation omitted); *see also Vantive*, 283 F.3d at 1091 (complaint lacked specific

10   contemporaneous conditions known to defendants suggesting their understanding that revenue

11   recognition would overstate revenues); *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035-36 (9th

12   Cir. 2002) (no scienter; allegation that corporation "could regularly track its sales data," where

13   plaintiff failed to "plead, in any detail, the contents of any such report or the purported data").

14                    **2.      The "Admissions" Do Not Raise a Strong Inference of Scienter.**

15       Plaintiff proffers two "admissions" to show that Defendants "knew the increase in member

16   churn was attributable to" DTV advertising."  ¶ 110.  First, Plaintiff points to a statement by Mr.

17   Francis on July 25, 2018 that "the opportunities for us to significantly improve retention rates in

18   that 90-day period post-sale are both substantial and reflect a lot of near-term opportunity that we

19   are very much focused on at the moment."  *Id.*  These statements do not concern DTV advertising.

20   Moreover, this statement about opportunities to improve retention is not an admission that prior

21   statements about churn were false.  As this Court has held, "[a]n after-the-fact statement does not

22   constitute an admission unless it contradicts the substance of an earlier statement and essentially

23   states 'I knew it all along.'"  *Lopes v. Fitbit, Inc.*, 2020 WL 1465932, at *11 (N.D. Cal. Mar. 23,

24   2020) (Tigar, J.) (citation omitted), *appeal docketed*, No. 20-16033 (9th Cir. May 28, 2020).

25       Second, Plaintiff points to a statement by Mr. Flanders on November 12, 2019:  "[t]he

26   highest churn . . . is direct response to TV." ¶ 111.  Here, the fact that DTV advertising generated

27   ────────────────

28   insurance carriers, including refunds.  ¶ 108.  CW7 alleges no facts to support its implausible
     "conspiracy theory" that "senior management in California 'was delaying getting . . . information
     [about policy cancellations] to us.'"  *Id.*

the highest churn during 3Q 2019 does not contradict earlier statements regarding the impact of changes in enrollment periods (Sections I.B. & C.) or the overall churn rates in 2019 (Section I.A.) or eHealth's estimates of LTVs or revenue.  Nothing about this statement suggests that LTVs or commission revenues or revenues were overstated due to DTV-related churn.  If anything, the fact that Mr. Flanders acknowledged higher churn in the DTV channel belies any claim that such information was fraudulently withheld.

### B.     The Individual Defendants' Stock Trading And Compensation Do Not Support An Inference of Scienter.

Plaintiff argues that stock trades by Messrs. Flanders and Francis creates a strong inference of scienter.  ¶ 113.  But stock sales do not raise a strong inference of scienter unless they are "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed public information."  *Zucco*, 552 F.3d at 1005 (citation omitted).  The Court must consider (1) the amount and percentage of shares sold by insiders, (2) the timing of the sales. and (3) whether the sales were consistent with insider's prior trading history.  *Id.*

Mr. Flanders sold small percentages of his available holdings in May 2019 (4.9%), July 2019 (13.1%), and January 2020 (18.3%).[16]  Sales of such percentages are far below the levels required to infer scienter.  *See, e.g., Vantive*, 283 F.3d at 1094-96 (no scienter with sales as high as 55%); *In re Veritas Software Corp. Sec. Litig.*, 2003 WL 27386177, at *7 (N.D. Cal. Dec. 10, 2003) (no scienter with sale of 53.1% of stock).  The sales in July 2019 and January 2020 were made pursuant to pre-existing trading plans.  *See* Exs. 30(c), (d); *In re Verifone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 704 n.2 (9th Cir. 2012) (sales pursuant to pre-existing trading plans "do not by themselves support an inference of scienter"); *Mellanox*, 2014 WL 12650991, at *19 (same).  Importantly, and conclusively refuting any inference of scienter, Mr. Flanders' vested holdings

---

[16] May 2019: sales of 34,005 shares (¶ 116) out of 694,931 vested shares.  *See* Ex. 29 at 22-23 (vested holdings of 691,681 as of March 31, 2019); Ex. 30(b) (reflecting cashless sale of an option to purchase 3,250 shares that was scheduled to expire on 6/9/2019").  July 2019:  sales of 99,516 shares (¶ 116) out of 760,442 shares.  760,442 shares calculated by subtracting the May 2019 sale from the vested shares as of the 2019 Proxy and adding the 99,516 shares exercised and sold in July 2019.  *See* Ex. 30(c) (reflecting cashless exercise and sale of an aggregate of 99,516 shares.  January 2020:  sales of 121,000 shares (¶ 116) out of 660,926 shares.  The 660,926 vested holdings calculated by subtracting 99,516 from 760,442.  Ex. 30(d).

were greater at the end of the Class Period (849,758) than at the beginning (430,301).  *See* Ex. 31 at 21-22; Ex. 32 at 23-24; *Applestein v. Medivation, Inc.*, 2011 WL 3651149, at *8 (N.D. Cal. Aug. 18, 2011) (holding more stock at end of class period "strongly rebuts an inference of scienter"); *Lipton*, 284 F.3d at 1037 (no scienter where officer "'h[olds] onto most of [his] company's stock and incur[s] the same large losses' as plaintiffs").  That Mr. Flanders sold only once prior to the Class Period (¶ 115) does not render his Class Period sales unusual or suspicious.  Mr. Flanders did not become CEO until May 2016 and his CEO stock grants did not begin to vest until May 31, 2017, less than a year before the Class Period began.  Ex. 33 at 37-38; Ex. 30(a).

