**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
Email:    aapton@zlk.com
Email: amccall@zlk.com
388 Market Street, Suite 1300
San Francisco, California 94111
Telephone: (415) 373-1671
Facsimile: (415) 484-1294

*Attorneys for Lead Plaintiff*
*and Lead Counsel for the Class*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

IN RE eHEALTH INC. SECURITIES
LITIGATION

Case No. 4:20-cv-02395-JST

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Hearing Date: February 17, 2021
Time: 2:00 p.m.
Courtroom: 6
Honorable Jon S. Tigar

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF FACTS ................................................................................................... 3

    A.    eHealth Shifts to a Strategy Prioritizing Quantity Over Quality ............................... 3

    B.    Television Advertising Yields Immediate Applications, but from Policyholders that Would Not Renew Their Policies. ............................................................... 4

    C.    Defendants Use ASC 606 to Record Massive Revenue and Earnings Increases While Concealing Underlying Problems with eHealth's New Strategy............................... 6

    D.    Flanders, Francis, Yung, and Other Insiders Reap Millions of Dollars in Stock Sales and Equity Compensation from eHealth's Inflated Stock Price. ............................... 8

    E.    Muddy Waters Uncovers the Truth about eHealth's Newfound Profitability. ........ 10

    F.    eHealth's Second Quarter Earnings Confirm Muddy Waters' Research Report..... 11

LEGAL STANDARDS ..................................................................................................... 12

ARGUMENT ................................................................................................................... 13

    I.    DEFENDANTS VIOLATED SECTION 10(B) AND RULE 10B-5..................... 13

        A.    The Complaint Adequately Pleads False Statements.................................. 13

        B.    Defendants' Knowledge of the Churn and Financial Gains Combine to Give Rise to a Strong, Cogent and Compelling Inference of Scienter. ................ 19

    II.    DEFENDANTS VIOLATED SECTION 20(a)....................................................... 23

CONCLUSION................................................................................................................. 23

## TABLE OF AUTHORITIES

**Cases**

*Aldridge v. A.T. Cross Corp.*,

    284 F.3d 72, (1st Cir. 2002) ..................................................................................................... 18

*In re Apple Comput. Sec. Litig.*,

    886 F.2d 1109 (9th Cir. 1989) ................................................................................................ 21

*In re Apple Comput., Inc.*,

    No. C-01-3667 CW, 2003 U.S. Dist. LEXIS 28303 (N.D. Cal. Aug. 13, 2003) ........................ 15

*In re Atossa Genetics Sec. Litig.*,

    868 F.3d 784 (9th Cir. 2017) ............................................................................................ 14, 16

*Azar v. Yelp, Inc.*,

    2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ........................................................................ 13

*Brody v. Transitional Hosps. Corp.*,

    280 F.3d 997 (9th Cir. 2002) ................................................................................................. 13

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,

    856 F.3d 605 (9th Cir. 2017) ................................................................................... 13, 14, 15, 16

*In re Countrywide Fin. Corp. Sec. Litig.*,

    2009 WL 943271 (C.D. Cal. Apr. 6, 2009) ............................................................................ 22

*In re Daou Systems, Inc.*,

    411 F.3d 1006 (9th Cir. 2005) ................................................................................................ 20

*Eminence Capital, LLC v. Aspeon, Inc.*,

    316 F.3d 1048 (9th Cir. 2003) ................................................................................................ 23

*Evanston Police Pens. Fund v. McKesson Corp.*,

    411 F. Supp. 3d 580 (N.D. Cal. 2019) ............................................................................... 12, 21

*Feiner v. SS&C Techs., Inc.*,

    11 F. Supp. 2d 204 (D. Conn. 1998) ...................................................................................... 18

*Greebel v. FTP Sotftware, Inc.*,

    194 F.3d 185 (1st Cir. 1999) .................................................................................................. 20

*Harris v. AmTrust Fin. Services, Inc.*,
   135 F. Supp. 3d 155 (S.D.N.Y. 2015) ......................................................................................... 17

*Howard v. Everex Sys.*,
   228 F.3d 1057 (9th Cir. 2000) .................................................................................................... 23

*Lu v. Align Tech, Inc.*,
   417 F. Supp. 3d 1266 (N.D. Cal. 2019) ...................................................................................... 16

*Maiman v. Talbott*,
   2010 WL 11421950 (C.D. Cal. Aug. 9, 2010) ............................................................................ 19

*Marksman Partners. L.P. v. Chantal Pharm. Corp.*,
   927 F.Supp. 1297 (C.D. Cal. 1996) ............................................................................................ 18

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) .............................................................................. 13, 21, 22, 23

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004) .................................................................................................... 21

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015) ............................................................................................................ 14, 16

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) .............................................................................................. 13, 20

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014) ...................................................................................................... 13

*Robb v. Fitbit Inc.*,
   216 F. Supp. 3d 1017 (N.D. Cal. 2016) ...................................................................................... 20

*S. Ferry LP #2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ...................................................................................................... 19

*Schueneman v. Arena Pharm., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ...................................................................................................... 13

*In re Scottish Re Grp. Sec. Litig.*,
   524 F. Supp. 2d 370 (S.D.N.Y. 2007) ........................................................................................ 18

iii

*Seaman v. Cal. Bus. Bank*,

   2014 WL 1339649 (N.D. Cal. Apr. 2, 2014)...................................................................... 17

*Stocke v. Shuffle Master, Inc.*,

   615 F. Supp. 2d 1180 (D. Nev. 2009)............................................................................... 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,

   551 U.S. 308 (2007) ......................................................................................................... 19

*United States v. Anderson*,

   472 F.3d 662 (9th Cir. 2006) ........................................................................................... 13

*Usher v. City of Los Angeles*,

   828 F.2d 556 (9th Cir. 1987) ........................................................................................... 12

*In re Velti PLC Sec. Litig.*,

   2015 WL 5736589 (N.D. Cal. Oct. 1, 2015) ................................................................... 17

*Virginia Bankshares, Inc. v. Sandberg*,

   501 U.S. 1083 (1991) ....................................................................................................... 15

*West v. eHealth, Inc.*,

   2016 WL 948116 (N.D. Cal.  Mar. 14, 2016) ................................................................. 16

**Statutes**

15 U.S.C. §78u-4 ...................................................................................................................... 12, 17

15 U.S.C. §78j........................................................................................................................... 12

15 U.S.C. §78t........................................................................................................................... 12

17 C.F.R. §240.10b-5................................................................................................................ 12

**Rules**

Fed. R. Civ. P. 9....................................................................................................................... 12

Fed. R. Civ. P. 12..................................................................................................................... 12

Fed. R. Civ. P. 15..................................................................................................................... 23

**PRELIMINARY STATEMENT**

In 2018, a new management team at eHealth, Inc. embarked on a risky new business strategy, moving away from predictable but stagnant sales of private Medicare insurance to focus on consumer television advertising. At the same time, eHealth also adopted an aggressive new accounting policy, accelerating the recognition of revenue from policies sold from the new advertising. The result was apparently a spectacular success: eHealth's revenues, and its stock price, soared. The new management team cashed in, selling over $40 million in eHealth stock and receiving an additional $23 million in bonuses. It was, however, a sham. The accelerated recognition of revenue assumed that eHealth's new customers would keep their new policies for several years, but many were being cancelled within the first 90 days. eHealth also assumed that it would incur no costs in retaining its customers once the policies were approved, but its retention costs were never zero and increased substantially during the Class Period. Thus, rather than being hugely profitable, eHealth's revenues were actually much less than publicly reported, and it was operating at a huge loss. This reality was kept hidden from the public and investors until the end of the Class Period on July 23, 2020.

