JEROME F. BIRN, JR., State Bar No. 128561
CATHERINE E. MORENO, State Bar No. 264517
BETTY CHANG ROWE, State Bar No. 214068
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
Email: jbirn@wsgr.com
        cmoreno@wsgr.om
        browe@wsgr.com

Attorneys for Defendants
eHealth Inc., Scott N. Flanders,
Derek N. Yung, and David K. Francis

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| IN RE eHEALTH INC. SECURITIES LITIGATION, . | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO.: 4:20-cv-02395-JST **REPLY MEMORANDUM IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT** Hearing Date: March 3, 2021 Time: 2:00 p.m. Courtroom: 6 Honorable Jon S. Tigar |

DEFS. REPLY IFSO MTD AM. COMPLT.
CASE NO. 4:20-CV-02395-JST

**TABLE OF CONTENTS**

**Page**

INTRODUCTION...................................................................................................................1

ARGUMENT .........................................................................................................................2

I.  PLAINTIFF FAILS TO PLEAD ANY ACTIONABLE MISSTATEMENT OR
    OMISSION...................................................................................................................2

    A.  The Adoption of ASC 606 Was Mandatory and Plaintiff Fails To Plead
        Facts Showing That eHealth's Application of ASC 606 Was Fraudulent. .............2

    B.  Plaintiff Fails To Allege Any False Statements Regarding Churn or LTVs...........4

        1.  Plaintiff Pleads No Facts To Suggest That Commission Revenue
            Was Inflated or That Churn Was Higher Than Reported............................4

            a.  Plaintiff Ignores eHealth's Application of ASC 606. .....................4

            b.  The CWs And The Cribbed Muddy Waters Allegations Fail
                To Show That LTVs Were Inflated or that Churn was Higher
                than Disclosed. ...................................................................................6

            c.  eHealth's July 2020 Disclosure that Churn Had Increased
                Does Not Show That Churn Or LTVs Were Elevated Earlier
                in the Class Period..............................................................................7

        2.  Plaintiff Fails to Plead an Actionable Omission Based on DTV
            Marketing. ...................................................................................................8

        3.  Plaintiff Concedes that the April 23, 2020 Statements Were Not
            Misleading. ..................................................................................................9

        4.  Plaintiff Fails to Plead Any False Statement Regarding Costs. ................10

II.  PLAINTIFF FAILS TO PLEAD FACTS GIVING RISE TO A STRONG
     INFERENCE OF SCIENTER......................................................................................11

    A.  The CWs Do Not Raise a Strong Inference of Scienter. ......................................11

    B.  The Supposed "Admissions" Do Not Raise a Strong Inference of Scienter.........13

    C.  The Individual Defendants' Stock Sales and Compensation Do Not Raise a
        Strong Inference of Scienter.................................................................................13

CONCLUSION ....................................................................................................................15

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002) ................................................................................................ 6

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) .............................................................................................. 5

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
880 F. Supp. 2d 1045 (N.D. Cal. 2012) .............................................................................. 7

*Eclectic Props. East, LLC v. Marcus & Millichap Co.*,
751 F.3d 990 (9th Cir. 2014) .............................................................................................. 3

*Evanston Police Pension Fund v. McKesson Corp.*,
411 F. Supp. 3d 580 (N.D. Cal. 2019) .............................................................................. 14

*Harris v. AmTrust Fin. Services, Inc.*,
135 F. Supp. 3d 155 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016) .................... 7

*In re Apple Computer, Inc. Sec. Litig.*,
2003 U.S. Dist. LEXIS 28303 (N.D. Cal. Aug. 13, 2003) ................................................ 10

*In re Century Aluminum Co. Sec. Litig.*,
704 F.3d 1119 (9th Cir. 2013) ............................................................................................ 3

*In re Countrywide Fin. Corp. Sec. Litig.*,
WL 943271 (C.D. Cal. Apr. 6, 2009) ................................................................................ 14

*In re Daou Systems, Inc. Sec. Litig.*,
411 F.3d 1006 (9th Cir. 2005) .......................................................................................... 14

*In re Nektar Therapeutics*,
2020 WL 3962004 (N.D. Cal. July 13, 2020) .................................................................... 6

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) .......................................................................................... 14

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) ............................................................................................ 15

*In re Scottish Re Group Sec. Litig.*,
524 F. Supp. 2d 370 (S.D.N.Y. 2007) ................................................................................ 6

*In re Velti PLC Sec. Litig.*,
2015 WL 5736589 (N.D. Cal. Oct. 1, 2015) ...................................................................... 7

*Lipton v. Pathogenesis Corp.*
284 F.3d 1027 (9th Cir 2002) ............................................................................................ 12

*Lopes v. Fitbit, Inc.*,
    2020 WL 1465932 (N.D. Cal. Mar. 23, 2020) (Tigar, J.), appeal docketed,
    No. 20-16033 (9th Cir. May 28, 2020) ................................................................................ 13

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
    927 F. Supp. 1297 (C.D. Cal. 1996) ...................................................................................... 6

