UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE eHEALTH INC. SECURITIES LITIGATION | Case No. 20-cv-02395-JST **ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS** Re: ECF No. 47 |

Before the Court is Defendants' motion to dismiss the amended complaint, ECF No. 46. The Court will grant the motion in part and will deny it in part.

## I.     BACKGROUND

For the purpose of resolving the present motion, the Court accepts as true the allegations in the amended complaint, ECF No. 46.

Lead Plaintiff Billy White ("Plaintiff") brings this proposed securities class action on his own behalf and on behalf of all persons and entities who purchased or otherwise acquired shares of eHealth, Inc. common stock between March 19, 2018, and July 23, 2020 ("Class Period"). *Id.* ¶ 1.  Plaintiff alleges that Defendants eHealth, Inc. and certain of its officers ("individual Defendants"), namely Scott N. Flanders (Chief Executive Officer), Derek N. Yung (Chief Financial Officer), and David K. Francis (Chief Operating Officer), violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5, by making false or misleading statements in SEC filings and earnings calls that artificially inflated the price of eHealth stock during the Class Period.

eHealth is a health insurance broker for large insurance companies such as Humana, Aetna, and UnitedHealthcare. *Id.* ¶¶ 1-2, 20.  Its main source of revenue is the commissions it receives from insurance companies for the various Medicare insurance policies it sells on their behalf, only

United States District Court
Northern District of California

1    one of which is at issue in this action, namely Medicare Advantage.  *Id.*  A customer or "member"

2    applies for a policy through eHealth; to become effective, the insurance company must approve it.

3    Once approved, eHealth begins to receive commissions from the insurance company, but the

4    policy can be cancelled by the member at any time.

5           The earnings that eHealth reports to investors are based on the commissions that eHealth

6    anticipates it will receive from insurance companies for each policy.  Prior to 2018, eHealth

7    "recognized revenue equal to only the commission received (or to be received) for the year in

8    which the applicant was approved" by the insurer.  *Id.* ¶¶ 28-29.  eHealth's revenue-recognition

9    practices changed on January 1, 2018, when eHealth adopted a new accounting standard for

10   recognizing revenue, namely Accounting Standard Codification 606 ("ASC 606"), pursuant to

11   which eHealth recognized the entirety of the commissions it expected to receive over the expected

12   life of the policy ("lifetime value" or "LTV" or "average plan duration"), which it estimated to be

13   three years.  *Id.* ¶¶ 1-8, 28, 37-39.

14          eHealth estimated the LTV of the policies based its assumptions as to "several factors,

15   including the conversion rates of approved members into paying members, forecasted member

16   churn (i.e., the rate at which customers cancel new policies or fail to renew them), and forecasted

17   commission amounts per approved member."  *Id.* ¶ 38.  Based on these assumptions, eHealth

18   estimated the LTV for Medicare Advantage policies to be three years.  *Id.* ¶ 39.  Accordingly, after

19   its adoption of ASC 606, eHealth recognized three-years' worth of commission revenue for a

20   Medicare Advantage policy as soon as the insurer approved a policy application.

21          Plaintiff alleges that the estimated LTV of three years for Medicare Advantage was

22   "falsified and inflated" because it "disregarded evidence of increased churn" (i.e., member

23   attrition) caused by "eHealth's direct response television advertising campaign, which attracted

24   low-quality customers in terms of member retention."  *Id.* ¶ 39.  While direct-response advertising

25   generated significant growth in terms of the number of policy applications that eHealth received,

26   direct-response members were notorious for cancelling their policies within a short period of time,

27   and this caused eHealth to experience increased churn within the first year of the policies.  *Id.* ¶¶

28   3, 26.  Defendants were aware of the "churn issue" because they contemporaneously "tracked

2

member churn data monthly and daily.  eHealth [also] received a 'book of business' (BOB) from each insurance carrier monthly" that contained information about new paid members and policy cancellations.  *Id.* ¶¶ 104, 106.  "These daily reports were closely monitored by eHealth, in part to determine the bonuses it paid to sales representatives to improve member retention."  *Id.* ¶ 112.

Plaintiff avers that eHealth's reliance on its inaccurate LTV estimate of three years for recognizing revenue under ASC 606 meant that eHealth's reported earnings were "overstated," false, and misleading.  *Id.* ¶ 4.  Plaintiff further avers that eHealth's false and misleading reported earnings prompted a significant and artificial rise in the price of eHealth's stock during the Class Period, because they led investors "to believe that eHealth had stronger earnings potential than it truly did."  *Id.* ¶¶ 5, 46.  Defendants capitalized on the artificially inflated stock price, selling over $40 million of eHealth stock and receiving more than $15 million in equity compensation.  *Id.* ¶ 5.

On April 8, 2020, Muddy Waters Capital, a research firm, published a report stating that eHealth's "highly aggressive accounting masks [] a significantly unprofitable business," "that the key driver of growth since 2018 has been [eHealth's] reliance on Direct Response television advertising, which attracts an unprofitable, high churn enrollee," and that eHealth's "assumptions in its LTV model [under ASC 606] seem highly aggressive when compared to reality."  *Id.* ¶ 6.  The Muddy Waters report also stated that, while eHealth was recognizing revenue based on an estimated LTV of three years for Medicare Advantage members, the LTV was actually between 2.1 and 2.34 years.  *Id.* ¶¶ 52, 55.  The report further stated that eHealth's financial statements for 2019: (a) overstated revenue by $128 million; (b) overstated operating profit by $263million; and (c) understated an operating loss of negative $181 million.  *Id.* ¶ 6.  The Muddy Waters report resulted in a sharp decline in the price of eHealth's stock.  *Id.*

On July 23, 2020, when eHealth announced its earnings results for the second quarter of 2020, its stock price fell again as the information contained in its announcement "confirmed" various aspects of the Muddy Waters report.  *Id.* ¶¶ 7, 64-65.

