UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE eHEALTH, INC. SECURITIES LITIGATION | Case No. 20-cv-02395-JST<br><br>**ORDER GRANTING MOTIONS FOR JUDGMENT ON THE PLEADINGS**<br><br>Re: ECF Nos. 117, 119 |

Before the Court are motions for judgment on the pleadings filed by Defendants eHealth, Inc, Scott N. Flanders, and Derek N. Yung (collectively "eHealth Defendants"), ECF No. 117; and Defendant David K. Francis, ECF No. 119.  The Court will grant the motions.

## I.     BACKGROUND[1]

Lead Plaintiff Chicago & Vicinity Laborers' District Council Pension Fund brings this proposed securities class action on behalf of all persons and entities who purchased or otherwise acquired shares of eHealth common stock between March 19, 2018, and July 23, 2020 ("Class Period").  ECF Nos. 46, 116.  Plaintiff alleges that eHealth and its officers Flanders, Yung, and Francis violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 by making misleading statements during earnings calls that artificially inflated the price of eHealth stock during the Class Period.

eHealth is a health insurance broker that receives commissions from insurance companies

---

[1] For the purposes of deciding this motion, the Court accepts as true all allegations set forth in the operative amended complaint, ECF No. 46.  *See Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) ("[U]nder Rule 12(c) . . . 'a court must determine whether the facts alleged in the complaint, taken as true, entitle the plaintiff to a legal remedy.'") (quoting *Brooks v. Dunlop Mfg. Inc.*, No. 10-cv-4341-CRB, 2011 WL 6140912, at *3 (N.D. Cal. Dec. 9, 2011)).

for policies it sells on their behalf.  A customer applies for a policy through eHealth; to become effective, the insurance company must approve it.  Once approved, eHealth begins to receive commissions from the insurance company, but the policy can be cancelled by the member at any time.

The earnings that eHealth reports to investors are based on the commissions that eHealth anticipates it will receive from insurance companies for each policy.  Prior to 2018, eHealth "recognized revenue equal to only the commission received (or to be received) for the year in which the applicant was approved" by the insurer.  *Id.* ¶¶ 28-29.  eHealth's revenue-recognition practices changed on January 1, 2018, when eHealth adopted a new accounting standard for recognizing revenue, Accounting Standard Codification 606 ("ASC 606"), pursuant to which eHealth recognized the entirety of the commissions it expected to receive over the expected life of the policy, which it estimated to be three years.

Plaintiff alleges that eHealth overstated its earnings during the Class Period.  Specifically, Plaintiff alleges that eHealth's officers made materially misleading statements regarding eHealth's expected earnings by concealing information about the costs it would need to incur to provide customer care to retain existing members.[2]  On earnings calls held on April 26, 2018, and February 20, 2020, Flanders and Yung made statements which "left investors with the false impression that the commissions" earned from health insurance companies "were free of associated costs," "depriv[ing investors] of the ability to adequately evaluate eHealth's profitability and assess the true risks associated with purchasing eHealth common stock."  *Id.* ¶¶ 76, 93.  These statements artificially inflated the price of eHealth stock by leading investors "to believe that eHealth had stronger earnings potential than it truly did."  *Id.* ¶ 46.  Defendants capitalized on the artificially inflated stock price, selling over $40 million of eHealth stock and receiving more than $15 million in equity compensation.

On April 8, 2020, research firm Muddy Waters Capital published a report stating that eHealth's "highly aggressive accounting masks [] a significantly unprofitable business,"

---

[2] While Plaintiff initially challenged a broader set of statements as false or misleading; the majority of those statements were dismissed by the Court on August 12, 2021.  *See* ECF No. 64.

1   overstating revenue and operating profit while understating a significant operating loss.  *Id.* ¶ 6.

2   The release of the Muddy Waters report resulted in a sharp decline in the price of eHealth's stock.

3   *Id.*  On July 23, 2020, eHealth announced its earnings results for the second quarter of 2020,

4   which "confirmed" various aspects of the Muddy Waters report.  *Id.* ¶¶ 64-65.  The company's

5   stock price fell again following release of these earnings results.

6       Plaintiff alleges that proposed class members were injured by Defendants' misleading

7   statements because class members purchased eHealth stock when its price was artificially inflated

8   and incurred losses when the market learned the truth about eHealth's financial condition.