Likewise, Mr. Francis' sales were not suspicious or unusual.  He sold small amounts of his available shares on July 30, 2019 (1.1%), August 12, 2019 (2.3%), and June 2, 2020 (13.8%).[17]  That Mr. Francis did not sell stock prior to the Class Period hardly raises an inference of scienter because his first shares did not vest until July 2017, less than a year before the start of the Class Period.  *Compare* Ex. 29 at 22-23, *with* Ex. 31 at 21-23.  Mr. Francis' vested holdings were also greater at the end of the Class Period (180,615) than at the beginning (25,322) (*see* Ex. 31 at 21-23; Ex. 32 at 23-24), dispelling any inference of scienter.[18]

Plaintiff's miscellaneous scienter allegations based on general executive compensation or the desire to raise capital can be quickly dismissed.  ¶¶ 132-138.  As the Ninth Circuit has held, it "is common for executive compensation, including stock options and bonuses, to be based partly on the executive's success in achieving key corporate goals."  *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012).  Equally inadequate are allegations that Defendants were motivated to inflate the stock price for eHealth's January 2019 offering.  ¶¶ 139-142.  "[T]he desire to raise capital is a generic motive held by all companies, and is therefore insufficient to establish scienter."  *In re Metricom Sec. Litig.*, 2004 WL 966291, at *35 (N.D. Cal. Apr. 29, 2004), *aff'd*

---

[17] July 2019:  sales of 1,000 shares (¶ 118) out of 88,379.  *See* Ex. 29 at 22-24 (vested holding of 88,379 shares as of March 31, 2019).  August 2019:  sales of 2,000 shares (¶ 118) out of 87,379.  The 87,379 vested holdings calculated by subtracting 1,000 shares from 88,379 shares.  June 2020:  sales of 25,000 shares (¶ 118) out of 180,615.  *See* Ex. 32 at 23-24 (vested holdings of 180,615 as of March 31, 2020).

[18] The alleged stock sales by non-defendants (¶¶ 119-131) "are irrelevant to the determination of the named defendants' scienter."  *Wozniak*, 850 F. Supp. 2d 1045; *e.g.*, *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1082 n.22 (N.D. Cal. 2001).

*sub nom. Young v. Dreisbach*, 182 F. App'x 714 (9th Cir. 2006); *see Seaman v. Cal. Bus. Bank*, 2013 WL 5890726, at *6 (N.D. Cal. Oct. 30, 2013) (Tigar, J.) (allegation that defendants "were motivated to raise capital" insufficient).

\*      \*      \*

Whether considered individually or holistically, Plaintiff's scienter allegations fail. *Zucco*, 552 F.3d at 1006. eHealth repeatedly disclosed that it recognizes revenue based upon estimates of constrained LTVs, and that there are substantial judgments and risks associated with such estimations. "Robust disclosure of risks . . . 'negates an inference . . . [of] intent to defraud.'" *City of Roseville Empls.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1142 (E.D. Wash. 2013), *aff'd*, 691 F. App'x 393 (9th Cir. 2017) (citation omitted). No facts are pled to show that eHealth acted fraudulently or with deliberate recklessness in applying ASC 606, let alone that the Individual Defendants knew this. The only compelling inference is that, notwithstanding its record revenues, eHealth encountered unexpected churn issues caused by its rapid growth. *See* Ex. 23 at 16; *Ronconi*, 253 F.3d at 434 ("problems and difficulties are the daily work of business people. That they exist does not make a lie out of any alleged false statements.").

## CONCLUSION

For the reasons stated above, the Complaint should be dismissed.[19]

Respectfully submitted,

DATED: October 23, 2020

**WILSON SONSINI GOODRICH & ROSATI**
Professional Corporation

By: /s/ Jerome F. Birn, Jr.
      Jerome F. Birn, Jr.

Attorneys for Defendants eHealth, Inc., Scott N. Flanders, Derek N. Yung, and David K. Francis

---

[19] Plaintiff's failure to state a predicate claim under Section 10(b) requires dismissal of its Section 20(a) claim. *See Intuitive*, 759 F.3d at 1064 n.6; *Fitbit*, 2020 WL 1465932, at *13.