Lead Plaintiff Billy White and other similarly situated investors purchased eHealth stock without knowing that the recent success was artificial and unlikely to last. During the Class Period (which extends from March 19, 2018 through July 23, 2020), Defendants concealed eHealth's worsening "member churn" while at the same time reporting exceptionally strong earnings results. For example, in its annual report on Form 10-K for fiscal 2019, eHealth reported revenue and operating profit of $506,201,000 and $81,409,000, respectively. These earnings results represented net income growth of more than 250% compared to 2017. These statements were false and/or materially misleading, however, due to the fact that eHealth was overstating its commission revenue. eHealth premised its revenue recognition on, among other things, the assumption that its customers would renew their policies for durations of between three- and five-years. Substantial portions of their enrollees were cancelling the policies within the first year and, as described by former employees, even within the first 90 days of the policy. When accounting for these cancellations, eHealth's revenue and operating profit for fiscal 2019 was $378,201,000 and negative $181,591,000,

respectively. eHealth also concealed its efforts and expenses to stop these customers from cancelling, claiming that the revenue it recognized upfront upon execution of the policy was free from any further operating costs. These statements provided investors with a false representation of eHealth's business as it existed at the time.

Defendants' motion to dismiss argues that Plaintiff does not adequately plead that any statements were misleading or made with scienter. This is not true. Plaintiff's allegations are premised on firsthand witness accounts from former employees of eHealth as well as admissions made by Defendants. These former employees confirm that "churn" was a known issue within eHealth and was routinely discussed at meetings attended by Defendants. The issue of "churn" was "primary in all the discussions," according to these former employees, and Defendant David K. Francis and other executives frequently discussed "strategies to retain the business." This included developing compensation plans that would reward employees simply for keeping their customers enrolled for longer than just 90 days into the life of the policy.

Although Defendants dispute they had any direct interactions with these former employees, they do not and cannot contest the allegation that "churn" existed and was severely impacting eHealth's business. At the end of the Class Period, they admitted during an earnings conference call the extent of the problem. Indeed, Defendant Scott N. Flanders, eHealth's Chief Executive Officer, confirmed that eHealth's "churn" rate had spiked to 42% and that as a result it had made "a strategic decision to increase [its] focus on member retention and recapture[,]… to identify the key drivers of elevated churn[,] and to develop a comprehensive action plan to address it." Accordingly, whether and to what extent Plaintiff's confidential witnesses discussed "churn" with Defendants is beside the point, as there is no material dispute that the "churn" existed and its impact on eHealth's business was known to eHealth management.

Defendants also argue that Plaintiff's motive allegations, which focus on insider sales and equity compensation tied to eHealth's stock price, do not give rise to a strong, cogent and compelling inference of culpable conduct. Defendants are again mistaken. Between the insider sales and equity compensation awards, Defendants and other eHealth executives walked away with nearly $65 million in illicit proceeds. The circumstances surrounding their stock sales are highly suspect,

namely the timing and amounts of the transactions and the fact that these insiders sold small amounts of stock previously if any at all. For example, Flanders sold approximately 35% of his holdings for more than $25 million in proceeds when, prior to the Class Period, he had made just one sale three years earlier consisting of just over 6,000 shares. The other Defendants and executive insiders sold similar percentages, ranging from 12% to as high as 65%, collectively netting another $20 million in proceeds. By concealing material information about eHealth's customer base, Defendants were able to inflate its stock price and benefit financially.

Plaintiff adequately pleads each element of his securities fraud claims under the Exchange Act. Defendants' motion to dismiss should be denied in its entirety.

## STATEMENT OF FACTS

**A.    eHealth Shifts to a Strategy Prioritizing Quantity Over Quality**

eHealth is an insurance broker that generates commission revenue from selling Medicare insurance plans. ¶20. After eHealth turned over its entire executive suite in May 2018, it shifted its focus away from individual and family health insurance plans to the Medicare segment. ¶21-22. In connection with this new strategy, eHealth acquired GoMedigap to provide enrollment services to individual customers and, central to this lawsuit, shifted its marketing strategy from targeting reliable long-term customers that would pay premiums over the life of the policy to shorter-term customers reachable through direct-response television advertising. ¶¶23, 25-26. eHealth's new marketing strategy provided immediate results, generating 39% growth in Medicare-related insurance applications between 2017 and 2018. ¶26. The increase in applications was directly attributable to its direct-response marketing with more than 70% of the applications in the fourth quarter of 2018 being generated from direct channels like direct-response television. ¶26.

At the same time as its shift to direct-response marketing, eHealth adopted ASU 2014-09, *Revenue from Contracts with Customers (ASC 606)* ("ASC 606") in 2018. ¶29. ASC 606 allowed for the immediate recognition of revenue expected to be received over the life of a contract. ¶29. Thus, after it adopted ASC 606, eHealth recognized an upfront, outsized amount of revenue for all policies it sold equal to the current commission rates multiplied by the number of years the policy would exist or, as eHealth referred to it, the "average plan duration." ¶37. eHealth referred to this

figure as the policy's "constrained lifetime value" or "LTV" which it then adjusted upwards or downwards depending several factors, including conversion rates of applications to paying members, forecasted member churn, and forecasted commissions per approved member. ¶38. While eHealth estimated plan durations of approximately three years for Medicare Advantage plans and approximately five years for Medicare Part D prescription drug plans and Medicare Supplement plans, based on historical experience, the actual plan durations for these policies were materially lower due to the fact that more than 45% of the new policyholders were likely to cancel their policies within the first year. ¶39. As a result, eHealth began recognizing multiple years of commission revenue upfront and immediately upon applicant approval notwithstanding the likelihood (or, in this case, the unlikelihood) that a policyholder would renew a policy past the first year. ¶29.