*McGovney v. Aerohive Networks, Inc.*,
    2019 WL 8137143 (N.D. Cal. Aug. 7, 2019) .................................................................. 4, 11

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ............................................................................................... 14

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ............................................................................................. 14

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
    575 U.S. 175 (2015) ............................................................................................................... 5

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ................................................................................................. 7

*Seaman v. Cal. Bus. Bank*,
    2014 WL 1339649 (N.D. Cal. Apr. 2, 2014) ......................................................................... 7

*South Ferry LP, No. 2 v Killinger*,
    542 F.3d 776 (9th Cir. 2008) ............................................................................................... 11

*Stocke v. Shuffle Master, Inc.*,
    615 F. Supp. 2d 1180 (D. Nev. 2009) .................................................................................. 14

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
    551 US. 308 (2007) .............................................................................................................. 11

*West v. eHealth, Inc.*,
    2016 WL 948116 (N.D. Cal. Mar. 14, 2016) ........................................................................ 9

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ............................................................................................... 11

**STATUTES**

15 U.S.C. § 78u-4(b)(1) ...................................................................................................................... 6

15 U.S.C. § 78u-4(b)(2)(A) ............................................................................................................... 11

**INTRODUCTION**

Plaintiff's Opposition Brief ("Opp.") fails to address most of the arguments made in Defendants' moving brief ("Br.").  Any one of these unanswered arguments compels dismissal of the Complaint.

For example, Plaintiff calls eHealth's adoption of ASC 606 an "inappropriate choice," one that is arguably "reckless."  Opp. at 17.  That is blatantly wrong: all companies applying U.S. Generally Accepted Accounting Principles ("GAAP") were *required* to implement the new revenue recognition standard at the beginning of 2018.  Br. at 1, 4.  Moreover, Plaintiff ignores all the undisputed disclosures about eHealth's application of ASC 606 demonstrating its conservatism.  For instance, eHealth "constrained" its members' estimated Life-Time Values (LTVs), thus recognizing less revenue than it could have recognized.  eHealth's conservatism is also apparent from the fact that cash collections from members exceeded its estimates, requiring eHealth to record additional "tail" revenue in 2017, 2018, and 2019.  Plaintiff likewise ignores the Company's detailed disclosures about the accounting assumptions and judgments required to calculate LTVs under ASC 606, and the risks associated with member churn.  And, Plaintiff ignores that there has been no financial restatement and no other disclosure suggesting anything wrong with the Company's revenue recognition; to the contrary, the Company has repeatedly received clean opinions from its auditors (Ernst & Young LLP) since its adoption of ASC 606.

Further, Plaintiff fails to address the fact that churn (or member dropout rate) has always been a part of eHealth's business, and that the Company has consistently disclosed and discussed information about churn before and during the Class Period.  In 2020, eHealth disclosed that churn had increased, but no facts are pled to show that churn was known to be higher and had been misrepresented since the beginning of the Class Period in 1Q 2018.  No CW offers any facts about the Company's calculation of LTVs or churn, let alone facts showing that churn was higher since 1Q 2018 or in any subsequent quarter before eHealth disclosed increased churn in 2020.  Plaintiff's attempts to suggest otherwise are classic and impermissible "fraud by hindsight."

The parroted opinions of Muddy Waters, a self-interested short seller, cannot show that LTVs were inflated or that churn was higher than what eHealth reported during the Class Period.

DEFS. REPLY IFSO MTD AM. COMPLT.    -1-
CASE NO. 4:20-CV-02395-JST

Muddy Waters simply expressed its disdain for ASC 606 and made its own baseless assumption that people will remain members for only one year, leading to its misguided presumption that LTVs were overstated.  Plaintiff fails to plead any basis in fact to support Muddy Waters' assumptions or application of ASC 606.

To the extent Plaintiff responds to Defendants' brief, Plaintiff's arguments contradict his allegations and the statements he challenges.  For example, Plaintiff argues that Defendants concealed the existence of member churn, falsely alleging that Defendants claimed not to know about churn.  Opp. at 20.  That argument is directly contradicted by the very statements Plaintiff cites.  For example, Plaintiff expressly references statements by COO Francis in 2018 concerning member attrition within the first 90 days of enrollment (Opp. at 6), and then points to statements by CEO Flanders and CFO Yung in February 2019 specifically addressing churn rates (Opp. at 7).  Put simply, eHealth repeatedly discussed churn and disclosed its risks.

Plaintiff's allegations also fail to establish the "strong inference" of scienter required under the PSLRA.  The CWs offer no information about the Company's calculation of LTVs or churn, and no facts about any Individual Defendants' knowledge as it pertains to the Company's financial results or statements about churn.  The Individual Defendants' stock sales do not suggest scienter because CEO Flanders and COO Francis sold small percentages of their available holdings and held more stock at the end of the Class Period than they held at the beginning.  The Ninth Circuit has repeatedly held that such stock sale patterns refute an inference of scienter.

Plaintiff's failure to plead either the falsity of a statement or that Defendants acted with scienter compels the dismissal of the Complaint.