Plaintiff alleges that the proposed class members were injured by Defendants' false or misleading statements during the Class Period because they purchased eHealth stock when its price was artificially inflated as a result of Defendants' conduct, and because they incurred losses

United States District Court
Northern District of California

1  when the market learned of the true condition of eHealth's financial health.

**II.      JURISDICTION**

3  The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

**III.     LEGAL STANDARD**

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter that, when accepted as true, states a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While this standard is not a probability requirement, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks and citation omitted). In determining whether a plaintiff has met this plausibility standard, the Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the plaintiff. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

"If a claim alleges securities fraud, the Private Securities Litigation Reform Act ('PSLRA'), 15 U.S.C. § 78u-4, also applies." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018). "The PSLRA altered the pleading requirements for private litigants by requiring that a complaint plead with particularity both falsity and scienter." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 931 (9th Cir. 2003). "Pursuant to the PSLRA, the complaint must 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed.'" *Id.* (quoting 15 U.S.C. § 78u–4(b)(1)). "In addition, the PSLRA requires that the complaint 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.* (quoting 15 U.S.C. § 78u–4(b)(2)). "In this Circuit the required state of mind is one of 'deliberate or conscious recklessness.'" *Id.* (citation omitted). "If a plaintiff fails to plead either the alleged misleading statements or scienter with particularity, his or her complaint must be dismissed." *Id.* (quoting 15

1  U.S.C. § 78u–4(b)(3)(A)).

2  **I.      DISCUSSION**

3      **A.      Claims under Section 10(b) of the Exchange Act and SEC Rule 10b-5**

4          The Securities and Exchange Act of 1934 "was designed to protect investors against

5  manipulation of stock prices." *Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988).  The Supreme

6  Court "repeatedly has described the fundamental purpose of the Act as implementing a philosophy

7  of full disclosure." *Id.* (citations and internal quotation marks omitted).

8          Section 10(b) of the Securities Exchange Act of 1934 declares it unlawful to "use or

9  employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive

10  device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as

11  necessary." 15 U.S.C. § 78j(b).  There is an "implied [ ] private cause of action" in Section 10(b).

12  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011).  "SEC Rule 10b-5 implements

13  [Section 10(b)] by making it unlawful to . . . 'make any untrue statement of a material fact or to

14  omit to state a material fact necessary in order to make the statements made . . . not misleading.'"

15  *Id.* (quoting 17 C.F.R. § 240.10b–5).  "Thus, to prevail on a claim for violations of either Section

16  10(b) or Rule 10b-5, a plaintiff must prove six elements: (1) a material misrepresentation or

17  omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or

18  omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or

19  omission; (5) economic loss; and (6) loss causation." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d

20  1046, 1051-52 (9th Cir. 2014) (citation and internal quotation marks omitted).

21          Defendants move to dismiss the Section 10(b) and Rule 10b-5 claims in the amended

22  complaint on the ground that they fail to satisfy the first two elements, which require, respectively,

23  a misrepresentation or omission, and scienter.[1]  Falsity and scienter both must be pleaded with

24  particularity.  *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001) (holding that the PSLRA

25  requires "that a complaint plead with particularity both falsity and scienter").

26

27  _____

28  [1] In their motion, Defendants do not move to dismiss the claims on the basis that Plaintiff has not
plausibly pleaded materiality, and the Court therefore does not address that issue.  .

United States District Court
Northern District of California

### 1.     Misrepresentation or Omission

The first element of a claim under Section 10(b) and Rule 10b-5 requires a plaintiff to show that the defendant made a statement that was false or "misleading as to a material fact." *Basic*, 485 U.S. at 238.  A statement is misleading if it acts to "create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  A plaintiff must "specify facts or evidence that show why the statement was false at the time it was made[.]" *Ronconi*, 253 F.3d at 431.

### a.     Statements that allegedly concealed churn

In his opposition, Plaintiff argues that the following challenged statements in the amended complaint were false or misleading because they fraudulently concealed increased churn caused by eHealth's shift to direct-response advertising.

### i.     Q2 2018 Form 10-Q, dated August 7, 2018

The Q2 2018 quarterly report on Form 10-Q, dated August 7, 2018, which was signed by Flanders and Yung, states:

> The constrained lifetime value of commissions per qualified health plan approved member decreased 17% in the three months ended June 30, 2018 compared to the three months ended June 30, 2017 **driven by the timing of the open enrollment period for coverage effective in 2018**, which ran through December 2017, versus the open enrollment period for coverage effective in 2017, which ran through January 2017.  Enrollments during the open enrollment period tend to have higher constrained lifetime value than enrollments outside of the open enrollment period.  Since the open enrollment period for coverage effective in 2018 did not continue into the first quarter of 2018, the constrained lifetime value declined compared to the first quarter of 2017.

ECF No. 46 ¶ 78 (emphasis in the original).[2]

Plaintiff alleges that this statement was misleading because it created the false impression that the decline in LTV was due *exclusively* to the "timing of the open enrollment period" even though the real cause for the decline was "member churn associated with eHealth's television advertising customers." *Id.* ¶ 79.  In his opposition, Plaintiff argues that, by omitting information

---

[2] The statements that Plaintiff challenges as false or misleading are indicated in bold throughout this order.