9       On August 12, 2021, the Court granted in part Defendants' motion to dismiss.  ECF

10  No. 64.  Defendants now move for judgment on the pleadings.  ECF Nos. 117, 119.

## II.     JURISDICTION

12      The Court has jurisdiction under 28 U.S.C. § 1331.

## III.    LEGAL STANDARD

14      After the pleadings are closed—but early enough not to delay trial—a party may move for

15  judgment on the pleadings.  Fed. R. Civ. P. 12(c).  "Judgment on the pleadings is properly granted

16  when there is no issue of material fact in dispute, and the moving party is entitled to judgment as a

17  matter of law."  *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009).  For the purposes of a Rule

18  12(c) motion, courts "accept all factual allegations in the complaint as true and construe them in

19  the light most favorable to the non-moving party."  *Id.*  Courts must consider the "complaint in its

20  entirety," as well as "documents incorporated into the complaint by reference[] and matters of

21  which a court may take judicial notice."  *Webb v. Trader Joe's Co.*, 999 F.3d 1196, 1201 (9th Cir.

22  2021) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)).

23      "Securities fraud class actions must meet the higher, exacting pleading standards of

24  Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act"

25  ("PSLRA").  *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014).

26  Under Rule 9(b) and the PSLRA, a complaint must "state with particularity the circumstances

27  constituting fraud or mistake" and "state with particularity facts giving rise to a strong inference

28  that the defendant acted with the required state of mind" in making the false or misleading

United States District Court
Northern District of California

3

1    statements.  Fed. R. Civ. P. 9(b); 15 U.S.C. § 78u-4(b)(2)(A).  Granting judgment on the pleadings

2    is appropriate where a complaint fails to satisfy the pleading standards of the PSLRA.  *Heliotrope*

3    *Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 980 (9th Cir. 1999).

4    **IV.    INCORPORATION BY REFERENCE AND JUDICIAL NOTICE**

5             The eHealth Defendants request that the Court find incorporated by reference or judicially

6    notice transcripts of eHealth's April 26, 2018 and February 20, 2020 earnings calls; press releases

7    filed with the Securities and Exchange Commission ("SEC") on April 28, 2018, and February 20,

8    2020; 10-K forms filed with the SEC for the years ending December 31, 2017 and December 31,

9    2018; a 10-Q form filed with the SEC for the quarter ending September 30, 2019; and the April 8,

10   2020 Muddy Waters report.  ECF No. 118.  Plaintiff does not oppose this request.

11            **A.    Incorporation by Reference**

12            A document is properly incorporated by reference where the complaint "refers extensively

13   to the document or the document forms the basis of the plaintiff's claim."  *Khoja v. Orexigen*

14   *Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (quoting *United States v. Ritchie*, 342 F.3d

15   903, 907 (9th Cir. 2003)).  "For 'extensively' to mean anything . . . it should, ordinarily at least,

16   mean more than once."  *Id.* at 1003.  "[T]he mere mention of the existence of a document is

17   insufficient to incorporate [its] contents."  *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th

18   Cir. 2010).  Courts may assume the contents of incorporated documents are true, though not for

19   the sole purpose of disputing facts in a well-pleaded complaint.  *Khoja*, 899 F.3d at 1003.

20            The transcripts of the April 26, 2018 and February 20, 2020 earnings calls are properly

21   incorporated by reference because Plaintiff challenges statements made on those calls as

22   misleading, such that the calls form the basis of Plaintiff's claims.  The Muddy Waters report is

23   extensively referred to—and excerpted—in the amended complaint, such that it is properly

24   incorporated by reference.  The 10-Ks filed for 2017 and 2018 are also repeatedly referred to and

25   quoted in the complaint, such that they are properly incorporated by reference.

26            eHealth's press releases, however, are not incorporated by reference into the amended

27   complaint.  Defendants argue that the amended complaint refers extensively to the press releases,

28   citing two paragraphs which mention press releases.  ECF No. 46 ¶ 17 ("The Individual

United States District Court  
Northern District of California

1    Defendants . . . possessed the power and authority to control the contents of the Company's  . . .

2    press releases."); *id.* ¶ 148 ("[T]he market for eHealth common stock was an efficient market . . .

3    [because] eHealth . . . communicated . . . through regular disseminations of press releases.").  A

4    document is incorporated by reference if the complaint "refers extensively to *the document*."

5    *Khoja*, 899 F.3d at 1002 (emphasis added).  That a complaint includes two generic references to a

6    category of documents, without more, is insufficient to incorporate specific documents within that

7    category by reference.