**B.      Television Advertising Yields Immediate Applications, but from Policyholders that Would Not Renew Their Policies.**

eHealth and its executives knew that their above-average policy cancellation rates were due to member churn caused by low quality or "less sticky" customers obtained predominantly through their direct-response television advertising campaign. CW2, employed in eHealth's Technical Management department from 2000 until March 2018 and reported directly to Francis, explained that eHealth was aware of customer churn and its deleterious impact on lifetime revenues. ¶40. CW2 reported that Francis and other senior executives had discussions about how new enrolled customers were quickly dropping their plans, which was causing eHealth to lose money on the Medicare business due to member churn. ¶40. CW2 confirmed that member churn was "primary in all the discussions" and that Francis and other executives frequently discussed "strategies to retain the business." ¶40. In response to the issue, eHealth formed a team "focused on developing strategies to retain" customers located at the Gold River, California, call center. ¶40. According to CW2, Francis and other senior executives "would meet on a daily basis" to discuss "how many people came on board – signed up for Medicare Advantage plans." ¶40.

CW2 further recalled that in his first-hand discussions about churn with Francis, Francis focused on the fact that eHealth "needed to retain membership for 'x' number of years—about two years—in order to turn a profit on enrolled customers." ¶41. CW2 had frequent, in-person

4

discussions with Francis about churn during his employment. ¶41. According to CW2, the Medicare business was eHealth's "bread and butter." ¶41. New Medicare members had to stay on the books a certain amount of time to be profitable. ¶41. However, according to CW2, given eHealth's churn rates, there was no business rationale for booking larger revenues for contracts that were likely to last only a short time. ¶41.

By late-2018, eHealth senior executives became very worried about customer churn, according to CW4, a former Medicare Sales Representative who worked at eHealth from July 2018 to April 2019. ¶¶42, 43. CW4 reported to Morgan Bradshaw, Sales Manager, at eHealth's Salt Lake City, Utah, call center who, in turn, reported to Mark Taub, Senior Director of Medicare Sales & Operations, and Michael Wilson, Director of Medicare Sales. ¶42. CW4 explained that in December 2018 his supervisors grew concerned about "increased turnover," including sales representatives with churn rates as 35% to 40%. ¶43. CW4 discussed the churn rates with Taub, Wilson, and senior executives in California who, in an attempt to address churn, introduced a compensation system to reward sales representatives whose customers stayed enrolled for 90 days. ¶43. Similarly, CW5, a former eHealth Business Development Director, corroborated that senior management was aware of "quite a bit" of churn in 2018 because new members would drop during the initial portion from enrollment to first premium. ¶44. CW5 explained that "quite a bit of people" signed up but "never made their first premium payment." ¶44.

eHealth and its executives tracked member churn data monthly and daily. ¶104. eHealth received a "book of business" ("BOB") from each insurance carrier monthly. ¶104. Defendants had access to the BOBs in which they reviewed data from carriers including new paid members and policy cancellations. ¶104. eHealth tracked daily the number of MA plans sold, the number of MA plans that customers "turned over", the length of phone calls and customer waiting times. ¶105. These daily reports calculated member churn, that is, the number of enrolled customers who subsequently dropped their MA plans. ¶105. eHealth's executives had access to the monthly and daily churn data necessary to understand the problem and attempt to shore up retention. ¶107. CW7, a former Commissions Specialist who worked at eHealth's Marketing and Finance Department from October 2019 to March 2020, explained that eHealth recorded and updated its files to reflect member

5

churn rates. ¶108. CW7 reported to Candace Mosby who, in turn, reported to senior managers at eHealth's headquarters in Santa Clara, California. ¶108. Each month, CW7 would receive a hard drive from Stephanie Donahue, Senior Director, Revenue Operations, containing a BOB from each insurance carrier showing that thousands of customers who had signed up for a Medicare Advantage plan had subsequently dropped off their plans. ¶108. Similarly, CW4 and other sales representatives received emailed data daily from eHealth's Medicare Sales Director (Michael Wilson) showing various metrics from all of eHealth's call centers in the U.S., including the number of MA plans sold and the number of MA plans that customers "turned over" (*i.e.*, dropped). ¶109. The daily reports came from eHealth senior managers in Santa Clara, California, and calculated member churn. ¶109.

Defendants' admissions during the Class Period confirm that eHealth was experiencing member churn throughout the Class Period and that they knew the increase in member churn was attributable to the direct response television advertising. ¶110. On July 26, 2018, while discussing eHealth's operational and financial results for the second quarter of fiscal 2018, Francis described the "retention" issues eHealth was experiencing within the first 90 days of enrollment. In pertinent part, Francis explained that eHealth was witnessing a "***a rapid dis-enrollment or early cancellation period, so the first 90 days post sale***" and was attempting "***to significantly improve retention rates in that 90-day period post-sale***." ¶110 (emphasis added). But eHealth never successfully improved the amount of churn over the next year and a half because its shift to direct response television inherently limited retention. ¶111. On November 12, 2019, during an investor conference call, Flanders explained that "***The highest churn . . . is direct response to TV. Think about it, the people that are sitting at home and just watching TV, they're easy to capture and they churn a lot, and they churn not -- 90% of them don't churn to us, they churn to a different plan from a different broker***. And so for us, while there's a lot of tonnage in the direct response TV and the direct mail, these -- all these other channels are more strategically valuable to us." ¶111 (emphasis added).

**C.      Defendants Use ASC 606 to Record Massive Revenue and Earnings Increases While Concealing Underlying Problems with eHealth's New Strategy.**

Defendants decided to adopt ASC 606 not because it would make eHealth's financial statements more accurate, but because they could use it to overstate revenue and earnings while

6

hiding the flaws in eHealth's new marketing strategy. ASC 606 permitted eHealth to immediately recognize revenue that it expected to earn over the life of a contract. ¶37. This expected revenue depended on conversion rates, forecasted member churn, the duration of the plans, and expected commission amounts. ¶37. But these inputs are based on historical data that would lose reliability as eHealth shifted away from its historical strategy. ¶38. As customer churn increased, Defendants misled investors regarding trends in customer churn, the customer retention costs associated with commission revenue, and eHealth's revenue and operating profit.