## ARGUMENT

### I.  PLAINTIFF FAILS TO PLEAD ANY ACTIONABLE MISSTATEMENT OR OMISSION.

#### A.  The Adoption of ASC 606 Was Mandatory and Plaintiff Fails To Plead Facts Showing That eHealth's Application of ASC 606 Was Fraudulent.

Plaintiff repeatedly mischaracterizes eHealth's implementation of ASC 606 as an "inappropriate choice" the Company made in order to "overstate revenue and earnings while

hiding the flaws in eHealth's new marketing strategy." Opp. at 6-7, 17 (claiming Defendants "decided to adopt ASC 606"); *id.* at 14 (Defendants "shifted to an accounting standard that would hide . . . downside risks"); *id.* at 17 (Defendants "adopted [ASC 606] despite . . . significant limitations" and referring to it as an "inappropriate choice"); *id.* at 18 (referring to "motives behind adopting ASC 606"). Plaintiff is demonstrably wrong. eHealth was ***required*** under GAAP to adopt the new revenue recognition standard as of January 1, 2018—a point Defendants raised multiple times in their moving brief and which Plaintiff ignores. *See* Br. at 4 & Ex. 2 at 48; Br. at 1 (referring to "mandatory adoption of ASC 606"). Regardless, Plaintiff concedes, as he must, that "ASC 606 is an accepted standard for revenue recognition" (Opp. at 17), and that ASC 606 "***directs*** entities" to recognize upfront all the revenue that the company "reasonably expects to receive during the life of the contract." ¶ 29 (emphasis added); ¶ 2.

Thus, Plaintiff's allegations that Defendants chose to use ASC 606 as part of a fraudulent plan to "report significantly better earnings results" by "recogniz[ing] revenue [eHealth] could not reasonably expect to receive" simply fail. Opp. at 6-8, 17. eHealth adopted the new accounting standard because it was required to do so, and it recognized revenue in accordance with ASC 606's parameters. *See, e.g.*, Br. at 12-13. Plaintiff does not (and cannot) allege particularized facts showing that Defendants failed to apply ASC 606 in accordance with GAAP. *Id.* at 13. Nor does Plaintiff dispute that the Company's auditors (Ernst & Young LLP) reviewed its implementation of ASC 606 when it was first adopted in 2018 and have consistently signed off on the Company's financial statements, including its application of ASC 606 to revenue recognition, since that time. *Id.* at 4 (citing Ex. 1 at 72-73). Indeed, the Company's application of ASC 606 has been conservative, demonstrated by the fact that eHealth ***underestimated*** the cash it will receive and was required to record a positive annual adjustment, or "tail" revenue, in 2017, 2018 and 2019. *Id.* at 6. Plaintiff's failure to respond to these indisputable basic facts mandates dismissal. *See, e.g.*, *Eclectic Props. East, LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996-97 (9th Cir. 2014) (to survive motion to dismiss, plaintiff must allege facts "tending to exclude the possibility" that an "innocuous alternative explanation" is true); *In re Century Aluminum Co. Sec. Litig.*, 704 F.3d 1119, 1122 (9th Cir. 2013) (same).

Moreover, Plaintiff ignores the Company's repeated and detailed disclosures about the complexities of applying ASC 606 and the related risks.  For example:  eHealth disclosed information about the judgments associated with calculating LTVs (Br. at 6-7); the risks associated with churn and member retention (*id.* at 7); the accounting assumptions used in calculating LTVs (*id.* at 5); and the risks associated with its direct marketing channel (*id.* at 7).  eHealth also disclosed that, because of the significant time lag between when a person is approved for coverage and chooses to start paying premiums, calculating whether a person will become a member or drop out (churn) requires estimation and judgment.  *Id.* at 6.

These detailed disclosures belie Plaintiff's assertion that eHealth deliberately concealed the fact that churn impacted its business.  *McGovney v. Aerohive Networks, Inc.*, 2019 WL 8137143, at *12 (N.D. Cal. Aug. 7, 2019) (company disclosed what was allegedly omitted).  Indeed, the CW allegations that churn was a "known issue within eHealth" and that its "impact on eHealth's business was known to eHealth management" are meaningless allegations.  Opp. at 2.  Churn was indeed a fact of life in eHealth's business—one that eHealth repeatedly and openly disclosed.  Br. at 4-6.

**B.     Plaintiff Fails To Allege Any False Statements Regarding Churn or LTVs.**

Defendants' opening brief identified four categories of alleged misstatements: (1) statements about the churn rate, including the alleged overstatement of 2019 commission revenue; (2) the alleged failure to disclose that higher churn for Medicare Advantage (MA) members was caused by "low quality" members resulting from Direct TV (DTV) advertising; (3) the alleged failure to disclose that churn for MA members was higher in the first year; and (4) statements regarding the absence of costs related to commission receivables.  *Id.* at 9.  Plaintiff fails to identify any well pled facts supporting the falsity of any statement in these categories.