United States District Court
Northern District of California

about other possible causes for the decline in LTV, such as direct-response member churn, the challenged statement misled investors into believing that the *only* cause for the decline in LTV was members disenrolling during the open enrollment period. *See* ECF No. 51 at 21.

The Court concludes that Plaintiff's allegations do not raise the inference that the challenged statement was false or misleading. Plaintiff's theory of liability is premised on the notion that the statement is impermissibly incomplete, in the sense that Defendants were required, but failed, to disclose all possible causes for the decline in LTV, including direct-response member churn. Section 10(b) and Rule 10b–5, however, make unlawful "only misleading and untrue statements, not statements that are incomplete." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014) (citation and internal quotation marks omitted); *Matrixx*, 563 U.S. at 44-45 ("§ 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information"). The Ninth Circuit has "expressly declined to require a rule of completeness for securities disclosures because '[n]o matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not.'" *Police Ret. Sys.*, 759 F.3d at 1061 (citation omitted). Accordingly, allegations that the challenged statement is incomplete are insufficient, without more, to raise the inference that the statement is actionable.

For a statement to be misleading because of an omission, the statement "must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Id.* (citation omitted). Plaintiff argues that the challenged statement satisfies this test because it created the false impression that there were *no other* causes for the decline in LTV other than the cause it identified, namely the timing of the open enrollment period. Based on the language used in the statement, the Court is not persuaded. The statement provides that the LTV decrease was "driven by" the timing of the open enrollment period. Stated simply, the phrase "driven by" does not foreclose other causes for the LTV decline. In the absence of plausible allegations or relevant authority to the contrary, the Court cannot reasonably infer that the statement at issue created the false impression that the *only* cause of the lower LTV was the open enrollment period. For this reason, the Court GRANTS Defendants'

motion to dismiss with respect to this challenged statement, with leave to amend.

**ii.      Q4 2018 earnings call, February 21, 2019**

During an earnings call for Q4 2018 held on February 21, 2019, the following statements were made:

> [Financial analyst:] And then I don't think you guys formally break out churn rates or report those, but when I look back and try to do the math on that and look at your 4Q churn rates back in 2016 and '17, it looks like it was about 6% in the fourth quarter in both of those years.  When I do that same math for the fourth quarter of '18, it spiked up to 17%, and as a result, your Medicare enrollment was at least 5% below what I was looking for, so I'm just trying to understand if you would agree with that math and what caused the spike in churn.

> [Yung:] We may have to follow-up on your math, but that's not how we see it.  Our lifetime of Medicare Advantage enrollees is roughly about 3 to 3.5 years, and for Med Supp and Part B, it's about 5 years, so we've typically put a 3.25 base on the range of products.  Of course, you can do the overall average of that across the product space and the mix of our enrollments.  In general, **we've actually seen some uptick and, therefore, uptick in LTVs since we've been on 606, so we actually have not seen an increase in churn.  We've actually seen a decrease in churn, on average.**

> [Flanders:] So, Dave, we'll circle back and walk through the math with you, because I'm not sure what you're looking at either, but **our persistency rates have improved with the margin rather than turned south.**

ECF No. 46 ¶ 82 (emphasis in the original).

Plaintiff alleges that these statements were false or misleading because they created the impression that churn for Medicare Advantage was decreasing even though it had increased from 3Q2018 to 4Q2018.  *Id.*  ¶¶ 82-84.  The amended complaint contains a chart that shows that churn *for Medicare Advantage* increased from 3Q 2018 to 4Q 2018.  *Id.* ¶ 84.  Based on this chart, Plaintiff alleges that the statements at issue "misled the public" because they "den[ied] a spike in member churn in late 2018" for Medicare Advantage members.  *Id.* ¶¶ 82, 84.

The Court concludes that Plaintiff's allegations do not raise the reasonable inference that the statements at issue were false or misleading on the basis that they concealed a "spike in

8

member churn in late 2018" with respect to Medicare Advantage members.  The challenged statements, and their immediate context, suggest that the churn discussed during the earnings call was an "average" churn for members of multiple plans, not just members of Medicare Advantage. *See* ECF No. 46 ¶ 82 (referring to churn "on average" and to an "overall average across the product space and the mix of our enrollments" when discussing churn).  That churn for Medicare Advantage members had "spiked" in late 2018 does not necessarily render false the statement that churn was decreasing "on average" across multiple products.  Accordingly, the Court cannot infer, based on the current allegations in the complaint, that the challenged statements, which are about "average" churn across multiple products, were knowingly false or misleading when made.  *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 618 (9th Cir. 2017) (holding that statements are not actionable unless they were "knowingly false or misleading when made").  The Court, therefore, GRANTS Defendants' motion to dismiss with respect to these statements, with leave to amend.

### iii.    Q2 2019 Form 10-Q, dated August 8, 2019

eHealth's Q2 2019 report on Form 10-Q, which was signed by Flanders and Yung, and which is dated August 8, 2019, states as follows:

> We experienced a decreased member retention rate in the Medicare Advantage members that we enrolled during the Medicare annual enrollment period in the fourth quarter of 2018**. We believe the reintroduction of the Medicare open enrollment period during the first quarter of 2019 contributed to the decreased retention rate since Medicare Advantage members that we enrolled during the annual enrollment period in the fourth quarter of 2018 were able to enroll in another Medicare Advantage plan or disenroll from their Medicare Advantage plan and return to original Medicare during the Medicare open enrollment period.**  While the net impact of the Medicare open enrollment period was positive to our Medicare business, we expect the constrained LTVs for Medicare Advantage plans to decrease in the fourth quarter of 2019 compared to the fourth quarter of 2018, as we expect lower retention rates for Medicare Advantage members that we enroll during the fourth quarter going forward.