8        **B.    Judicial Notice**

9        Courts may judicially notice an adjudicative fact if it is "not subject to reasonable dispute"

10   because it is "generally known" or "can be accurately and readily determined from sources whose

11   accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(1)-(2).  "Accordingly, '[a] court

12   may take judicial notice of matters of public record without converting a motion to dismiss into a

13   motion for summary judgment[,]'" "[b]ut a court cannot take judicial notice of disputed facts

14   contained in such public records."  *Khoja*, 899 F.3d at 999 (quoting *Lee v. City of Los Angeles*,

15   250 F.3d 668, 689 (9th Cir. 2001)).

16       Defendants request that this Court judicially notice the press releases and eHealth's 10-Q

17   for the fact that eHealth made specific public disclosures regarding operating expenses, customer

18   care expenses, and adherence to policies under ASC 606.  ECF No. 118 at 6.  The Court may take

19   judicial notice of these documents, which were filed publicly with the SEC, to determine what

20   representations eHealth made to the market.  *See In re Pivotal Sec. Litig.*, No. 19-cv-03589-CRB,

21   2020 WL 4193384, at *5 (N.D. Cal. July 21, 2020) (taking judicial notice of SEC filings to

22   determine what the defendant disclosed to the market).

23   **V.    DISCUSSION**

24       **A.    eHealth Defendants' Motion for Judgment on the Pleadings**

25           **1.    Section 10(b) and Rule 10b-5 Claims**

26       "To plead a claim under [S]ection 10(b) and Rule 10b-5, the Plaintiff must allege: (1) a

27   material misrepresentation or omission; (2) scienter; (3) a connection between the

28   misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic

United States District Court
Northern District of California

5

1    loss; and (6) loss causation." *Or. Pub. Emps. Ret.*, 774 F.3d at 603.  The eHealth Defendants

2    challenge the sufficiency of Plaintiff's allegations of material misrepresentations, scienter, and

3    loss causation.

### a.    Material Misrepresentation or Omission

5        For a statement to be actionable, it must be both false or misleading and material.  Plaintiff

6    challenges as misleading statements made by Flanders and Yung during earnings calls held on

7    April 26, 2018, and February 20, 2020.

8        The Q1 2018 earnings call held on April 26, 2018, included the following exchange:

> [Financial analyst:] So I wanted to walk through the commission receivables.  So if I look at the combination of your short and your long-term receivables, even relative to your enterprise value, it's basically equivalent.  So effectively that represents receivables that you will be ultimately -- you will be receiving cash for under that constrained assumption.  Are there any other real costs associated against that?
>
> …
>
> [Flanders:] No, the costs attached to each of the receivable balances have essentially been absorbed as we generate the revenue in any particular quarter.  *So as the cash comes in, there is no additional cost attached to that.  And the reason that those receivables are there is because there is no meaningful service component attached to them either.*  So according to our contracts with the carriers, these are all cash collection expectations that we have, both in the short term and long term.

19   ECF No. 46 ¶ 75.[3]  Plaintiff alleges that the challenged statements were misleading because they

20   "left investors with the false impression that the commission receivables reported by eHealth had

21   no associated costs."  *Id.* ¶ 76.  Plaintiff further avers that, "[c]ontrary to Flanders' statement,

22   eHealth has additional operating expenses that it must incur in order to retain customers and keep

23   them from cancelling their policies within the first year," *id.*, which included the cost of providing

24   "customer care service," *id.* ¶ 71.  These operating costs must be offset against any commissions

25   receivable.  *Id.* ¶¶ 30-33.

26       The Q4 2019 earnings call held on February 20, 2020, included the following exchange:

---

[3] Only the emphasized statements are challenged as misleading.

[Financial analyst:] Okay.  The final question would be, I know you highlighted the substantial growth in your commission receivable, both current and noncurrent.  Can you talk about—and I know you mentioned some of this in your prepared remarks, can you talk about the expense associated with that receivable?  Maybe the biggest piece would be the noncurrent.  Is there any expense associated with that?  Or is that pure, pure cash?