Knowing that direct response marketing would lead to more churn and thus decrease the expected duration of plans, Defendants falsified and inflated the plan durations and increased costs of retaining the direct response customers. ¶¶39-45.  In 2019, eHealth's LTV calculations assumed a remaining plan duration of 3.35 years for Medicare Advantage customers when the contemporaneous churn rate implied a remaining plan duration of only 2.1 years. ¶55.  But it was in Defendants' interests to hide eHealth's churn increasing issues with churn in order to maximize LTV. Flanders and Yung publicly denied any issues with churn during an analyst call on February 21, 2019, with Yung stating that "we've actually seen some uptick and, therefore, uptick in LTVs since we've been on 606, so we actually have not seen an increase in churn. *We've actually seen a decrease in churn, on average*." ¶82. Flanders then supported Yung's answer, adding that "persistency rates have improved with the margin rather than turned south." ¶82. In fact, churn for the year had grown to 45% for Medicare Advantage members from only 37% during the prior year. ¶84.

eHealth executives also concealed the increased costs of retaining customers. In its 2018 annual report, eHealth stated that under ASC 606, "our services associated with Medicare-related, individual and family and ancillary health insurance plans are complete once an application is approved by a carrier[.]" ¶70. In applying ASC 606, eHealth booked "multiple years of commission revenue by claiming that no further performance on its part is necessary in order to collect these commissions." ¶57. By doing so, eHealth "ignore[d] the reality that EHTH need[ed] to provide ongoing service to members and conduct outreach to them in order to retain them." ¶57. Flanders affirmed this misleading statement during an analyst call on April 26, 2018, saying "as the cash

comes in, there is no additional cost attached to that. And the reason that those receivables are there is because there is no meaningful service component attached to them either." ¶75. Then, in an analyst call on February 20, 2020, Yung claimed that "from an operating perspective, other than reconciling the cash coming in and the cash that we should be being paid as a broker record, there's no other cost associated" with the commission receivable. ¶91. Flanders immediately followed up, assuring the analyst that all expenses were recorded against the receivable at the time of recognition: "[t]here's no cost against it, Greg. It's all -- the costs have been expensed in period. And it's all cash to be collected free of additional charge." ¶91. That was false. After health insurance carriers approve Medicare applications, eHealth must incur ongoing operating expenses in providing customer care services to retain new and existing members to limit churn. ¶92.

These misstatements and Defendants' ongoing efforts to conceal increased churn led them to file a false and misleading annual report for the 2019 fiscal year. eHealth represented in this report that its revenue and operating profit for the year was $506,201,000 and $81,409,000, respectively. ¶95. This was materially false. eHealth overstated its revenue and operating profit by $128 million and $263 million, respectively. ¶96. eHealth's actual revenue and operating profit for fiscal 2019 was $378,201,000 and negative $181,591,000. ¶96. The LTV for Medicare Advantage members in 2019 was 28.1% less than what eHealth had represented in its 2019 annual report because the plan durations were 2.34 years, and not 3.0 years due to increased churn. ¶97.

**D.    Flanders, Francis, Yung, and Other Insiders Reap Millions of Dollars in Stock Sales and Equity Compensation from eHealth's Inflated Stock Price.**

In spite of and contrary to the churn, eHealth used its new ASC 606 accounting standard to report significantly better earnings results. ¶34. CW1, a former employee of eHealth who worked at the company from February 2018 through June 2019 as Vice President & General Manager, Value-Based Provider, recalled meeting with Francis at eHealth's Santa Clara headquarters in February 2018. ¶34. Francis and other top executives were "happy" about the new standard and how it would increase eHealth's revenue without any improvement its book of business. ¶34. Other former employees, including CW2 who reported directly to Francis, also recalled that senior management was "excited" for ASC 606's implementation. ¶35. CW2 overheard senior managers frequently

8

discuss the change, recalling that they were all excited because "they'd be able to count revenue based on the life of the business" irrespective of what ultimately happened to the policy. ¶35. CW2 overheard these conversations about the accounting rule while attending regular meetings with Francis, Flanders, and Yung. ¶35. Likewise, CW3, who worked as a business systems analyst, recalled Flanders discussing the new accounting standard during quarterly "town hall" meetings in 2017 and 2018 and explaining the valuable role that the new revenue recognition standard would play in eHealth's overall financial health. ¶36. According to CW3, the new standard was greeted enthusiastically by senior management, because it allowed them to book revenue for commissions far into the future that it did not in fact receive when customers cancelled their plans. ¶36. CW3 recalled Flanders saying during the town halls that the new rule would be "good for business." ¶36.

eHealth's shift in marketing combined with the adoption of ASC 606 enabled it to exponentially increase its revenue in an extremely short period of time and, in turn, drive its stock price to new, unseen highs. At the start of 2018, eHealth's stock price was $16.49 per share; by March 2020, it had reached $146.09 per share, an increase of nearly *1,000%*. ¶5. During the Class Period, Flanders sold 254,521 shares of eHealth common stock for proceeds of more than $25 million. ¶¶115-16. Comparatively, in the three years prior to the Class Period, Flanders sold just barely more than 6,000 shares. ¶115. Francis, meanwhile, sold 28,000 shares for nearly $3.6 million. ¶¶117-18. Francis had never before sold any of his eHealth stock. ¶117. Non-party Robert Hurley, eHealth's President, Carrier and Business Development, sold over 32,000 shares for proceeds of more than $3 million. ¶¶119-20. Non-party Michael Goldberg, one of eHealth's directors, sold 49,511 shares of eHealth stock for over $4.4 million. ¶121-22. Non-party Timothy Hannan, eHealth's Chief Marketing Officer and Chief Revenue Officer, sold almost 20,000 shares of eHealth stock for more than $2 million. ¶¶123-25. Non-party Livingston Randall, another of eHealth's directors, sold over 35,000 shares of eHealth stock for more than $2 million. ¶¶126-28. Non-party Ian Kalin, eHealth's Chief Technology Officer, sold 5,500 shares of eHealth stock for just over half a million dollars. ¶¶129-30. Collectively, these insiders sold 435,380 shares of eHealth common stock and reaped of $41.4 million in proceeds by selling their shares during the Class Period at artificially inflated prices. ¶131.

Flanders, Francis and Yung also used the inflated stock price to benefit financially from various equity incentive awards. Each executive owned restricted stock units ("RSUs") that, by their terms, would vest upon meeting certain predetermined requirements. ¶132. Those requirements included increasing eHealth's stock price, which Defendants did handily. ¶¶133-35. Between 2017 and 2019, Defendants met the stock price requirements for their RSUs to vest and in turn received millions of dollars in additional compensation: Flanders netted over $11.5 million; Francis received about $6.5 million; and Yung took home over $5 million. ¶137. Relative to their annual base salaries ranging between $188,000 and $600,000, these amounts were certainly materials. ¶138. Even eHealth itself benefited from the inflated stock price. In January 2019, it sold over 2.7 million shares of stock at $48.50 per share for total proceeds of $126.2 million. ¶139-41.

**E.      Muddy Waters Uncovers the Truth about eHealth's Newfound Profitability.**

On April 7, 2020, shortly after Flanders, Francis, Yung and the other insiders cashed out on eHealth's inflated stock price, Muddy Waters published its report asserting that: eHealth was "booking multiple years of revenue at one time" consistent with a "highly aggressive accounting" that was "mask[ing] a significantly unprofitable business"; that "[i]n addition to using aggressive modeling assumptions, [eHealth was] misleadingly downplay[ing] the need for ongoing service and retention" of existing customers; that eHealth's was "manipulat[ing] its presentation of churn to be misleadingly low"; that eHealth "[was] pursuing low quality, lossmaking growth while its LTVs are based on lower churn, pre-growth cohorts"; that to "generate [the] unprofitable growth [of its Medicare Advantage segment], [eHealth] has been incinerating cash"; and that, based on estimations of variable and fixed costs, eHealth will lose approximately -$402 from each Medicare Advantage member it enrolled in 2019, "yielding an operating loss of -$181 million." ¶48. Importantly, Muddy Waters revealed that, while eHealth was booking three years of future sales, "it should expect to lose 47% of its members over the first year post-sale" due to the "high-churn demographic" associated with its television advertising campaign. ¶¶51-52. Muddy Waters' report incorporated interview excerpts with former eHealth executives, explaining why television advertising attracted particularly undesirable customers in terms of retention. ¶¶53-56. The higher turnover led to greater costs associated with retaining customers, costs that had not been previously disclosed by Defendants.