**1.     Plaintiff Pleads No Facts To Suggest That Commission Revenue Was Inflated or That Churn Was Higher Than Reported.**

**a.     Plaintiff Ignores eHealth's Application of ASC 606.**

The crux of Plaintiff's claim is that Defendants "hid[] eHealth's increasing issues with churn in order to maximize LTV."  Opp. at 7.  But Plaintiff identifies no facts supporting his

conjecture that LTVs were actually inflated, that churn was greater than reported, or that eHealth wrongly disregarded evidence of churn in estimating LTVs. *See* Br. at 10-12.

As a threshold matter, Plaintiff ignores that, far from using "inflated" LTVs, eHealth's LTV assumptions for 2019 were conservative. In February 2019, the Company initially guided for flat LTVs. *Id.* at 11; Ex. 6 at 9-10. After 3Q 2019, eHealth guided for a 1%-2% decrease in LTVs. *Id.*; Ex. 7 at 6. Plaintiff likewise ignores that MA churn rates were *lower* in each quarter of 2019 than in 4Q 2018. *Id.* at 11.

Plaintiff likewise does not contest either that eHealth's calculation of constrained LTVs was a judgment-laden exercise, and that the Company's statements about LTVs and churn were opinions, which are not actionable unless Plaintiff can satisfy the criteria set forth in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175, 185-86 (2015). *See* Br. at 12-14. Plaintiff has alleged no facts to satisfy *Omnicare*'s standard. *Id.* By Plaintiff's own description, the Complaint's allegations imply only that Defendants were aware that eHealth, like any subscription-based business, experienced member churn. Opp. at 18. Equally insufficient are allegations that salespersons were offered bonuses to encourage member retention. Opp. at 5 (citing ¶ 43). These allegations do not demonstrate—and certainly not with the requisite particularity—that Defendants did not believe in the assumptions underlying their estimated constrained LTVs, that LTVs were inflated or that churn was higher than reported, that Defendants supplied untrue facts, or that Defendants failed to disclose known facts that conflicted with their professed beliefs. The reasonable inference is that eHealth monitored churn and sought to improve or maintain its member retention rates. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 617-18 (9th Cir. 2017).

Moreover, Plaintiff ignores that the CWs offer no information about the calculation of LTVs and commission revenue, much less that churn was ignored, understated, or otherwise misreported. That should come as no surprise, as none of the CWs claim to have been involved in the calculation of LTVs or revenue. Br. at 12. At best, the CW statements show merely that churn was known to management and that the Company was employing measures to address it. *See, e.g.*, Opp. at 2 (recounting CW statements that churn was a "known issue" and that

management discussed "strategies to retain the business"). But as noted above, churn has always been a part of the business, and eHealth has routinely discussed it and disclosed relevant metrics. *See supra* at 4. There is simply no factual basis to infer that the Company's statements about LTVs or churn were false based on the CW statements.

Finally, Plaintiff cannot dispute that Ernst & Young specifically examined, among other things, "management's determination of the LTV of commission revenue" and tested the processes and controls "covering the models and methods used to calculate LTV . . . ." Br. at 14. While it is no doubt true that "a restatement is not a prerequisite to pleading falsity," (Opp. at 18), the lack of a restatement coupled with Ernst & Young's unqualified sign off on the Company's financial statements for the three years since its adoption of ASC 606 presents Plaintiff with a steep hill indeed to plead falsity.[1]

> **b. The CWs And The Cribbed Muddy Waters Allegations Fail To Show That LTVs Were Inflated or that Churn was Higher than Disclosed.**

A securities fraud plaintiff cannot simply adopt the assumptions and opinions of a self-interested short seller and repackage them as proof of a false or misleading statement. Br. at 11 (citing *In re Nektar Therapeutics*, 2020 WL 3962004, at *10 (N.D. Cal. July 13, 2020) (short seller report does not show falsity given unreliability of its opinions)). Likewise, a short-seller's mere disagreement with a company's accounting judgments and assumptions is insufficient to state a claim. Br. at 11, 13 (citing cases).

In response, Plaintiff argues that it must only allege "the [allegedly false financial] statement, the correct amount, and the cause for the deviation" between the two. Opp. at 17. Plaintiff is wrong. The PSLRA requires Plaintiff to state with particularity "the reason or reasons why the statement is misleading . . . ." 15 U.S.C. § 78u-4(b)(1). To do so, it is beyond

---

[1] Plaintiff's cited cases are distinguishable either because there was a restatement and conceded error or specific allegations of accounting errors. *See* Opp. at 18 (citing *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 391 (S.D.N.Y. 2007) (company restated financial statements "for the first two quarters of fiscal year 2006"); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) (alleged facts showed that "accounting standards required" defendant to establish reserve it did not maintain); *Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1315 (C.D. Cal. 1996) (specific allegations of improper revenue recognition)).

dispute that Plaintiff must "specify facts or evidence that show why the statement was false at the time it was made . . . ." *Ronconi v. Larkin*, 253 F.3d 423, 431 (9th Cir. 2001); Br. at 10.[2]