ECF No. 46 ¶ 87 (emphasis in the original).

Plaintiff alleges that this statement was misleading because it created the false impression that the *only* cause for the decline in the Medicare Advantage retention rate was the

United States District Court
Northern District of California

1   open enrollment period where, in reality, churn of direct-response members also contributed to

2   the decline.  *Id.* ¶¶ 88-89.

3        Defendants argue that this statement is not actionable because the statement does not

4   indicate, as Plaintiff alleges, that the "only" reason for the decline in the retention rate was the

5   open enrollment period; rather, the statement provides that the open enrollment period

6   "contributed to" the decline in the retention rate.  ECF No. 47 at 17.

7        The Court agrees with Defendants.  As discussed above, Section 10(b) and Rule 10b-5

8   make unlawful "only misleading and untrue statements, not statements that are incomplete."

9   *Police Ret. Sys.*, 759 F.3d at 1061 (citation and internal quotation marks omitted).  Accordingly,

10  the challenged statement is not actionable merely because it failed to mention every cause for

11  the decline in the retention rate.  To be actionable, the statement must be false or misleading.

12  *Id.*  Plaintiff alleges that the statement is misleading because it created the impression that there

13  were no other causes for the decreased retention rate other than the cause it identified, namely

14  the open enrollment period.  The Court disagrees based on the language of the statement, which

15  provides that the open enrollment period "contributed to" the decline in retention rates.  The

16  phrase "contributed to" does not foreclose the existence of any other causes for the decline.

17  Accordingly, the Court cannot reasonably infer that the challenged statement was false or

18  misleading when made.  The Court, therefore, GRANTS Defendants' motion to dismiss with

19  respect to this statement, with leave to amend.

20                    **iv.    Fiscal year 2019 Form 10-K, dated March 2, 2020**

21        Plaintiff alleges that Defendants' reported revenue and profit for 2019 in eHealth's Form

22  10K of March 2, 2020, was artificially inflated and, therefore, false and misleading.  ECF No. 46

23  ¶¶ 94-98.  Plaintiff avers that eHealth's reported revenue and profit for 2019 was based on

24  eHealth's estimated LTV, which was allegedly inflated because it "ignored evidence of increased

25  member churn" caused by "eHealth's direct response television advertising campaign, which

26  attracted low-quality customers in terms of member retention," particularly during the first year of

27  the policy.  *Id.* ¶¶ 38-39.  Plaintiff further avers that the discrepancy between the allegedly inflated

28  reported revenue and profit for 2019 and the actual revenue and profit for 2019 was "due to

United States District Court
Northern District of California

1    eHealth's *undisclosed member churn* and the toll it was taking on its policy renewals," which

2    eHealth's estimated LTV failed to take into account.  *Id.* ¶ 97 (emphasis added).

3            The Court concludes that Plaintiff has not plausibly pleaded that eHealth's statements

4    about its revenue and profit for 2019 were false or misleading.  Plaintiff's theory of liability with

5    respect to the statements at issue is predicated on allegations that there was "*undisclosed* member

6    churn" related to direct-response advertising that Defendants failed to take into account when

7    estimating LTV, and that this allegedly caused eHealth's estimated LTV (and the reported

8    revenues and profit based thereon) to be fraudulently inflated.  The amended complaint is devoid

9    of factual matter that supports this theory, however.  To the contrary, according to the amended

10   complaint, Defendants routinely disclosed member churn, including churn associated with direct-

11   response advertising, as well as the impact of this churn on LTV.  *See, e.g.*, *id.* ¶ 110 ("On July 26,

12   2018, while discussing eHealth's operational and financial results for the second quarter of fiscal

13   2018, Francis described the 'retention' issues eHealth was experiencing within the first 90 days of

14   enrollment); *id.* (quoting Francis as stating that "to the extent that we're successful in

15   meaningfully changing that amount of churn [within the first 90 days of enrollment], that will

16   ultimately reflect in meaningfully higher LTVs for Medicare customers in the relatively near

17   future"); *id.* ¶ 111 ("On November 12, 2019, during an investor conference call, Flanders

18   explained as follows why the television advertising resulted in lower quality customers in terms of

19   member retention."); *id.* (quoting Flanders as stating that "[t]he highest churn, for example, is

20   direct response to TV").  Further, the allegations in the complaint raise the inference that

21   Defendants *did* consider member churn when estimating LTV.  *See id.* ¶ 38 ("The LTV for a

22   policy is based on several factors, including the conversion rates of approved members into paying

23   members, *forecasted member churn* (i.e., the rate at which customers cancel new policies or fail to

24   renew them), and forecasted commission amounts per approved member") (emphasis added).

25           Plaintiff does not explain, either in the amended complaint or in his opposition, how the

26   purported "undisclosed" churn upon which his theory of liability depends differs from the churn

27   that Plaintiff avers was routinely disclosed by Defendants and taken into account when calculating

28   LTV.  Accordingly, the Court cannot reasonably infer, based on the allegations in the amended

United States District Court
Northern District of California

11

1   complaint, that there was *any* undisclosed churn that Defendants failed to take into account when

2   calculating LTV that rendered eHealth's 2019 revenue and profit statements false or misleading.

3   The Court, therefore, GRANTS Defendants' motion to dismiss with respect to these challenged

4   statements, with leave to amend.