[Yung:] So the commission receivable represents the cash collections to be collected associated with the commissions that we earn from carriers for the policies that we help acquire customers for them on their behalf.  So once that's happened, and it's actually the reason why we recognize the revenue we do, our service obligation is completed, and therefore, we recognize the lifetime value of that.  *From an operating perspective,* other than reconciling the cash coming in and the cash that we should be being paid as a broker record, *there's no other cost associated.*

[Flanders:] There's no cost against it, Greg**.**  It's all—the costs have been expensed in period.  *And it's all cash to be collected free of additional charge.*

ECF No. 46 ¶ 91.  Plaintiff alleges that these statements were misleading because they created the false impression that eHealth did not have any operating expenses that would need to be offset against the commissions it received from insurers.  *Id.* ¶¶ 69-72, 92-93.  Plaintiff alleges that eHealth had to incur operational costs associated with those commissions, including retention-related customer care expenses.  *Id.* ¶¶ 30-31, 43.

The Court previously declined to dismiss these statements, holding that the allegations of the amended complaint were sufficient to raise the reasonable inference that a reasonable investor could have been misled into believing that eHealth did not have to incur any costs that had to be offset against the commissions it expected to receive from insurance companies.   ECF No. 64 at 15, 17.  Though Defendants argued operation expenses were irrelevant to recognition of revenue under ASC 606, the Court explained that nothing before it permitted the inference that these statements were made "in the context of the mechanics of revenue recognition under ASC 606."  *Id.* at 15, 17.  Though Defendants argued eHealth adequately disclosed its operational expenses in SEC filings throughout the Class Period, that "d[id] not mean that the statements at issue, which were made *during an earnings call* and without any reference to any SEC filings in which Defendants disclosed operational expenses, could not have created 'an impression of a state of affairs that differs in a material way from the one that actually exists.'"  *Id.* at 16 (emphasis in

7

1   original) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)); *see id.*

2   at 17 (rejecting Defendants' arguments "for the same reasons discussed above in connection with

3   the challenged statements made in the earnings call of April 26, 2018").

4         Defendants now move for judgment on the pleadings, arguing that the challenged

5   statements were not misleading as a matter of law.  In the Ninth Circuit, courts "apply the

6   objective standard of a 'reasonable investor' to determine whether a statement is misleading." *In*

7   *re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 699 (9th Cir. 2021).  "Section 10(b) and Rule 10b-5 . . .

8   require disclosure 'only when necessary "to make . . . statements made, in light of the

9   circumstances under which they were made, not misleading."'" *Id.* (quoting *Matrixx Initiatives,*

10   *Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)).  A statement is misleading "if it would give a

11   reasonable investor the 'impression of a state of affairs that differs in a material way from the one

12   that actually exists.'"  *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008)

13   (quoting *Brody*, 280 F.3d at 1006).

14         Defendants argue that the challenged statements were not misleading because, considered

15   in the context of the two earnings calls, the statements "were made from an accounting

16   perspective."  ECF No. 117 at 16-19.  The challenged statements from the Q1 2018 earnings call

17   were made during the unscripted question-and-answer portion of the call, in response to an

18   analyst's question about commission receivables.  ECF No. 117-1 at 15 ("So as the cash comes in,

19   there is no additional cost attached to that.  And the reason that those receivables are there is

20   because there is no meaningful service component attached to them either.").  Defendants suggest

21   that, because the prepared remarks delivered at the start of the call referenced the ASC 606

22   revenue recognition accounting standard and the analyst used the term "constrained assumption,"

23   the challenged statements concerned the mechanics of revenue recognition under ASC 606.  ECF

24   No. 117 at 18.  Defendants similarly argue that the challenged statements from the Q4 2019 call

25   were made in the context of revenue recognition under ASC 606, pointing to the speakers' use of

26   accounting terminology like "commission receivable," revenue recognition, service obligation,

27   and lifetime value.  *Id.*

28         The Court is not persuaded that the challenged statements were not misleading in context.

United States District Court
Northern District of California

8

The prior reference to ASC 606 during the Q1 2018 earnings call does not necessarily place the entire call within the context of that accounting standard; this was a quarterly earnings call, and the transcript reflects that many topics were discussed.  The reference to "constrained assumption" does not mandate the inference that the analyst's question was about corresponding cost accounts—rather than corresponding actual costs—and the Court cannot infer that a reasonable investor would necessarily understand it as such.  The language used by eHealth officers during the Q4 2019 earnings call similarly does not establish that a reasonable investor would not be misled by the officers' statements that "[f]rom an operating perspective . . . there's no other cost associated" with the commission receivable and that "it's all cash to be collected free of additional charge."  ECF No. 117-1 at 69.  Construing all reasonable inferences in Plaintiff's favor, as the Court must, the Court cannot conclude that the challenged statements made on the earnings calls were not misleading as a matter of law.