¶57. It also contradicted eHealth's statements about revenue, given the risk that eHealth would not ultimately receive the commissions already booked for future years. ¶57. eHealth's stock price declined significantly in response to the revelations contained in the Muddy Waters report, including in particular that eHealth had materially overstated its commission revenue. ¶61. From a closing price of $130.57 per share on April 6, 2020, eHealth's stock price fell to $116.90 per share the next day on April 7, 2020 before declining to $103.20 on April 8, 2020. ¶61.

**F.    eHealth's Second Quarter Earnings Confirm Muddy Waters' Research Report**

On July 23, 2020, eHealth reported its earnings for the second quarter of fiscal 2020. ¶¶7, 62. Statements made by Flanders and Yung at that time validated the conclusions asserted in the Muddy Waters report.[1] In particular, eHealth reported a higher churn rate in Medicare Advantage customers which spiked to 42% despite substantial investments in marketing and customer care and enrollment. ¶63. Flanders also reported that "in the first half of this year, we saw increased levels of Medicare Advantage plan churn compared to our historic observations." ¶64. Regarding the elevated churn seen in the second quarter, Flanders stressed that eHealth was "making a strategic decision to increase [its] focus on member retention and recapture[,]… to identify the key drivers of elevated churn[,] and to develop a comprehensive action plan to address it." ¶64. Flanders later elaborated that it was "absolutely critical that you retain your customers… When we saw churn tick up late in the second quarter, we jumped on it... [Our advisor] said 90% of the churn is due to our own actions or inactions. So we've already taken the steps … recommended… We really feel passionate about [growth] and maybe we needed to focus more on retention. ¶64.

Yung echoed Flanders during the earnings report. He explained that the elevated churn levels in Medicare Advantage during the first half of the year "had a negative impact on our second quarter MA LTVs and our estimates for the full year 2020 LTVs." ¶65. Further, Yung "project[ed] MA

---

[1] Defendants dispute this point by relying on a number of documents outside of Plaintiff's complaint. These documents consist of several analyst reports that Plaintiff did not incorporate into the complaint and contain facts that hotly contested. Defs. Br. at 8, Exs. 17-20. The Court should not take judicial notice of the contents of these reports or consider them for the purposes of this motion. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1001 (9th Cir. 2018) (excluding a conference call transcript from judicial notice).

11

LTVs to decline up to 10% in the fourth quarter of 2020 and by mid-single digits for the full year, which has been reflected in our revised 2020 annual guidance." ¶65.

These announcements largely confirmed the allegations raised by Muddy Waters in its research report and further evidenced that some of Defendants' previous statements about eHealth's business had been materially misleading. In response, eHealth's stock price declined from a closing price of $114 per share on July 23, 2020 to $79.17 per share on July 24, 2020. ¶67.

## LEGAL STANDARDS

On a motion to dismiss, the Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." *Evanston Police Pens. Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 591 (N.D. Cal. 2019) (*quoting Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987)). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face; that is, plaintiff must plead factual content that allows the court to draw the reasonable inference that the defendant is liable." *Khoja*, 899 F.3d at 1008 (internal quotations and alterations omitted). "Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint . . . ." *Id.* at 998 (citing Fed. R. Civ. P. 12(d)). While a court may consider materials incorporated into the complaint or properly subject to judicial notice, they should not be used to dispute well-pleaded facts or where their substance "is subject to varying interpretations, and there is a reasonable dispute as to what the [document] establishes." *Khoja*, 899 F.3d at 1000. In particular, a district court should guard against defendants' attempts "to insert their own version of events into the complaint to defeat otherwise cognizable claims." *Id.* at 1002-03.

Plaintiff alleges securities fraud under Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5. Plaintiff also alleges liability under Section 20(a) of the Exchange Act, 15 U.S.C. §78t. Plaintiff's claims are subject to Rule 9 and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §78u-4 ("PSLRA"). "Rule 9 imposes a heightened pleading requirement, which requires that a party state with particularity the circumstances constituting fraud" and the PSLRA "requir[es] that the complaint . . . specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is

misleading." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016) (quotations omitted). The PSLRA also requires that "the allegations give rise to a strong inference that the defendant acted with the required state of mind." *Id*. (quotations omitted). While the PSLRA sets a higher pleading standard, courts should be wary against "rais[ing] the bar of the PSLRA any higher than that which is required." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 946 (9th Cir. 2003).

To recover damages under Section 10(b), a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140-41 (9th Cir. 2017). Defendants' motion to dismiss only challenges Plaintiff's allegations concerning falsity and scienter. All other elements are therefore conceded for the motion. *See United States v. Anderson*, 472 F.3d 662, 668 (9th Cir. 2006) (arguments raised for the first time in a reply brief are waived).

## ARGUMENT

### I.   DEFENDANTS VIOLATED SECTION 10(B) AND RULE 10B-5.

#### A.   The Complaint Adequately Pleads False Statements.

A statement is misleading if it acts to "create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *Azar v. Yelp, Inc.*, 2018 WL 6182756, at *9 (N.D. Cal. Nov. 27, 2018). This may be alleged "when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time." *Khoja*, 899 F.3d at 1008. Falsity may also be alleged where "the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017) (*quoting Reese v. Malone*, 747 F.3d 557, 579 (9th Cir. 2014)).

##### 1.   Defendants Concealed the Risks and Effects of Increased Member Churn

Despite knowing that the shift to more transient members would increase retention costs and shorten the expected duration of policies and thus reduce commissions from those policies,

13

Defendants shifted to an accounting standard that would hide these downside risks. Defendants then continually concealed this knowledge from investors at the same time they reaped substantial personal profits.

The Complaint alleges two key misleading statements during analyst earnings calls regarding the costs of retaining these transient direct response customers. On April 26, 2018, Flanders stated that "as the cash comes in, there is no additional cost attached to that . . . because there is no meaningful service component attached." ¶75. On February 20, 2020, Yung stated that "[f]rom an operating perspective . . . there's no other cost associated" with the commissions earned over the life of a plan. ¶91. Flanders immediately followed, stating that "There's no cost against" the receivable commissions, "the costs have been expensed in period. And it's all cash to be collected free of additional charge." ¶91. These statements were false. At the time, eHealth had additional operating expenses incurred to retain customers and keep them from cancelling their policies within the first year. ¶¶76, 92. The shift to direct response marketing required additional "churn" costs to ensure that the policyholders renewed their policies. ¶¶76, 92-93. These statements misled investors about eHealth's profitability and prevented the market from evaluating its true financial performance.