Plaintiff fails to do so. Beyond the short seller's self-serving allegations (insufficient for the reasons discussed above), the only "facts" alleged concern eHealth's receipt of "books of business" from insurance carriers, which allegedly contained unspecified, two to three month old information regarding plan turnover and/or policy cancellations. ¶¶ 104, 108, 112. These allegations cannot establish that any challenged statement was false when made. No specific facts are alleged to explain how information in the books of business received months after the fact could undermine the accounting assumptions incorporated into eHealth's financial results. Given the significant lag time between when insurers approve a new member and that person starts paying premiums, there necessarily is a delay before eHealth could learn that member has "churned" out. *See* Br. at 6. Moreover, the allegations about "books of business" do not contain any information at all about actual churn levels and over what periods of time. It is Plaintiff's burden to plead with specificity facts showing why the challenged statements were false when made, including the "hard numbers" that were purportedly known to the Individual Defendants and were inconsistent with their public statements. *See, e.g.*, *Ronconi*, 253 F.3d at 431; *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1068 (N.D. Cal. 2012); Br. at 22 (citing cases). Plaintiff has not done so here.

           **c.**      **eHealth's July 2020 Disclosure that Churn Had Increased Does Not Show That Churn Or LTVs Were Elevated Earlier in the Class Period.**

Plaintiff argues that CFO Yung made the following false statement in February 2019: "We've actually seen a decrease in churn, on average." Opp. at 15-16 (the statement was not

---

[2] Plaintiff fails to distinguish Defendants' authority, which is squarely on point and holds that a plaintiff must plead facts, rather than just disagreement with defendants' accounting judgments and assumptions, to state a claim. *See* Br. at 13 (citing *Seaman v. Cal. Bus. Bank*, 2014 WL 1339649, at *6 (N.D. Cal. Apr. 2, 2014) (dismissed; no suggestion that projections which "necessarily involve[d] some degree of judgment" "deviated from accepted accounting procedures"); *Harris v. AmTrust Fin. Services, Inc.*, 135 F. Supp. 3d 155, 171 (S.D.N.Y. 2015) (dismissed; failure to allege violation of GAAP where complaint asserted defendant "used fraudulent accounting practices"), *aff'd*, 649 F. App'x 7 (2d Cir. 2016); *In re Velti PLC Sec. Litig.*, 2015 WL 5736589, at *26 (N.D. Cal. Oct. 1, 2015) (dismissed; company disclosed reserves were calculated based upon assumptions)).

made "in late 2018" (Opp. at 15), but on February 21, 2019 (¶ 82)). No basis is alleged to show that this statement was false. Both eHealth's disclosures and even the Muddy Waters report show that churn *did* decline between 4Q 2018 and 1Q 2019. Defendants' opening brief included a chart showing that trailing 12-month MA churn rates declined from 36% in 4Q 2018 to 32% in 1Q 2019; Muddy Waters asserted that MA churn declined from 45.6% in 4Q 2018 to 40.3% in 1Q 2019. Br. at 6. Thus, Plaintiff's assertion that Defendants had "knowledge of . . . increased churn" during the corresponding time period is flatly contradicted by his own allegations (¶ 84) showing that churn was not "increased" when the statement was made. Plaintiff also ignores that Mr. Yung expressly acknowledged member retention issues in the same earnings call and in prior disclosures. Br. at 14-15. Mr. Yung's disclosure of the supposedly omitted facts belies the assertion that his statement "left investors with the false impression that eHealth had no problems associated with member retention." ¶ 85.

Similarly, Plaintiff cannot plead fraud by taking later statements about elevated churn as evidence that Defendants knew this information earlier. The fact that the Company reported increased churn and a decline in LTVs at the end of the Class Period does not show that churn or LTVs were elevated earlier in the Class Period. Br. at 15-16. Thus, neither Mr. Francis' July 2018 statement that eHealth was looking to "improve retention rates in that 90-day period post sale" (Opp. at 6; ¶ 110), nor Mr. Flanders' November 2019 statement that "the highest churn . . . is direct response to TV" (Opp. at 6; ¶ 111) show that eHealth was concealing higher churn rates or inflating its LTVs. To the contrary, such forthright disclosure about churn and retention efforts is antithetical to the notion that Defendants were hiding information. Br. at 15-16.

### 2. Plaintiff Fails to Plead an Actionable Omission Based on DTV Marketing.

Plaintiff argues that eHealth's 2Q 2018 and 2Q 2019 quarterly disclosures falsely blamed changes in the open enrollment periods as the reason the Company forecasted flat LTVs, but instead the flat forecast allegedly was due to higher churn from DTV members. Opp. at 15.

At the outset, Plaintiff has simply misread the 2Q 2018 statement. It concerns Individual and Family Plans (IFPs). Plaintiff's case concerns alleged misrepresentations about Medicare

Advantage plans, not IFPs.  Br. at 16.  Indeed, Plaintiff fails to allege that the IFPs were even marketed through DTV (*see* ¶¶ 25-26, DTV marketing was a Medicare-related initiative).  Plaintiff ignores his error.