5                                 **v.      Q1 2020 earnings call, April 23, 2020**

6          During an earnings call for Q1 2020 held on April 23, 2020, the following statements

7   were made:

8              [Financial analyst:]  Got it. And then just the last one for Derek on
               the LTVs for Medicare Advantage.  I think guidance there, you
9              mentioned, is still flat for the year, despite 1Q, I think, was up 5%,
               and I know the commission rates for brokers are up, I think, mid-
10             single digits.  So I'm just wondering, is that more of a conservative
               posture on your end?  Or is there something -- some other element
11             that comes in that would cause the -- that to not increase by, call it,
               mid-single digits?
12
               [Yung:] Yes.  So you're right that our Q1 LTV for MA were --
13             increase year-over-year was largely driven by the rate increase.
               It's actually been pretty much right in line.  And really what -- the
14             reason why **we are forecasting flat LTVs is because of the
               increase of number of seniors we're seeing taking advantage of**
15             **the open enrollment period that we see causing that higher
               churn in the AEP cohort.**  We are expecting that, similar to last
16             year, that to normalize.  And when that happens, **this will be then
               kind of the new seasonal trend that we will see from here on**
17             **out in terms of when we think a senior to churn, which is when
               they can switch, and when they won't after that,** which is
18             they're in the plan that they want.  So that's what we're
               anticipating, and that's why we're forecasting flat LTV.
19

20   ECF No. 46 ¶ 100 (emphasis in the original).

21          Plaintiff alleges that the challenged statements were misleading because they "concealed"

22   *another* cause for the "higher churn" referenced in the statements, namely the "high churn rate

23   that eHealth experiences during the first year of the plans and the churn rates affecting the

24   remaining years."  *Id.* ¶ 101.  Plaintiff further avers that, by omitting the information about churn

25   in the first and subsequent years of membership, the challenged statements created the false

26   impression that the only cause of the "higher churn" referenced in the statements was the

27   "disenrollment during annual enrollment periods in the first quarter of the year."  *Id.* ¶ 102.

28          Defendants argue that their statements at issue are not actionable because, during the

United States District Court
Northern District of California

1    same earnings call, Defendants disclosed the information about the churn rate for the first year

2    and subsequent years of a policy that Plaintiff alleges Defendants concealed.

3          The Court concludes that Plaintiff has not plausibly alleged that the statements at issue

4    were misleading.  A securities fraud claim premised on a theory of fraudulent omissions "fails

5    to state a claim [where] the Defendants clearly disclosed material information to investors."

6    *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014) (citation

7    omitted) ("*Oregon Public Employees*").  Plaintiff's claim is premised on the theory that the

8    challenged statements were misleading because Defendants concealed the "high churn rate" that

9    eHealth experiences during the first year of membership and the churn rates for subsequent

10   years.  *See* ECF No. 46 ¶¶ 101, 102.  But Defendants discussed this information about churn

11   during *the same earnings call*.  *See* ECF No. 47-10 at 7[3] (transcript of April 23, 2020, earnings

12   call) ("We currently expect for churn to decline later in the year, as was the case in 2019, and

13   continue to forecast 2020 Medicare Advantage lifetime values to be roughly flat with last

14   year's.  It is also important to note that churn in our member base is highest in year 1 and

15   declined significantly in subsequent years.  For example, our average first churn -- first year

16   churn for our Medicare Advantage member is in the mid-30s.  This declined to just under 20%

17   in year 2 and then again to 11% in year 3.  In year 4 and beyond, churn rates have dropped to

18   single digits.").  Because Defendants discussed during the same earnings call exactly what

19   Plaintiff alleges was omitted from the challenged statements, Plaintiff's allegations do not raise

20   the reasonable inference that the challenged statements were misleading by virtue of having

21   omitted material information.  *See McGovney v. Aerohive Networks, Inc.*, No. 18-CV-00435-

22   LHK, 2019 WL 8137143, at *11 (N.D. Cal. Aug. 7, 2019) ("*Aerohive*") (relying on *Oregon*

23   *Public Employees* to dismiss claim for securities fraud predicated on an omissions theory,

24   reasoning that "Aerohive disclosed exactly what Plaintiffs allege Aerohive omitted").  In his

25

26   [3] The Court considers the transcript of this earnings call and the fact that certain statements were
     made during the call under Federal Rule of Evidence 201, but not for the truth asserted therein.
27   Plaintiff has not disputed the authenticity of the transcript.  *See Khoja*, 899 F.3d at 999 (holding
     that a court may consider an investors conference call transcript under Fed. R. Evid. 201 where the
28   transcript's authenticity is not disputed, and where the court does not consider the statements made
     during the call for their truth).

United States District Court
Northern District of California

opposition, Plaintiff does not address the fact that the allegedly omitted facts about churn were discussed by Defendants during the same earnings call, and he also does not address, much less distinguish, *Oregon Public Employees* and *Aerohive*.  *See* ECF No. 51 at 20-21.  Accordingly, the Court GRANTS Defendants' motion to dismiss with respect to the challenged statements, with leave to amend.

### b.    Statements that allegedly concealed operating costs

In his opposition, Plaintiff argues that Defendants made misleading statements that allegedly concealed the operating costs that eHealth must incur to retain members and that must be offset against any commissions it receives from insurance companies.

### i.    Q1 2018 earnings call, April 26, 2018

During an earnings call for Q1 2018 held on April 26, 2018, the following statements were made:

> [Financial analyst:] So I wanted to walk through the commission receivables.  So if I look at the combination of your short and your long-term receivables, even relative to your enterprise value, it's basically equivalent.  So effectively that represents receivables that you will be ultimately -- you will be receiving cash for under that constrained assumption.  Are there any other real costs associated against that?
>
> …
>
> [Flanders:] No, the costs attached to each of the receivable balances have essentially been absorbed as we generate the revenue in any particular quarter.  **So as the cash comes in, there is no additional cost attached to that.  And the reason that those receivables are there is because there is no meaningful service component attached to them either.**  So according to our contracts with the carriers, these are all cash collection expectations that we have, both in the short term and long term.