Defendants argue that any misleading statements were not material because Defendants disclosed the existence of customer care-related operational expenses during the relevant earnings calls and in SEC filings referenced on those calls.  Defendants are correct that both calls featured generic references to operating expenses, including customer care and enrollment costs.  But Defendants do not point to any reference to specific operating costs associated with retaining enrolled members—that is, any disclosure that establishes that the commission receivables had associated operating costs.  As the Court explained in its prior order, Plaintiff's allegations are sufficient to raise the reasonable inference that a reasonable investor could have been misled into believing that eHealth did not have to incur any costs that had to be offset against the commissions it expected to receive from insurance companies.  Nothing in the transcript of either call addresses that specific issue.  "Where . . . reasonable minds could differ as to the adequacy of . . . disclosure . . ., the question of whether that disclosure was adequate to render the challenged statements not misleading cannot be resolved as a matter of law."  *In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 940 (N.D. Cal. Mar. 21, 2022); *see also Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) ("[O]nly if the adequacy of the disclosure . . . is 'so obvious that reasonable minds could not differ' are these issues 'appropriately resolved as a matter of law.'" (quoting *Durning v. First Bos.*

1   *Corp.*, 815 F.2d 1265, 1268 (9th Cir. 1987)).  Because the adequacy of the disclosures Defendants

2   identify is not obvious, such adequacy cannot be resolved as a matter of law.

3         Defendants' argument concerning disclosure in SEC filings generally referenced during

4   both calls fails for the same reasons.  On each call, investors were referred to documents,

5   including press releases, filed with the SEC that day.  But Defendants identify nothing in those

6   SEC filings which specifically addresses the existence of post-enrollment, retention-related

7   operating costs, such that reasonable minds could not differ as to the adequacy of such disclosure.

8   As such, the adequacy of these disclosures cannot be resolved as a matter of law.

9         Finally, Defendants argue that Plaintiff fails to sufficiently plead materiality.  A misleading

10  statement is only actionable if it is also material, meaning there is a "substantial likelihood that the

11  disclosure of the omitted fact would have been viewed by the reasonable investor as having

12  significantly altered the 'total mix' of information made available."  *TSC Indus., Inc. v. Northway,*

13  *Inc.*, 426 U.S. 438, 449 (1976).  "The inquiry into materiality is 'fact-specific.'"  *Alphabet*, 1 F.

14  4th at 700 (quoting *Matrixx*, 563 U.S. at 43).  As such, "resolving materiality as a matter of law is

15  generally appropriate 'only if . . . the materiality of the statement is so obvious that reasonable

16  minds could not differ.'"  *Id.* (quoting *Fecht*, 70 F.3d at 1081).

17        Where a reasonable investor believes there to be no additional costs associated with certain

18  revenue—that it is, as Defendants stated, "cash to be collected free of additional charge," ECF

19  No. 117-1 at 69—it is reasonable to infer that the fact that additional costs *must* be incurred to

20  ensure receipt of that revenue would be viewed by a reasonable investor as significantly altering

21  the total mix of available information.  Plaintiff's allegations, taken as true, raise the reasonable

22  inference that such investor would view disclosure of the fact that there *were* post-enrollment

23  expenses associated with the commission as significantly altering the total mix of information

24  available.  Taking the facts alleged in the complaint as true and construing all reasonable

25  inferences Plaintiff's favor, Plaintiff has sufficiently alleged the materiality of the challenged

26  statements.

27  / / /

28  / / /

United States District Court
Northern District of California

### b.    Scienter

Defendant argues that Plaintiff fails to sufficiently plead scienter.  To establish scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  The required state of mind is "a mental state that not only covers 'intent to deceive, manipulate, or defraud,' but also 'deliberate recklessness[.]'"  *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016) (internal citation omitted).  Deliberate recklessness is "'an extreme departure from the standards of ordinary care,' which 'presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'"  *Alphabet*, 1 F. 4th at 701 (emphasis omitted) (quoting *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020)).  "Facts showing mere recklessness or a motive to commit fraud and opportunity to do so provide some reasonable inference of intent, but are not sufficient to establish a strong inference of deliberate recklessness."  *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012).

The "strong inference" required by the PSLRA "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations."  *Tellabs*, 551 U.S. at 324.  "A court must compare the malicious and innocent references cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference."  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009).  In evaluating whether a complaint satisfies the "strong inference" requirement, courts must consider the allegations and other relevant material "holistically," not "scrutinized in isolation."  *VeriFone*, 704 F.3d at 701-02.