The statement that there were no additional costs once an application was approved was a statement of fact, but even if it is viewed as a statement of opinion, it is still misleading. A statement of opinion is misleading, even if genuinely believed, if "the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." *Align Tech., Inc.*, 856 F.3d at 615-16; *see also Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185-86 (2015); *In re Atossa Genetics Sec. Litig.*, 868 F.3d 784, 802 (9th Cir. 2017). Defendants omitted eHealth's increased reliance on direct response marketing and the higher rate of turnover in these new customers. ¶39. The confidential witness statements demonstrate not only Defendants' knowledge of this increased churn, but that they frequently discussed "strategies to retain" such customers. ¶40. CW2 noted that "Francis and other senior executives had discussions about how they were losing money on the Medicare business due to member churn, which was causing new enrolled customers to quickly drop their plans." ¶40. CW4 discussed this increased churn with Taub and Wilson, and soon eHealth began offering bonuses to sales representative to increase retention, a

clear new cost of the churn. ¶43. And management kept close tabs on churn figures in daily reports delivered to salespeople. ¶¶108-09. Thus, the statements that a plan required no additional costs after insurer approval belie the "undisclosed facts tending to seriously undermine the statement's accuracy." *Align Tech., Inc.*, 856 F.3d at 615-16.

Defendants argue that eHealth disclosed the existence of retention costs in a portion of a sentence buried within SEC filings even though eHealth's Form 10-K for the fiscal year ended December 31, 2018 also stated that its services regarding health plans were complete after approval of an application. ¶70; Defs. Br. at 19-20. These passing acknowledgments and contradictory statements failed to address the increased retention costs associated with increased churn, and were insufficient to reduce the risk of misleading to "nil." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991) ("not every mixture with the true will neutralize the deceptive. If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow."); *see also In re Apple Comput., Inc.*, No. C-01-3667 CW, 2003 U.S. Dist. LEXIS 28303, at *7-8 (N.D. Cal. Aug. 13, 2003) (referring to SEC filings generally for cautionary language does not sufficiently place investors on notice of risks).

Other statements made by Defendants misled investors regarding the decrease in LTVs and increased churn. In late 2018, during an analyst call, Yung and Flanders actively denied any increase in member churn with Yung stating that eHealth had seen an "uptick in LTVs since we've been on 606, so we actually have not seen an increase in churn. We've actually seen a decrease in churn, on average." ¶82. In its second quarter 2018 Form 10-Q, eHealth blamed LTV decreases on the lack of open enrollment. ¶78. The second quarter 2019 Form 10-Q then claimed that a reopened enrollment period during the first quarter of 2019 allowed customers to disenroll from their Medicare Advantage plans to return to original Medicare, constraining the LTV of eHealth's Medicare Advantage plans. ¶87. Yung then blamed a forecast of "flat LTVs" on the open enrollment period in an analyst call on April 23, 2020 "because of the increase of number of seniors we're seeing taking advantage of the open enrollment period that we see causing that higher churn in the AEP cohort. ¶100. This focus on the open enrollment period in forecasting LTV concealed the increased number of members that simply cancelled their plans after the shift to direct response marketing. ¶¶101-02.

Once again, these statements that the rate of churn "we've actually seen" had decreased when, in fact, it had increased, is a false statement of fact. Nevertheless, even they are viewed as opinions, they are still misleading. A statement of opinion may be reasonably interpreted as an implied statement that "the speaker knows facts sufficient to justify him in forming the opinion, or that he at least knows no facts incompatible with the opinion." *Omnicare*, 575 U.S. at 191. While Defendants argue that the above statements represent mere opinions (Defs. Br. 16-17), their knowledge of the increased churn contradicted those statements. A statement of opinion is still misleading, even if genuinely believed, if "the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." *Align Tech.*, 856 F.3d at 615-16; *see also Omnicare*, 575 U.S. at 185-86; *Atossa Genetics*, 868 F.3d at 802.

Defendants argue that eHealth never claimed that the decline in retention rate was caused "solely" by open enrollment timing, but only that the timing "contributed to" the decline. Defs. Br. at 17. But unlike in *Lu v. Align Tech, Inc.*, 417 F. Supp. 3d 1266, 1276 (N.D. Cal. 2019), where the plaintiff emphasized some phrases and ignored others in order to allege misstatements, Plaintiff's complaint does not ignore any portion of these statements. Defendants here offered no other explanation other than open enrollment timing despite extensive knowledge of increased churn from cancellations. ¶78. This knowledge made the statement of only one cause materially misleading. *Align Tech.*, 856 F.3d at 615-16. Moreover, unlike in *West v. eHealth, Inc.*, Plaintiff does not allege that Defendants failed to disclose facts pertaining to the formation of their opinion "of the primary driver" of low LTV. 2016 WL 948116, at *7 (N.D. Cal.  Mar. 14, 2016) ("Plaintiffs also fail to adequately allege that defendants' statements were made misleading by their failure to mention facts about how they formed their opinion").  Plaintiff has alleged, instead, that Defendants entirely failed to disclose the increased member churn caused by marketing shifts as even a partial cause of low LTV and retention rates. ¶¶88, 101-02. As revealed by Muddy Waters, the change to direct response marketing materially decreased retention and therefore LTV. ¶¶50-58.

### 2.  Defendants Filed False and Misleading Financial Statements.

Defendants filed a false and misleading income statement in its fiscal year 2019 annual report on Form 10-K. ¶95. eHealth overstated its revenue and operating profit by hundreds of millions of

dollars because it inflated the LTV of policies through its recognition of revenue. ¶96. The LTV for Medicare Advantage members in 2019 was 28.1% less than what eHealth represented because of eHealth's undisclosed member churn and the toll it had taken on its policy renewals. ¶97. Accordingly, eHealth materially misled investors when stating in the annual report that its LTV for Medicare Advantage policies was $1,013 per approved member; in actuality, it was $728 per approved member. ¶97.