Moreover, the Complaint is devoid of facts showing that DTV marketing caused the declines in LTVs or retention rates.  Even assuming *arguendo* that members who sign up through DTV are more likely to churn out, that does not mean the Company's estimates of overall churn or LTVs were wrong.  Moreover, the Company disclosed its use of direct marketing, including television.  Br. at 7 (citing Ex. 1 at 9); Ex. 2 at 21.  And in any event, Defendants' statements about the reasons for the decline in constrained LTVs and retention rates were statements of opinion.  As Judge Donato held in *West v. eHealth, Inc.*, 2016 WL 948116, at *8 (N.D. Cal. Mar. 14, 2016), companies are "entitled to form an opinion that [the timing of enrollment periods] w[as] the primary driver of the low" LTV or retention rates.  Plaintiff fails to plead any facts to undermine these opinions, such as facts showing that the declines were actually caused solely by DTV-related churn.  Relying on Muddy Waters' uncorroborated assertions is insufficient.

### 3. Plaintiff Concedes that the April 23, 2020 Statements Were Not Misleading.

Plaintiff challenged the following statement made by Mr. Yung:

> [W]e are forecasting flat LTVs . . . because of the increase of number of seniors we're seeing taking advantage of the open enrollment period that we see causing that higher churn in the AEP cohort.

¶ 100.  Plaintiff alleged this statement was false because it "concealed the high churn rate that eHealth experiences during the first year of the plans and the churn rates affecting the remaining years."  ¶ 101.  Defendants showed not only that Mr. Yung's statement was protected by the PSLRA safe harbor (Br. at 18), but also that the Company disclosed the allegedly omitted fact: "churn in our member base is highest in year 1 and decline[s] significantly in subsequent years"; the specific churn rates for MA members by year were also disclosed.  *Id.* at 18-19, Ex. 9 at 7.  Plaintiff concedes he "does not allege in the Complaint that the statements referenced by Defendants were false or misleading."  Opp. at 19 n.2.

**4.      Plaintiff Fails to Plead Any False Statement Regarding Costs.**

Plaintiff alleges that eHealth made two "key misleading statements" that it had no costs associated with commission receivables.  Opp. at 14.  The challenged statements are a statement by Mr. Flanders on April 26, 2018 (¶¶ 75-76), and a statement by Mr. Yung on February 20, 2020 (¶¶ 91-92).  Plaintiff argues these statements are misleading because eHealth spent money to retain members.  *Id.*

Plaintiff has wrongly confused statements about what is required for revenue recognition with eHealth's decision to spend money to retain members later.  Mr. Flanders and Mr. Yung accurately stated that eHealth recognizes as revenue all the constrained LTV because it is not required by the insurers to incur any costs after the customer's application is submitted and approved by an insurer.  Br. at 19 (citing Ex 1 at 66, Ex. 26 at 11, Ex. 8 at 13).  eHealth has disclosed that it is entitled to recognize revenue when a submitted application is approved by an insurer because its services to the insurer are complete at that time.  *Id.* at 19 (citing Ex. 1 at 65). Plaintiff does not allege that eHealth is contractually obligated to the insurers to provide ongoing customer care.

The fact that eHealth chooses to spend money later to retain existing members does not impact revenue recognition because eHealth is not contractually obligated to the insurers to do so.  Just as a company may choose to spend money on marketing or advertising without affecting its ability to recognize revenue, eHealth's voluntary efforts to improve member retention do not affect the criteria for recognizing revenue; and, Plaintiff pleads no facts to the contrary. Moreover, eHealth plainly distinguished its decision to spend money in "maintaining our relationship with [] existing member[s]" (Ex. 10 at 22) from its revenue recognition criteria (Ex. 1 at 64-66).  This is not an obscure statement that it would "take a financial analyst" to decipher.[3]

Plaintiff appears to assert a new, unpled allegation, arguing that eHealth failed to disclose that such retention costs were increasing in light of the "shift to direct response marketing . . . ."

---

[3] *In re Apple Computer, Inc. Sec. Litig.*, 2003 U.S. Dist. LEXIS 28303, at *6-8 (N.D. Cal. Aug. 13, 2003), is inapposite, as it concerned the applicability of the safe harbor, not whether sufficient facts were alleged to demonstrate falsity.

Opp. at 14.  Setting aside that Plaintiff cannot amend his pleading via an opposition brief, this assertion is clearly false.  eHealth disclosed its "customer care and enrollment expenses" in its financial statements, which include retention costs."  *See* Ex. 10 at 45 and Ex. 1 at 53.  There can be no claim where Defendants disclosed the very thing Plaintiff claims was concealed.  *See Aerohive*, 2019 WL 8137143, at *3 (no claim; defendants disclosed what allegedly was omitted).

## II. PLAINTIFF FAILS TO PLEAD FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER.

To plead scienter, the PSLRA requires that Plaintiff "state with particularity facts giving rise to a strong inference" of scienter.  15 U.S.C. § 78u-4(b)(2)(A).  That inference must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 US. 308, 323-24 (2007); Br. at 10.