ECF No. 46 ¶ 75.

Plaintiff alleges that the challenged statements were misleading because they "left investors with the false impression that the commission receivables reported by eHealth had no associated costs."  *Id.* ¶ 76.  Plaintiff further avers that, "[c]ontrary to Flanders' statement, eHealth has additional operating expenses that it must incur in order to retain customers and keep them from cancelling their policies within the first year," *id.* ¶ 76, which included the cost of providing

14

"customer care service," *id.* ¶ 71.  These operating costs must be offset against any commissions receivable.  *Id.* ¶¶ 30-33.

The Court concludes that Plaintiff's allegations are sufficient to raise the reasonable inference that a reasonable investor could have been misled by the statements into believing, incorrectly, that eHealth did not have to incur any costs that had to be offset against the commissions it expected to receive from insurance companies.  The statements "as the cash comes in, there is no additional cost attached to that," and "there is no meaningful service component attached to them," suggest that eHealth did not have to incur any costs, such as operational and customer service expenses, that would need to be offset against its commissions receivable.  But Plaintiff alleges that, in reality, eHealth *did* have operational costs that had to be offset against its commissions receivable, such as costs of "customer care and enrollment."  *See, e.g.*, *id.* ¶¶ 31-33.  Accordingly, Plaintiff's allegations are sufficient to raise the inference that the challenged statements created "an impression of a state of affairs that differs in a material way from the one that actually exists."  *See Brody*, 280 F.3d at 1006.

Defendants' arguments to the contrary are unpersuasive.  First, Defendants argue that the challenged statements are not actionable because operational expenses are "irrelevant" to eHealth's ability to recognize revenue under ASC 606.  ECF No. 47 at 25.  Defendants contend that, under ASC 606, eHealth can recognize revenue as soon as an application is approved by an insurer "because its services to the insurer are then complete and it is entitled to receive commission payments."  *Id.*  For that reason, according to Defendants, any operational expenses associated with "ongoing customer care" have "no impact on revenue recognition" under ASC 606.  *Id.*  The Court is not persuaded by this argument, because it presupposes that the challenged statements were made in the context of the mechanics of revenue recognition under ASC 606.  Defendants, however, have not pointed to any material that the Court can consider at this stage of the litigation that would allow the Court to infer that this was the case.  When construing the allegations in the complaint in the light most favorable to the Plaintiff, as the Court must at this juncture, Plaintiff's allegations suggest that the challenged statements were *not* limited to the context of the mechanics of revenue recognition under ASC 606 and, instead, were made in the

much broader context of whether eHealth had any operational or other expenses *in general* that would need to be offset against its commissions receivable.

Second, Defendants argue that the challenged statements are not actionable because eHealth disclosed its operational expenses in its SEC filings throughout the class period. *Id.* at 25-26. That eHealth disclosed its operational expenses in SEC filings does not mean that the statements at issue, which were made *during an earnings call* and without any reference to any SEC filings in which Defendants disclosed operational expenses, could not have created "an impression of a state of affairs that differs in a material way from the one that actually exists." *See Brody,* 280 F.3d at 1006; *see also In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1034 (C.D. Cal. 2008) ("'[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers.'") (quoting *In re Convergent Technologies Securities Litigation*, 948 F.2d 507, 512 (9th Cir. 1991)).

Accordingly, the Court DENIES Defendants' motion to dismiss Plaintiff's claims on the basis that Plaintiff has not plausibly alleged that the challenged statements just discussed were false or misleading.

### ii.   Q4 2019 earnings call, February 20, 2020

During an earnings call regarding Q4 2019 held on February 20, 2020, the following statements were made.

> [Financial analyst:] Okay. The final question would be, I know you highlighted the substantial growth in your commission receivable, both current and noncurrent. Can you talk about -- and I know you mentioned some of this in your prepared remarks, can you talk about the expense associated with that receivable? Maybe the biggest piece would be the noncurrent. Is there any expense associated with that? Or is that pure, pure cash?
>
> [Yung:] So the commission receivable represents the cash collections to be collected associated with the commissions that we earn from carriers for the policies that we help acquire customers for them on their behalf. So once that's happened, and it's actually the reason why we recognize the revenue we do, our service obligation is completed, and therefore, we recognize the lifetime value of that. **From an operating perspective**, other than reconciling the cash coming in and the cash that we should be being paid as a broker record, **there's no other cost associated**.
>
> [Flanders:] There's no cost against it, Greg**.** It's all -- the costs

16

1    have been expensed in period.  **And it's all cash to be collected
     free of additional charge.**

2  ECF No. 46 ¶ 91.

3         Plaintiff alleges that these statements were misleading because they created the false

4  impression that eHealth did not have any operating expenses that would need to be offset against

5  the commissions it received from insurers.  ECF No. 46 ¶¶ 69-72, 92-93.  Plaintiff alleges that

6  eHealth had to incur operational costs, including expenses to retain high-churn direct-response

7  members, and that these costs had to be deducted from its commissions receivable.  *Id.* ¶¶ 30-31,

8  43.