The Court previously held that Plaintiff's allegations, "considered holistically, raise the reasonable inference that individual Defendants acted with at least deliberate recklessness when making the April 26, 2018[] and February 20, 2020[] challenged statements, which . . . created the false impression that eHealth did not have operational expended that [would] need[] to be offset against its commissions receivable."  ECF No. 64 at 19.  The Court found that, "[b]ecause of the magnitude of the operational expenses at issue, the amended complaint raises the inference that

11

the individual Defendants, who allegedly participated in eHealth's management and operations at the highest level by virtue of being the company's CEO, CFO, and COO, were aware of them and the importance of disclosing them to investors," and that their "failure to mention or acknowledge operational expenses [associated with post-enrollment retention] when making the challenged statements created an obvious danger of misleading investors." *Id.* at 19-20.  The Court further noted that additional allegations, including those concerning Defendants' compensation-related motive to inflate eHealth's stock price, supported a finding of scienter. *Id.* at 20 n.5.

For the reasons outlined in its prior order, the Court again concludes that Plaintiff's allegations, considered holistically, raise a strong inference of deliberate recklessness.  While Defendants argue that the "far more plausible inference is that Defendants honestly believed they were discussing such expenses from the accounting perspective of ASC 606," ECF No. 117 at 21, the Court finds that, considered as a whole, Plaintiff's allegations raise a strong inference of deliberate recklessness that is "at least as compelling" as any "opposing innocent inference." *Zucco*, 552 F.3d at 991.  Taking Plaintiff's allegations as true, it is implausible that Defendants did not know that there were post-enrollment retention costs associated with the commissions receivable or were unaware that describing such commissions as "all cash to be collected free of additional charge," with "no other cost associated" and "no meaningful service component attached" created an obvious danger of misleading investors.  ECF No. 46 ¶¶ 75, 91.

Plaintiff sufficiently pleads scienter as to the remaining challenged statements.

### c.   Loss Causation

Defendant argues that Plaintiff fails to sufficiently plead loss causation.  To establish loss causation, the plaintiff must prove "that the act or omission of the defendant alleged to violate th[e] [Exchange Act] caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4).  "Because loss causation is simply a variant of proximate cause, the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) (internal citation omitted).  "[T]o prove loss causation by relying on one or more corrective disclosures, a plaintiff must show that (1) a corrective disclosure revealed, in whole or in part, the truth concealed by the

defendant's misstatements; and (2) disclosure of the truth caused the company's stock price to decline and the inflation attributable to the misstatements to dissipate." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 791 (9th Cir. 2020). "At the pleading stage, the plaintiff's task is to allege with particularity facts 'plausibly suggesting' that both showings can be made." *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 557 (2007)).

Plaintiff alleges that the challenged statements artificially inflated the price of eHealth stock, which dropped after two corrective disclosures revealed the truth of the company's financial situation. First, following the April 8, 2020 publication of the Muddy Waters Capital report, the stock price dropped from $136.32 to $103.20 per share. ECF No. 46 ¶¶ 6, 48, 57. Second, after eHealth announced its Q2 2020 earnings results, the stock price dropped further, to $79.17 per share. *Id.* ¶ 7.

Defendants argue that the Muddy Waters report cannot constitute a corrective disclosure, citing *BofI*, 977 F.3d at 797. In *BofI*, the Ninth Circuit outlined "a flexible approach to evaluating corrective disclosures," under which courts ask whether, "[b]ased on plaintiffs' particularized allegations, [they] can [] plausibly infer that the alleged corrective disclosure provided new information to the market that was not yet reflected in the company's stock price." *Id.* at 795. Factors to consider include whether the underlying data was publicly available, the complexity of the data and its relationship to the alleged misstatements, and the great effort needed to locate and analyze it. *Id.* Applying this approach, the Ninth Circuit concluded that shareholders had not plausibly alleged that blog posts based on publicly available information constituted corrective disclosures because "the posts were authored by anonymous short-sellers who had a financial incentive to convince others to sell, and the posts included disclaimers from the authors," such that "[a] reasonable investor . . . would likely have taken their contents with a healthy grain of salt." *Id.* at 797; *see also Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1208 (9th Cir. 2020) (holding that article could not constitute corrective disclosure where it was written by an anonymous short-seller, was based on publicly available information, did not require expertise beyond that of a typical market participant, and included a disclaimer about its accuracy and completeness); *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 840 (9th Cir. 2022) (holding that report could not

United States District Court
Northern District of California

1   constitute corrective disclosure where it was written by anonymous short-sellers who disclaimed

2   the accuracy or completeness of the information provided).  "*BofI* underscored the high bar that

3   plaintiffs must meet in relying on self-interested and anonymous short-sellers." *Nektar*, 34 F.4th

4   at 839.