Defendants argue that that Plaintiff simply disagrees with the accounting assumptions made by eHealth, but that no violation of GAAP has been alleged. Defs. Br. at 13. However, Plaintiff does not need to allege any violation of GAAP because Plaintiff alleges the necessary facts for pleading the falsity of a financial statement: the statement, the correct amount, and the cause for the deviation. 15 U.S.C. § 78u-4(b)(1). Plaintiff clearly identifies the financial statement in question at ¶94, the correct amounts at ¶¶96-97, and the reason for the deviation between the correct and misstated amounts at ¶97. While ASC 606 is an accepted standard for revenue recognition, Defendants adopted it despite the significant limitations with respect to accurately recognizing eHealth's highly contingent long-term revenue streams. ¶58.  This was not simply a misjudgment, but as alleged a deliberate recklessness that sought to juice eHealth's short-term stock price for Defendants' benefit. ¶¶30-36. The cases cited by Defendants stand for irrelevant points of law. *See Seaman v. Cal. Bus. Bank*, 2014 WL 1339649, at *6 (N.D. Cal. Apr. 2, 2014) (noting that the loan loss *projections* required some degree of judgment); *Harris v. AmTrust Fin. Services, Inc.*, 135 F. Supp. 3d 155, 171 (S.D.N.Y. 2015) (finding that plaintiff failed to allege a specific violation of GAAP when alleging that defendants violated GAAP); *In re Velti PLC Sec. Litig.*, 2015 WL 5736589, at *26 (N.D. Cal. Oct. 1, 2015) (finding that plaintiffs failed to allege material misstatement where company used "quantitative measures"  rather than a mathematical methodology to calculate bad debt reserves). The inappropriate choice of ASC 606 caused eHealth to recognize revenue it could not reasonably expect to receive, and thus led eHealth to materially misstate its revenue and operating profits in its 2019 annual report.

Defendants also argue that Plaintiff fails to allege any facts demonstrating that Ernst & Young, eHealth's auditor, disagreed with any of eHealth's accounting assumptions and

methodologies. Defs. Br. at 14. But Defendants rely too heavily on the fact that E&Y approved their financial statements, because while helpful to allegations, a restatement is not a prerequisite to pleading falsity. *See In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 390 (S.D.N.Y. 2007) (finding failure to disclose uncertain tax liability in financial statements made these statements false and misleading even though defendants never restated their financial statements); *see also Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) ("[T]he fact that the financial statements for the year in question were not restated does not end Aldridge's case when he has otherwise met the pleading requirements of the PSLRA. To hold otherwise would shift to accountants the responsibility that belongs to the courts."); *Feiner v. SS&C Techs., Inc.*, 11 F. Supp. 2d 204, 209 (D. Conn. 1998) (prospectus contained false statement concerning revenue recognition process notwithstanding absence of restatement); *Marksman Partners. L.P. v. Chantal Pharm. Corp.*, 927 F.Supp. 1297, 1314 n.13 (C.D. Cal. 1996) ("[t]he fact that Chantal's independent auditor may have approved the accounting methods will not shield Chantal from liability for deception such methods may have caused").

Similarly, Defendants cannot shield themselves from liability simply because estimates and assumptions may have been involved in their calculations. Defendants knew that the churn associated with their television clients was at odds with recognizing revenue for multiple years. ¶¶41-44. Cancellations became such an issue that eHealth began offering employees bonuses if they managed to keep a customer enrolled for just 90 days. ¶43. Plaintiff alleges facts regarding the increased "churn" from poor-quality customers to support the falsity of the annual report. eHealth's executives had books of business that detailed the number of customers enrolled by eHealth who dropped their plans shortly after signing up. ¶¶108-09. This known churn directly undermines the levels of revenue and operating profits recognized and reported in the 2019 annual report

Plaintiff further alleges facts regarding Defendants' motives behind adopting ASC 606. ¶30-34. As recalled by CW1, Francis and other top executives were "happy" about the new standard because it would increase eHealth's reportable revenue from the same book of business. ¶34. Senior management enthusiastically embraced the new standard not because it more accurately would capture revenue, but "because it allowed them to book revenue for commissions far into the future

18

that [eHealth] did not in fact receive due to customer churn." ¶36. Flanders stated during eHealth town halls that the new rule would be "good for business." ¶36. Revenue recognition standards should have no effect on the underlying health of a company, so this "business" could only mean one thing: eHealth's stock price.[2]

**B.     Defendants' Knowledge of the Churn and Financial Gains Combine to Give Rise to a Strong, Cogent and Compelling Inference of Scienter.**

The relevant inquiry in considering scienter is "whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007) (emphasis in original). The inference "need not be irrefutable … or even the most plausible." *Id.* at 324. An inference of scienter is "strong," and a motion to dismiss must be denied, where "a reasonable person would deem [it]… cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* "[A] tie goes to the Plaintiff." *Maiman v. Talbott*, 2010 WL 11421950, at *5 (C.D. Cal. Aug. 9, 2010) (quotations omitted). Scienter may be pled by facts showing defendants had actual knowledge of, or access to, information contradicting the challenged statements, or were in a position where it would be "absurd" to suggest they did not know the undisclosed facts. *S. Ferry LP #2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008).

Plaintiffs' allegations provide a compelling inference of scienter against Defendants. Defendants concealed the increased "churn" of customers caused by a shift in marketing strategies. At the same time, they took advantage of eHealth's inflated stock price by selling inordinate amounts of stock and receiving huge windfalls in the form of equity compensation. Given the allegations of the complaint, the inference created by Defendants' knowledge of the "churn" and their motives to

---

[2] Defendants raise other arguments regarding the adequacy of Plaintiff's falsity allegations, including that the 2020 LTV Forecast is protected by the PSLRA Safe Harbor (Defs. Br. at 18), increased retention costs due to churn (Defs. Br. at 19), fraud by hindsight (Defs. Br. at 15-16), and eHealth's churn rates (Defs. Br. at 15-16). These arguments are irrelevant to Plaintiff's allegations of falsity because Plaintiff does not allege in the Complaint that the statements referenced by Defendants were false or misleading.

19

conceal it is "at least as compelling" as any other inference available from the facts alleged. *Tellabs*, 551 U.S. at 324.

Defendants argue that they had no knowledge of the "churn," directly contradicting Plaintiff's confidential witness allegations. Defs. Br. at 20-21. For many of the CWs, Defendants argue that they had no direct communication with the named defendants. Defs. Br. at 20-21. This is not true because, as alleged, CW2 had direct and substantive contact with Francis as he reported to him and had frequent discussions with CW2 related to churn. ¶¶40-41. Likewise, CW4 discussed the churn with "Taub, Wilson, and other senior executives. ¶43. Regardless, even if the CWs had no direct communication with a defendant (they did), the CWs still confirm that the "churn" existed. So, unless Defendants are arguing that they were unaware of the "churn," the frequency of CW discussions of "churn" with the named defendants is irrelevant. But Defendants cannot argue that they were unaware, as they admitted the retention issues during analyst calls throughout the Class Period. ¶¶110-11; *see also Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1033 (N.D. Cal. 2016) (finding that holistically the core nature of the product in question and the statements of the confidential witnesses sufficed to establish scienter).