As a threshold matter, Plaintiff misstates the scienter standard.  Although it is not pled in the Complaint, Plaintiff refers to the "core operations" inference.  This is a narrow ground for alleging scienter that applies only where facts are pled "showing defendants had actual knowledge of or access to information contradicting the challenged statements or were in apposition where it would be 'absurd' to suggest they did not know the undisclosed facts"; it applies only in "exceedingly rare" cases where there are "detailed allegations about the defendants' actual exposure to information."  *South Ferry LP, No. 2 v Killinger*, 542 F.3d 776, 784-86 & n.3 (9th Cir. 2008).  No facts are pled suggesting it would apply here.

### A. The CWs Do Not Raise a Strong Inference of Scienter.

Plaintiff cites repeatedly to the allegations of confidential witnesses in an attempt to establish scienter.  *See, e.g.*, Opp. at 2-6, 8-9, 20.  But Plaintiff fails to cite, much less address, controlling Ninth Circuit authority holding that CW allegations cannot be credited unless the CWs are described with sufficient particularity to establish their reliability and personal knowledge; and in any event, their statements must "themselves be indicative of scienter."  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009).  None of Plaintiff's CWs had direct, substantive contact with the Individual Defendants or has personal knowledge of how the Company calculated LTVs or churn.  Br. at 20.  Indeed, Plaintiff abandons five of the

DEFS. REPLY IFSO MTD AM. CMPLT.                    -11-
CASE NO. 4:20-cv-02395-JST

CWs (CW1, CW3, CW5, CW6, and CW7), who are not even mentioned in the Opposition; for the reasons set forth in Defendants' opening brief, their testimony should be disregarded. *Id.*

CW4 offers no more than to have interacted with two non-defendants and other unnamed "senior executives." Opp. at 20; ¶ 43. Thus, CW4 offers nothing about the state of mind of any Individual Defendant. CW4's allegation of receiving "daily reports" (Opp. at 6) concerning churn is unsurprising and cannot give rise to a strong inference of scienter. As discussed, *supra* at 4-6, churn was a known fact at eHealth, and the Company's efforts to address it do not mean that its disclosures about churn were false or misleading. And even assuming there were regular reports about churn, nothing in CW4's allegations suggests that the Company had access to real-time information about churn, which would be impossible given the time lag between application approval and the Company's knowledge that a member has stopped paying premiums. Indeed, CW7 notes at least a two to three-month lag in the Company's receipt of "books of business" from insurers. Thus, CW4 offers no factual basis to draw a strong inference that the Individual Defendants were aware of facts that contradicted the Company's public statements. *See* Br. at 22 (citing cases, including *Lipton v. Pathogenesis Corp.* 284 F.3d 1027, 1035-36 (9th Cir 2002) (allegation that corporation "could regularly track its sales data" insufficient to state claim)).

Equally unconvincing are CW2's allegations. CW2 left the Company either before or shortly after the beginning of the Class Period. Thus, CW2 could know nothing about any Defendant's mental state during the relevant time. Br. at 20-21. For example, CW2 cannot speak to whether or how churn was factored into LTV calculations because he or she did not work in accounting or finance. *Id.* Moreover, some of CW2's testimony is demonstrably false: CW2 claims to have "attend[ed] regular meetings with . . . Yung" but CW2 left eHealth months before Mr. Yung joined the Company. *Id.* at 21. Nor could CW2 have overheard Mr. Yung's purported excitement about the "coming" implementation of ASC 606, because Mr. Yung joined eHealth months ***after*** ASC 606 was implemented. *Id.*

Fatal to Plaintiff's claim is the fact that no CW offered any specific facts about how churn or DTV-related churn impacted LTVs or revenue recognition. The fact that CW2 allegedly reported to and had discussions with Mr. Francis "related to churn" is hardly

remarkable, as member churn has always been a factor in the business that is regularly disclosed. Opp. at 20. Moreover, though Plaintiff relies on CW allegations that eHealth executives were "happy" or "excited" or "enthusiastically embraced the new standard allegations" (see id. at 17-19), the adoption of a mandatory new revenue recognition standard and "enthusiasm" for its impact on the business cannot conceivably be "deliberate[ly] reckless." These allegations are hardly "themselves indicative of scienter" and fail to meet the Zucco standard. See Br. at 21.

Plaintiff's assertion that "Defendants argue that they had no knowledge of the 'churn,'" citing to pages 20-21 of Defendants' opening brief, is wrong. Defendants never argued any such thing. Defendants pointed out the many times that executives discussed churn, as alleged in the statements Plaintiff challenges. The key point is that Plaintiff fails to plead any factual basis to infer that Defendants knew of elevated churn levels that impacted LTVs before they disclosed it at the end of the Class Period. See, e.g., id. at 6-7.