9         The Court concludes that Plaintiff's allegations are sufficient to raise the reasonable

10 inference that the challenged statements were misleading.  Defendants' statements that there

11 would be "no other cost" from an "operating perspective," and that "[t]here's no cost against" the

12 commissions receivable, suggest that eHealth had no operational expenses that would need to be

13 offset against the commissions it expected to receive from insurers.  Plaintiff alleges that this

14 suggestion contradicted the reality, which was that Defendants *did* have operational expenses that

15 had to be offset against its commissions receivable.  *See, e.g.*, ECF No. 46 ¶¶ 31-33, 43.  These

16 allegations are enough to raise the reasonable inference that the challenged statements created "an

17 impression of a state of affairs that differs in a material way from the one that actually exists."  *See*

18 *Brody,* 280 F.3d at 1006.

19        Defendants argue that the challenged statements are not misleading because (1) they were

20 made in the context of the mechanics of revenue recognition under ASC 606, and (2) eHealth

21 disclosed its operational expenses in its SEC filings.  *See* ECF No. 47 at 25-26.  These arguments

22 are unavailing for the same reasons discussed above in connection with the challenged statements

23 made in the earnings call of April 26, 2018.

24        In light of the foregoing, the Court DENIES Defendants' motion to dismiss Plaintiff's

25 claims on the basis that Plaintiff has not plausibly alleged that the challenged statements just

26 discussed were false or misleading.

27

28

United States District Court
Northern District of California

17

1

### 2.   Scienter

2      "To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the

3   defendant acted with scienter[.]"  *Matrixx Initiatives*, 563 U.S. at 48 (citation and internal

4   quotation marks omitted).  Scienter is "a mental state that not only covers 'intent to deceive,

5   manipulate, or defraud,' but also 'deliberate recklessness[.]'"  *Schueneman v. Arena Pharms., Inc*.,

6   840 F.3d 698, 705 (9th Cir. 2016) (internal citations omitted).  "[D]eliberate recklessness is an

7   extreme departure from the standards of ordinary care . . . which presents a danger of misleading

8   buyers or sellers that is either known to the defendant or is so obvious that the actor must have

9   been aware of it."  *Id.* (citation and internal quotation marks omitted).  In evaluating scienter,

10   courts must "consider plausible, nonculpable explanations for the defendant's conduct, as well as

11   inferences favoring the plaintiff."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-

12   24 (2007).  "A complaint will survive . . . only if a reasonable person would deem the inference of

13   scienter cogent and at least as compelling as any opposing inference one could draw from the facts

14   alleged."  *Id.* at 324.  A complaint not meeting these requirements "shall" be dismissed.  15 U.S.C.

15   § 78u-4(b)(3)(A).

16      Defendants argue Plaintiff's allegations are insufficient to plausibly plead scienter with

17   respect to any of the challenged statements in the amended complaint.  ECF No. 47 at 29-31.

18      Plaintiff responds that his allegations are sufficient to satisfy the scienter element in light

19   of the core operations doctrine described in *S. Ferry LP #2 v. Killinger*, 542 F.3d 776, 783-86 (9th

20   Cir. 2008) ("*South Ferry*").  *See* ECF No. 51 at 24-25.  Under the core operations doctrine, a court

21   may infer scienter based on defendants' alleged management of the core operations of a company,

22   and it may do so, in relevant part, "without accompanying particularized allegations, in rare

23   circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd'

24   to suggest that management was without knowledge of the matter."  *Id.* at 786-87 (citing *Berson v.*

25   *Applied Signal Tech., Inc.*, 527 F.3d 982, 988 (9th Cir. 2008) ("*Applied Signal*")).  For example, in

26   *Applied Signal*,  the Ninth Circuit held that it was appropriate for the court to infer scienter based

27   on the core operations doctrine where the plaintiffs' allegations raised the inference that the

28   defendants were directly responsible for the company's day-to-day operations and, in light of this

United States District Court
Northern District of California

1   alleged role in the company, it was "hard to believe that [defendants] would not have known

2   about" work-stop orders that halted work on the company's largest contract with one of its most

3   important customers, which plaintiffs alleged had not been disclosed to investors. *Applied Signal*,

4   527 F.3d at 988 & n.5.  The prominent nature and impact of the work-stop orders at issue in

5   *Applied Signal* raised the inference that the defendants, in light of their alleged role in the

6   company, must have known about them and the importance of disclosing them to investors.  *Id.*

7          Here, Plaintiff's allegations, when considered holistically, raise the reasonable inference

8   that individual Defendants[4] acted with at least deliberate recklessness when making the April 26,

9   2018, and February 20, 2020, challenged statements, which, as discussed above, created the false

10  impression that eHealth did not have operational expenses that needed to be offset against its

11  commissions receivable.  eHealth's operational expenses, which individual Defendants failed to

12  mention or acknowledge when making the challenged statements, were significant relative to

13  eHealth's commission revenue.  During the Class Period, eHealth's commissions receivable

14  ranged between approximately $158 million to $466 million per year, whereas its operational

15  expenses ranged from approximately $200 million to $400 million per year, with operational

16  expenses related to customer care and enrollment ranging between approximately $48 million and

17  $134 million per year.  *See* ECF No. 46 ¶¶ 30-33.  Because of the magnitude of the operational

18  expenses at issue, the amended complaint raises the inference that the individual Defendants, who

19  allegedly participated in eHealth's management and operations at the highest level by virtue of

20  being the company's CEO, CFO, and COO, were aware of them and the importance of disclosing

21  them to investors.  *See South Ferry*, 542 F.3d at 786 (holding that scienter can be inferred under

22  the core operations doctrine "where the nature of the relevant fact is of such prominence that it

23  would be 'absurd' to suggest that management was without knowledge of the matter"); *see also*

24  *Applied Signal*, 527 F.3d at 988 & n.5.  In light of this, the amended complaint raises the inference

25  that the individual Defendants' failure to mention or acknowledge the operational expenses when

26  _____

27  [4] The parties do not distinguish each of the Defendants from each other for the purpose of
    analyzing the question of whether Plaintiff has adequately pleaded scienter.  Instead, the parties

28  analyze this issue by referring to "Defendants" collectively.  The Court does the same in this
    order.