5          The Muddy Waters report is not a corrective disclosure under *BofI* and related cases.

6   Muddy Waters is a short-seller with a financial incentive to convince others to sell:  the first page

7   of the Muddy Waters report warns readers that they "should assume that . . . [Muddy Waters] ha[s]

8   a short position in one or more of the securities of a Covered Issuer . . . and therefore stand[s] to

9   realize significant gains in the event that the prices of either equity or debt securities of a Covered

10  Issuer decline or appreciate."  ECF No. 117-1 at 114.  The report warns that all information "is

11  presented 'as is,' without warranty of any kind, whether express or implied," and that Muddy

12  Waters "makes no representation, express or implied, as to the accuracy, timeliness, or

13  completeness of any such information."  *Id.*  The report has no identified author and appears to

14  contain only public information.  In light of *BofI* and related cases, Plaintiff fails to plausibly

15  allege that the Muddy Waters report constitutes a corrective disclosure.

16         Defendant further argues that Plaintiff fails to allege that the Q2 2020 earnings results

17  announcement revealed the allegedly concealed post-enrollment customer care costs associated

18  with retention.  Plaintiff alleges that the Muddy Waters report disclosed that eHealth "pretends

19  that ongoing service needs, which carry real costs, do not exist," ECF No. 36 ¶ 57, and that the Q2

20  2020 earnings results "confirmed these concerns," *id.* ¶ 64.  Plaintiff alleges that, on the Q2 2020

21  earnings call, Flanders stated that eHealth was "making a strategic decision to increase [its] focus

22  on member retention and recapture."  *Id.* ¶ 64.  None of Plaintiff's remaining allegations about the

23  Q2 2020 earnings results address post-enrollment customer care costs.

24         Plaintiff does not sufficiently allege that the Q2 2020 earnings results constitute a

25  corrective disclosure because Plaintiff does not allege that those results "revealed, in whole or in

26  part, the truth concealed by the defendant's misstatements."  *BofI*, 977 F.3d at 791.  Taken as true,

27  the facts alleged in the complaint do not support a reasonable inference that the Q2 2020 earnings

28  results revealed that eHealth had concealed post-enrollment, retention-related customer care costs.

United States District Court
Northern District of California

1    And Flanders's statement is not plausibly understood as an admission of past concealment of

2    retention-related costs, but rather as a forward-looking statement of intent to increase spending on

3    retention.

4            Because Plaintiff fails to sufficiently plead loss causation, Plaintiff's Section 10(b) claims

5    against the eHealth Defendants must be dismissed.

6                        **2.        Section 20(a) Claims**

7            Because Plaintiff fails to plead a predicate violation of securities law, Plaintiff's Section

8    20(a) claims against the eHealth Defendants necessarily fail.  *In re NVIDIA Corp. Sec. Litig.*, 768

9    F.3d 1046, 1052 (9th Cir. 2014) ( "To establish a cause of action under [Section 20(a)], a plaintiff

10   must first prove a primary violation of underlying federal securities laws, such as Section 10(b) or

11   Rule 10b-5, and then show that the defendant exercised actual power over the primary violator.").

12                        **3.        Leave to Amend**

13          Plaintiff requests leave to amend, which Defendants do not oppose.  "[A]lthough Rule

14   12(c) does not mention leave to amend, courts have discretion both to grant a Rule 12(c) motion

15   with leave to amend, and to simply grant dismissal of the action instead of entry of judgment."

16   *Sarmiento v. Sealy*, 367 F. Supp. 3d 1131, 1139 (N.D. Cal. 2019) (quoting *Lonberg v. City of*

17   *Riverside*, 300 F. Supp. 2d 942, 945 (C.D. Cal. 2004)).  "[A] district court should grant leave to

18   amend even if no request to amend the pleading was made, unless it determines that the pleading

19   could not possibly be cured by the allegation of other facts."  *Doe v. United States*, 58 F.3d 494,

20   497 (9th Cir. 1995) (quoting *Cook, Perkiss & Liehe v. N. Cal. Collection Serv.*, 911 F.2d 242, 247

21   (9th Cir. 1990)); *see Harris v. Cnty. of Orange*, 682 F.3d 1126, 1131-34 (9th Cir. 2012) (affirming

22   dismissal under Rule 12(c) but reversing for failure to grant leave to amend).