Defendants' significant and unusual sales of stock during the Class period lend further support to an inference of scienter. *See Quality Sys.*, 865 F.3d at 1146 (holding that unusual or suspicious stock sales by insiders provides circumstantial evidence of scienter). At the same time the materially misleading statements and omissions supported eHealth's stock price, Defendants departed substantially from their historical pattern of stock transactions. ¶114. For example, before the Class Period, Flanders had only sold 6,076 shares of eHealth; but during the Class Period alone, he sold 254,521 shares for total proceeds of $25,753,724. ¶116. Francis, meanwhile, sold 28,000 shares during the Class Period for $3,597,914 in proceeds. ¶118. These sales of shares were highly unusual, and demonstrate Defendants' motive to mislead investors. *See In re Daou Systems, Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005) ("Unusual trading or trading at suspicious times or in suspicious amounts by corporate insiders has long been recognized as probative of scienter") (quoting *Greebel v. FTP Sotfware, Inc.*, 194 F.3d 185, 197 (1st Cir. 1999)). Defendants argue that these represented too small of a portion of their respective overall holdings to be indicative of anything, but provide

20

no support for this position and do not otherwise suggest a minimum threshold that the insider selling allegations needed to meet. Defs. Br. at 24. Suspicious insider sales can provide circumstantial evidence of scienter no matter the percentage of overall holdings sold. *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004), demonstrates this point. In that case, the relatively small insider sale gave rise to an inference of scienter because other aspects of the sale (namely the amount) decidedly suggested scienter.

In this case, the sales were material relative to Defendants' base salaries, supporting the conclusion that the sales were not trivial in size or context. ¶138 (salaries ranged from $188,000 to $600,000). Further, the sales relative to Defendants' overall holdings were substantial; for example, by the end of the Class Period, Flanders in particular had sold approximately 35% of his pre-Class Period holdings. ¶116. Several other executive insiders also sold substantial portions of their holdings. *See also* ¶118 (Francis sold 12%), ¶120 (Hurley sold 23%), ¶122 (Goldberg sold 65%), ¶125 (Hannan sold 31%), ¶128 (Randall sold 61%), ¶130 (Kalin sold 16%). These insiders also had little or no prior history of selling stock. ¶¶115, 117, 119, 121, 124, 127, 129. "Thus, the sudden flurry of massive insider trading over this three month period of time, after an extended period of inactivity, appears unusual." *Am. W. Holding Corp.*, 320 F.3d at 940; *see also In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989) (sales suspicious where evidence showed that defendants collectively sold about eight percent of holdings valued at roughly $ 84 million during the class period). That these sales occurred during a period of time in which eHealth's stock price was abnormally high only furthers Plaintiff's allegations of motive and circumstantial evidence of scienter. Indeed, Defendants sold over $40 million in stock while the eHealth's share price was nearly *1,000%* of its pre-Class Period levels. ¶5.

Defendants misplace reliance on the argument that some of these sales were made pursuant to 10b5-1 trading plans. Defs. Br. at 23-24. First, 10b5-1 plans are not dispositive, particularly in cases like this where the motive of Defendants does not entirely depend on the timing of the sales, but on the existence of any sales at all. *See*, *e.g.*, *McKesson Corp.*, 411 F. Supp. 3d at 605 n.3 (10b5-1 plans do not negate inference of scienter at pleading stage, citing *Khoja*, 899 F.3d at 999); *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, at 1193 (D. Nev. 2009) (noting that simply entering

into a 10b5-1 plan does not rebut an inference of scienter); *In re Countrywide Fin. Corp. Sec. Litig.*, 2009 WL 943271, at *4 (C.D. Cal. Apr. 6, 2009) (finding that 'unusual 10b5-1 plan modifications" made it inappropriate to dismiss Section 20A claims on the basis of said plan). Second, only a small portion of the sales at issue were made purportedly in connection with a trading plan; and, with regard to those sales, were made by non-party insiders and were vastly out of line with previous sales suggesting that the plans were modified for the purpose of benefitting from eHealth's inflated stock price. *See, e.g.*, ¶127 (Randall's sales were substantially larger than previous trading plan sales).

Moreover, Flanders, Francis, and Yung also benefitted from equity compensation, specifically RSUs tied to eHealth's stock price. ¶132. While Defendants claim that the growing holdings of Defendants Flanders and Francis throughout the Class Period "conclusively" refute an inference of scienter (Defs. Br. at 23), their equity interests in eHealth substantiate Plaintiff's allegations of motive. These RSUs would only vest if eHealth's stock price rose by a certain percentage within a certain amount of time. ¶¶133-135. Thanks to Defendants false and materially misleading statements, eHealth's stock price rose high enough that the RSUs for 2017, 2018, and 2019 could vest and result in millions of dollars in additional compensation. ¶137 ($23 million in additional equity compensation between 2017 and 2019). Again, given that Defendants Flanders, Francis, and Yung earned between $188,000 and $600,000 in annual base salary, these amounts were material and therefore support Plaintiff's inference of scienter. *See Am. W. Holding Corp.*, 320 F.3d at 944 (holding that allegations of motive demonstrated scienter where defendants' "eligibility for stock options and executive bonuses were based principally on the company's financial performance").

Plaintiffs' inference of scienter is easily "at least as compelling" as Defendants' inference of nonfraudulent intent. *Tellabs*, 551 U.S. at 314 ("To qualify as 'strong' within the intendment of § 21D(b)(2), we hold, an inference of scienter must be more than merely plausible or reasonable--it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.").

## II.    DEFENDANTS VIOLATED SECTION 20(a).

To state a claim for "controlling person" liability under Section 20(a), Plaintiffs need only allege an ability to control or influence (directly or indirectly) a primary violator, but need not allege that such defendants actually exercised control or participated in the underlying securities law violation. *See Am. West Holding*, 320 F.3d at 945 (*quoting Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000)). Defendants do not challenge Plaintiff's Section 20(a) claim except insofar as they challenge an underlying Section 10(b) violation. Because Plaintiff has stated a Section 10(b) against Defendants, Plaintiff's Section 20(a) claim should be upheld as well. *See Howard*, 228 F.3d at 1065.

### CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendants' motion in its entirety.[3]

Dated: December 23, 2020                Respectfully submitted,

**LEVI & KORSINSKY, LLP**

 */s/ Adam M. Apton*
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
Email: aapton@zlk.com
Email: amccall@zlk.com
388 Market Street, Suite 1300
San Francisco, California 94111
Telephone: (415) 373-1671
Facsimile: (415) 484-1294

-and-

Nicholas I. Porritt
**LEVI & KORSINSKY, LLP**
1101 30th Street N.W., Suite 115
Washington, D.C. 20007

---

[3] Alternatively, Plaintiff requests leave to amend. *See* Fed. R. Civ. P. 15(a)(2); *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) ("In this technical and demanding corner of the law, the drafting of a cognizable complaint can be a matter of trial and error.").

Tel:    (202) 524-4290
Fax:    (212) 363-7171
Email: nporritt@zlk.com
(*to be admitted pro hac vice*)

*Attorneys for Lead Plaintiff*
*and Lead Counsel for the Class*