**B.      The Supposed "Admissions" Do Not Raise a Strong Inference of Scienter.**

Plaintiff asserts that Defendants "admitted the retention issues during analyst calls throughout the Class Period." Opp. at 20. Yes, later in the Class Period, eHealth reported that churn rates were elevated. But Defendants did not admit that any prior statement was incorrect. Plaintiff cannot rely upon hindsight by pulling eHealth's later statements out of context and arguing that churn rates also must have been higher, and that LTVs also must have been inflated, earlier in the Class Period. Br. at 22-23. Nothing in the statements that Plaintiff identifies "contradict[] the substance of an earlier statement and essentially state[] 'I knew it all along.'" *Lopes v. Fitbit, Inc.*, 2020 WL 1465932, at *11 (N.D. Cal. Mar. 23, 2020) (Tigar, J.) (citation omitted), appeal docketed, No. 20-16033 (9th Cir. May 28, 2020).

**C.      The Individual Defendants' Stock Sales and Compensation Do Not Raise a Strong Inference of Scienter**

Lastly, and predictably, Plaintiff points to stock sales by Mr. Flanders and Mr. Francis, claiming their Class Period sales were "significant and unusual" and "departed substantially from their historical pattern of stock transactions." Opp. at 20. The stock sales here are innocuous under long-standing Ninth Circuit law.

Defendants' opening brief explained that the timing of these sales was not suspicious in light of when Messrs. Flanders and Francis joined the Company and their shares vested. Mr. Flanders, previously a director, became CEO in May 2016. His CEO stock grants did not begin to vest until May 31, 2017, less than a year before the Class Period began. Mr. Francis joined the Company in July 2016. *See* Ex. 2 at 17. His stock grants did not begin to vest until July 2017. Br. at 23-24. Thus, the fact that they sold shares during the Class Period is unsurprising. Plaintiff ignores the timing, and none of Plaintiff's cases involve similar facts.[4]

Defendants also explained that each stock sale was a small percentage of the Individuals' available shares (Flanders: 5%-18%; Francis 1%-14%). *Id.* Defendants cited multiple cases holding that the percentages sold here were "far below the levels required to infer scienter." *Id.* at 23. Plaintiff asserts that the stock sales were "material relative to Defendants' base salaries" and "overall holdings," Opp. at 21, but ignores the well-established Ninth Circuit law holding that sales of such small percentages cannot give rise to a strong inference of scienter.

Plaintiff likewise ignores that Flanders' sales in July 2019 and January 2020 were made pursuant to pre-existing Rule 10b5-1 trading plans entered into well before eHealth disclosed in April and July 2020 that churn rates were increasing. Br. at 23.[5]

---

[4] *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1146 (9th Cir. 2017) ("massive and uncharacteristic sale . . . made near the apogee of [the company's] stock price during the Class Period, and shortly before the stock went into a steep decline"); *In re Daou Systems, Inc. Sec. Litig.*, 411 F.3d 1006, 1024 (9th Cir. 2005) ("specific allegations of deliberate accounting misfeasance" and specifically noting "defendants' suspicious stock sales . . . alone would not likely demonstrate defendants' scienter"); *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) (stockholder held shares for multiple years prior and had no sales in past five years); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 940 (9th Cir. 2003) (no defendant sold for twenty months preceding or four months following the class period, while nine individual defendants sold in succession over three months of the class period).

[5] Plaintiff's authority is inapposite. *See Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 605 n.3 (N.D. Cal. 2019) (noting in context of insider trading claim that "not every 10b5-1 plan is sufficient to negate the inference that trading was made on the basis of insider knowledge"); *In re Countrywide Fin. Corp. Sec. Litig.*, 2009 WL 943271, at *4 (C.D. Cal. Apr. 6, 2009) (involving "unusual 10b5-1 plan modifications"); *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1193 (D. Nev. 2009) (declining to find that "suspiciously-timed stock sales independently give rise to an inference of scienter").

Finally, and importantly, it is virtually dispositive that both Flanders and Francis held far more stock at the end of the Class Period than at the beginning of the Class Period. Flanders' holdings nearly doubled, from 430,301 to 849,758 shares; Francis' holdings increased from 25,322 to 180,615 shares. *Id.* at 23-24. Thus, it is beyond dispute that these executives did not bail out of the Company because they knew that churn rates and LTVs were elevated. To the contrary, their continuing and increasing investment in eHealth refutes any notion of scienter.[6] *See id.* at 24 (citing cases)

* * *

In short, whether considered individually or holistically, Plaintiff has failed allege facts establishing any inference of scienter, let alone the strong inference mandated by the PSLRA.

**CONCLUSION**

For the reasons stated above and in Defendants' opening brief, the Complaint should be dismissed.

Respectfully submitted,

DATED: January 29, 2021

**WILSON SONSINI GOODRICH & ROSATI**
Professional Corporation

By: /s/ Jerome F. Birn, Jr.
      Jerome F. Birn, Jr.

Attorneys for Defendants eHealth, Inc., Scott N. Flanders, Derek N. Yung, and David K. Francis

---

[6] The fact that Defendants were compensated in part with equity is hardly probative of scienter. Br. at 24-25. As the Ninth Circuit has held, it is common for executive compensation to be tied to achieving corporate goals. *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012).