United States District Court
Northern District of California

1    making the challenged statements created an obvious danger of misleading investors.  This is

2    sufficient for the Court to conclude that Plaintiff has adequately pleaded scienter as to the

3    individual Defendants with respect to the April 26, 2018, and February 20, 2020, challenged

4    statements.[5]

5          Because the scienter element is met as to the individual Defendants, it also is met as to

6    eHealth because Defendants do not argue that the individual Defendants were acting outside the

7    scope of their apparent authority.  *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476

8    (9th Cir. 2015) ("The scienter of the senior controlling officers of a corporation may be attributed

9    to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b-5 when

10   those senior officials were acting within the scope of their apparent authority.").

11         Defendants contend that Plaintiff cannot rely on the core operations doctrine to satisfy the

12   scienter element on the ground that "[n]o facts are pled suggesting it would apply here."  *See* ECF

13   No. 54 at 15.  The Court disagrees in light of the discussion above.

14         In sum, because Plaintiff's allegations, when considered collectively, raise the inference of

15   scienter that is "cogent and at least as compelling as any opposing inference one could draw from

16   the facts alleged," *see Tellabs*, 551 U.S. at 323-24, the Court DENIES Defendants' motion to

17   dismiss Plaintiff's claims on the basis that Plaintiff has not satisfied the scienter element as to the

18   April 26, 2018, and February 20, 2020, challenged statements.[6]

19         **B.    Claim under Section 20(a)**

20         "Section 20(a) of the Securities Exchange Act of 1934 provides for liability of a

21   'controlling person.'"  *In re NVIDIA*, 768 F.3d at 1052 (quoting 15 U.S.C. § 78t(a)).  "To establish

22   _____

23   [5] The Court notes that the complaint contains other allegations that further support a finding that
     Plaintiff has adequately pleaded scienter as to the April 26, 2018, and February 20, 2020,
24   challenged statements.  For example, Plaintiff alleges that the individual Defendants were
     motivated to inflate eHealth's stock price because their compensation and their ability to profit
25   from sales of their eHealth stock depended on eHealth's financial performance.  *See Am. W.
     Holding Corp.*, 320 F.3d at 944 (holding that allegations of motive demonstrated scienter where
26   defendants' "eligibility for stock options and executive bonuses were based principally on the
     company's financial performance").

27   [6] The Court concludes that Plaintiff has not adequately pleaded scienter with respect to any other
     statement challenged in the complaint, as Plaintiff's allegations do not raise the inference that any
28   other challenged statement was false or misleading, for the reasons discussed above.

1    a cause of action under this provision, a plaintiff must first prove a primary violation of underlying

2    federal securities laws, such as Section 10(b) or Rule 10b-5, and then show that the defendant

3    exercised actual power over the primary violator." *Id.* (citation omitted).  A claim under Section

4    20(a) can survive only if the underlying predicate Exchange Act violation also survives. *See City*

5    *of Dearborn Heights*, 856 F.3d at 623.  "'Section 20(a) claims may be dismissed summarily . . . if

6    a plaintiff fails to adequately plead a primary violation of section 10(b).'" *Zucco Partners, LLC v.*

7    *Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009), *as amended* (Feb. 10, 2009).

8         Plaintiff asserts a claim under Section 20(a) against individual Defendants Flanders, Yung,

9    and Francis based on allegations that they exercised power and authority over eHealth's operations

10   and management and that their false and misleading statements caused artificial inflation of

11   eHealth's stock price during the Class Period.  ECF No. 46 ¶¶ 163-68.

12         Defendants move to dismiss this claim on the ground that "Plaintiff's failure to state a

13   predicate claim under Section 10(b) requires dismissal of its Section 20(a) claim."  *See* ECF No.

14   47 at 25 n.19.

15         Because the only basis that Defendants have advanced for dismissing Plaintiff's Section

16   20(a) claim is that Plaintiff failed to state a predicate claim under Section 10(b), the Court

17   DENIES Defendants' motion to dismiss the Section 20(a) claim to the extent that it is predicated

18   on the challenged statements made on April 26, 2018, and February 20, 2020.  As discussed

19   above, the Court has found that Plaintiff's Section 10(b) claim is not subject to dismissal for

20   failure to allege falsity or scienter to the extent that it is predicated on the challenged statements

21   made on April 26, 2018, and February 20, 2020.

22                        **CONCLUSION**

23         For the foregoing reasons, the Court DENIES Defendants' motion to dismiss the amended

24   complaint with respect to the challenged statements made on April 26, 2018, and February 20,

25   2020.  The Court otherwise GRANTS Defendants' motion to dismiss, with leave to amend.

26         Plaintiff may file an amended complaint within 30 days of the date this order is filed to

27   cure the deficiencies discussed herein, to the extent that Plaintiff can do so without contradicting

28   his allegations in his prior pleadings.  A failure to file an amended complaint will result in

United States District Court
Northern District of California

dismissal with prejudice of all claims predicated on challenged statements other than those made on April 26, 2018, and February 20, 2020.

**IT IS SO ORDERED.**

Dated:  August 12, 2021



JON S. TIGAR
United States District Judge