23          Plaintiff's Section 10(b) claims against the eHealth Defendants must be dismissed for

24   failure to sufficiently plead loss causation.  Plaintiff's Section 20(a) claims against these

25   Defendants must be dismissed for failure to establish predicate securities violations.  Because the

26   allegation of additional facts could cure Plaintiff's failure to establish loss causation, the Court

27   will grant leave to amend Plaintiff's Section 10(b) and 20(a) claims against eHealth, Yung, and

28   Flanders.

United States District Court
Northern District of California

15

1      **B.      Francis's Motion for Judgment on the Pleadings**

2           Francis moves for judgment on the pleadings, arguing that Plaintiff's claims against him

3      fail as a matter of law.

4                    **1.      Section 10(b) and Rule 10b-5 Claim**

5           Francis argues that Plaintiff cannot state a Section 10(b) claim against him because he did

6      not make any of the remaining statements.  In the securities context, "the maker of a statement is

7      the person or entity with ultimate authority over the statement, including its content and whether

8      and how to communicate it."  *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142

9      (2011).  "One 'makes' a statement by stating it. . . .  Even when a speechwriter drafts a speech, the

10     content is entirely within the control of the person who delivers it.  And it is the speaker who takes

11     credit—or blame—for what is ultimately said."  *Id.* at 142-43.

12          The allegedly misleading statements were delivered aloud by Flanders and Yung during

13     the question-and-answer portions of two earnings calls.  These were not remarks prepared in

14     advance, but rather extemporaneous responses to analysts' questions.  Francis did not deliver any

15     of the challenged statements, and therefore is not liable for making these statements.  *See City of

16     Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 800 F. Supp. 2d 1045, 1071 (N.D. Cal. 2012)

17     (dismissing claims based on misleading statements of other defendants on analyst or investor

18     calls); *In re Coinstar Inc. Sec. Litig.*, No. C11-133 MJP, 2011 WL 4712206, at *10 (W.D. Wash.

19     Oct. 6, 2011) (dismissing claims based on misleading statements of other executives at

20     conferences).

21          Plaintiff argues that there is a dispute of fact about whether Francis had "'ultimate

22     authority' over the Company's message about its operating costs."  ECF No. 125 at 15.  Plaintiff

23     alleges that Francis controlled the contents of SEC filings, press releases, and other publicly

24     available documents, ECF No. 46 ¶ 17, and suggests that Francis was in a position to inform the

25     market about the allegedly concealed post-enrollment retention costs.  However, given the nature

26     of the remaining challenged statements in this case, Francis cannot have had "ultimate authority"

27     over them.  As the Supreme Court explained, regardless of who drafts the message, the speaker

28     retains ultimate authority over the spoken statement, because they control the actual content of the

statement and whether and how their message is communicated.  *Janus*, 564 U.S. at 142-43.

Under *Janus*, Francis cannot have exercised ultimate authority over the extemporaneous oral

statements of other corporate officers.

Because Francis did not "make" the remaining challenged statements under *Janus*, the

Section 10(b) claims against him based on these statements must be dismissed.

### 2.    Section 20(a) Claim

Absent a predicate violation of securities law, Plaintiff's Section 20(a) claim against

Francis also fails.  *NVIDIA*, 768 F.3d at 1052.[4]

### 3.    Leave to Amend

"Dismissal without leave to amend is appropriate only when the Court is satisfied that an

amendment could not cure the deficiency."  *Harris*, 682 F.3d at 1135.  Because Plaintiff's Section

10(b) claim against Francis cannot be cured by allegation of additional facts, and Plaintiff cannot

plead a Section 20(a) claim against Francis in the absence of a predicate securities violation, the

Court denies leave to amend these claims.

## CONCLUSION

Plaintiff's claims against eHealth, Yung, and Flanders are dismissed with leave to amend.

Leave to amend is granted solely to cure the deficiencies identified above.  Any amended

complaint shall be filed within 28 days of this order.

Plaintiff's claims against Francis are dismissed with prejudice.

**IT IS SO ORDERED.**

Dated: September 28, 2023

_____
JON S. TIGAR
United States District Judge

United States District Court
Northern District of California

---

[4] Because Plaintiff fails to sufficiently plead a primary violation, the Court does not reach Francis's argument concerning actual power.